# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

IN RE EXPRESS SCRIPTS/ANTHEM
ERISA LITIGATION

Case No. 1:16-CV-03399-ER

**SECOND AMENDED
CONSOLIDATED CLASS ACTION
COMPLAINT**

Plaintiffs, by and through the undersigned attorneys, bring this action on behalf of themselves and all others similarly situated against Defendant Express Scripts, Inc., including its subsidiary companies as more specifically defined in Paragraphs 101 and 102 as "Express Scripts" or "ESI"), Defendant Anthem, Inc., a health benefit company, including its operational divisions and subsidiaries as more specifically defined in Paragraphs 105 and 106 as "Anthem" and DOES 1 through 10. Except as to the allegations of Plaintiffs' experiences, which are based on personal knowledge, all other allegations are based on information and belief and are formed based on an inquiry reasonable under the circumstances. Such allegations are likely to have evidentiary support after a reasonable opportunity for further investigation and discovery.[1]

---

[1] Certain allegations herein are based upon the allegations of the complaint filed by Anthem in *Anthem v. Express Scripts, Inc.*, No. 1:16-cv-02048, and certain other allegations are based upon the allegations of Express Scripts' Answer and Counterclaims in that same action. To the extent there are any inconsistencies between such allegations, Plaintiffs reserve the right to amend this Complaint to conform to the evidence once it becomes clear which of the conflicting allegations, Anthem's or Express Scripts', are correct after a reasonable opportunity for further investigation and discovery. Regardless of which version of events is proven true, Plaintiffs and the Classes were overcharged for, overpaid, and continue to overpay for prescription medications.

## I.      INTRODUCTION

1.      This action seeks restitution, surcharge and/or other forms of relief for losses suffered by Plaintiffs and the Classes, who overpaid and continue to overpay for prescription medications.

2.      Plaintiffs and the Classes they seek to represent comprise two groups of victims of Defendants' conduct: the Subscriber Class and a subclass within that group, and the Plan Class. Both groups have been subjected to inflated and excessive prescription medication prices, as described below, as a result of the same improper and illegal conduct by Defendants. Unless otherwise indicated, references to "Plaintiffs" shall include both the Subscriber Plaintiffs and Plan Plaintiffs. Unless otherwise indicated, references to "Class members" or "Classes" shall include both the Subscriber Class members and the Plan Class members.

3.      The Subscriber Plaintiffs are enrolled in health care plans insured or administered by Anthem, Inc. or its subsidiary companies ("Anthem Health Care Plans" or "Anthem Plans"). The Anthem Health Care Plans include Employee Welfare Benefit Plans as that term is defined in 29 U.S.C. § 1002(1)(A) ("ERISA plans") and health care plans that are not ERISA plans ("Non-ERISA plans"), including individual and family health care plans offered directly by Anthem or on an insurance exchange pursuant to the applicable provisions of the Affordable Care Act ("ACA plans"). Anthem offers individual ACA plans, Administrative Services Only ("ASO") plans to self-funded employers, fully-insured plans to employer groups, families and individuals, Medicare Advantage plans, Medicare Part D prescription benefit plans, and Medicaid managed care plans.

4.      At all relevant times, the Subscriber Plaintiffs and Subscriber Class members' responsibility for the cost of certain prescription medications under their ERISA and non-ERISA plans had been to pay percentage based co-insurance amounts, which are payments directly

derived from the prices Express Scripts sets and/or charges Anthem for those prescription medications, and that Anthem in turn authorizes, approves or allows Express Scripts to charge. As a result of the acts and omissions of Express Scripts and Anthem, as described below, Subscriber Class members have paid more in terms of inflated prescription medication prices than they should have had to pay as members of Anthem Health Care Plans.[2]

5. The Plan Plaintiffs, as defined below, are fiduciaries of ERISA plans. Like the Subscriber Plaintiffs, their ERISA Plans have been subject to excessive pricing for prescription medications ordered by the participants and beneficiaries in their ERISA plans.

6. The Subscriber Plaintiffs and Plan Plaintiffs are collectively referred to herein as "Plaintiffs." The Anthem Plans and the plans for which the Plan Class members are fiduciaries, all of which are administered or provided by Anthem and where Express Scripts provides PBM services as described in detail below, are collectively referred to herein as the "Plans."

7. Plaintiff Stamford Health, Inc., formerly known as Stamford Health System, Inc., is a fiduciary of an Employee Welfare Benefit Plan (the "Stamford Plan") as that term is defined under 29 U.S.C. § 1002(1)(A). Plaintiff Stamford Health, Inc. and the Stamford Plan will be referred to herein as "Stamford" unless otherwise indicated. Plaintiff Brothers Trading Co., Inc. ("Brothers Trading") is a fiduciary of an Employee Welfare Benefit Plan (the "Brothers Trading Plan") as that term is defined under 29 U.S.C. § 1002(1)(A). Plaintiff Brothers Trading Co., Inc. and the Brothers Trading Employee Welfare Benefit Plan will be referred to as "Brothers

---

[2] While the terms are similar, "co-insurance" and "copay" refer to different healthcare cost-sharing structures. "Co-insurance" refers to the percentage share of healthcare costs that enrollees pay, including where an enrollee is responsible for a percentage or full share up to a specified ceiling such as an annual deductible or for an individual prescription, while a "copay" is a flat fee that enrollees pay toward such healthcare costs that is independent of the overall cost. Thus, where enrollees pay a percentage of the costs of prescription medications, they are paying percentage based co-insurance rather than a copay.

Trading" unless otherwise indicated. Collectively, Stamford and Brothers Trading are referred to as the "Plan Plaintiffs."

8.     Plaintiffs Stamford and Brothers Trading bring this action as fiduciaries of the Stamford Plan and the Brothers Trading Employee Health Plan, and on behalf of the Stamford Plan and the Brothers Trading Employee Health Plan pursuant to ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2).

9.     The Stamford Plan and Brothers Trading Plan are both self-funded plans. Anthem administers certain healthcare benefits of the Stamford Plan and the Brothers Trading Plan, including prescription medication benefits, pursuant to ASO agreements that give Anthem the discretion to choose a pharmacy benefit manager; i.e., Express Scripts. Accordingly, Stamford, Brothers Trading, and the Plan Class are "customers" of Anthem. The same arrangement applies to a significant number of self-funded Anthem Plans throughout the country, as estimates suggest that currently three in five United States companies offer self-funded plans to their employees. As self-funded plans, the Stamford, and Brothers Trading contribute to and help pay the cost of prescription medication benefits for their Plan's members, subject to any applicable co-pay or co-insurance to be paid by their members. They are directly impacted by inflated and excessive prescription medication charges caused by Defendants' conduct.

10.     Defendant Anthem is one of the nation's leading health benefits companies. According to Anthem's most recent 10-K, Anthem has approximately 23,666,000 members in self-funded plans and approximately 14,933,000 in fully-insured plans. Therefore, ASO plans account for more than sixty percent (60%) of Anthem's business. Anthem generates billions of dollars in fees each year from ASO contracts.

11.     Defendant Express Scripts provides pharmacy benefit management ("PBM") services, including network-pharmacy claims processing, mail order delivery pharmacy services, specialty pharmacy benefit management, benefit-design consultation, drug-utilization review, formulary management, contracting with pharmaceutical manufacturers, and medical and drug data analysis services to manage prescription drug plans for a wide variety of health insurers, self-funded employers, the public sector, and government entity clients. According to Express Scripts, it supports Anthem's business operations in over 24 states, on behalf of more than 15 million individual members.

12.     In December 2009, Anthem contracted with Express Scripts to provide exclusive pharmacy benefits for Anthem plans for 10 years, which collectively included ERISA plans, non-ERISA plans, and ACA plans.[3] Through the PBM Agreement, Express Scripts—by agreement with Anthem and subject to Anthem's periodic review and negotiation—has influenced the prices for prescription medications that Plaintiffs and Class members have paid and/or continue to pay, as well as the prices upon which the Subscriber Plaintiffs and Subscriber Class members had their co-insurance payments calculated. The prescription medication benefits of Stamford, Brothers Trading, and the Plans represented by the Plan Class members, and the prescription medication benefits of the Subscriber Plaintiffs and the Subscriber Class under their

---

[3] For purposes of this Complaint, the "PBM Agreement" is the Pharmacy Benefit Management Services Agreement entered into as of December 1, 2009 and the Amended Restated Pharmacy Benefit Management Services Agreement, dated as of January 1, 2012, by and between Anthem (formerly known as WellPoint, Inc.) on behalf of itself and its designated affiliates, and Express Scripts, on behalf of itself and its subsidiaries and designated affiliates. A copy of the amended PBM Agreement is on file with this Court in *Anthem v. Express Scripts, Inc.*, No. 1:16-cv-02048 referenced herein, but is currently not a matter of public record. The original December 2009 agreement can be accessed in redacted form at: https://www.sec.gov/Archives/edgar/data/885721/000095012310016370/c54821exv10w30.htm. Both are incorporated by reference rather than attached hereto in order to make them part of this pleading. A non-redacted version of the PBM Agreement has yet to be produced in this litigation.

Anthem plans have thus been administered, at least in part, by Defendant Express Scripts for all Anthem Health Care Plans subject to the PBM Agreement.[4]

13.     The PBM Agreement requires Express Scripts to provide prescription medications at "competitive benchmark pricing" levels. Section 5.6 of the PBM Agreement states that Anthem has the right to periodically conduct a market analysis to ensure both it and its customers are receiving "competitive benchmark pricing" as that term is used in the PBM Agreement, and Express Scripts must negotiate in good faith over such pricing.

14.     Anthem and Express Scripts currently are engaged in litigation over the meaning of the PBM Agreement and the meaning of the term "competitive benchmark pricing." Anthem alleges Express Scripts breached this contractual provision by refusing to engage in negotiations in good faith, or at all, and by charging both Anthem and its customers prices in excess of competitive benchmark pricing for prescription medications. Indeed, Anthem alleges both it and its members will be overcharged by more than $15 billion over the remaining term of the PBM Agreement.

15.     Express Scripts, on the other hand, alleges that the PBM Agreement allows it to set prescription medication prices at levels that exceed what Anthem contends are appropriate and consistent with the terms of the PBM Agreement. According to Express Scripts, it negotiated the PBM Agreement in connection with parallel negotiations over Express Scripts' purchase of Anthem's pharmacy benefit business, NextRx. Express Scripts agreed to purchase NextRx for $4.675 billion, and Anthem agreed that Express Scripts would be the exclusive PBM provider for Anthem plans for a 10-year period, pursuant to the terms of the simultaneously negotiated PBM

---

[4] Given that members of the Plan Class would bring suit solely on behalf of the plans of which they are fiduciaries, in the balance of this pleading, when discussing Defendants' conduct and the harm suffered thereby, the term "Plan Class" refers to the Plans themselves.

6

Agreement. In addition, according to Express Scripts, the PBM Agreement by using the term

"competitive benchmark prices" effectively authorized Express Scripts to charge prices in excess

of those that would normally be charged by Express Scripts or other PBMs in the market during

the 10-year term of the PBM Agreement.

16.     Express Scripts contends that it offered to pay Anthem less money for NextRx

and in exchange would charge lower prices for prescription medications, but that Anthem

declined this offer.

17.     Whichever allegation is correct, Plaintiffs and the Class members have been

forced to pay inflated prices for prescription medications through inflated co-insurance charges

for Subscribers, and increased prescription medication costs for Plans.

18.     The term "competitive benchmark pricing" used in the PBM Agreement is not a

standard term within the PBM industry. Whether Anthem's or Express Scripts' interpretation of

the term is accepted, the result for Class members is inflated and excessive prices for prescription

medications as compared to solely referring to prices that result from utilizing standard industry

pricing metrics such as AWP ("Average Wholesale Price") less a certain percentage, MAC

("Maximum Allowable Cost"), WAC ("Wholesale Acquisition Cost"), or other similar measures

generally used in the industry for calculating prescription medication pricing.

19.     As Anthem acknowledges in its lawsuit against Express Scripts, because Anthem

insureds are not paying "competitive benchmark pricing" levels for prescription medications,

members "are paying inflated prices to ESI." *See Anthem v. Express Scripts, Inc.*, No. 1:16-cv-

02048, Complaint at ¶ 46. Anthem further admits that this "excessive pricing is harming Anthem

and *its customers.*" *Id.*, ¶ 42 (emphasis added). Anthem does not absorb pricing overages above

this "competitive benchmark pricing" measure, however calculated. Instead, Anthem passes

these inflated and excessive prices through to Plans and Plan members, either in the form of

required payments or co-insurance charges.

20.     The pricing data utilized during the relevant time period are retained by

Defendants or their consultants, including Health Strategy, LLC, and have not been provided to

Plaintiffs at this point such that a calculation of the amount of overcharges imposed upon

Plaintiffs can be pled with specificity. This is despite Plaintiffs' repeated and diligent attempts to

obtain this information. However, in light of Anthem's own allegation that Express Scripts has

overcharged Anthem and its customers by over $15 billion by exceeding "competitive

benchmark pricing" (*Id.*, ¶ 46) and its passing on of such charges to Plaintiffs and Class

members, and Plaintiffs' own experience with inflated and excessive prescription medication

prices as set forth below, Express Scripts and Anthem's conduct has caused them and the Class

members  to spend substantially more on prescription medications than they would be required to

pay if Defendants provided such medications  at prices pursuant to Anthem's interpretation of

the PBM Agreement. Plaintiffs and Class members have also been charged inflated pricing for

prescription medications as a result of Anthem's agreement to use a term in the PBM Agreement

that permitted Express Scripts to exploit that agreement and charge inflated prescription

medication prices calculated by using measures inconsistent with the industry standard metrics

generally used to establish prescription medication costs to Plaintiffs and Class members. The

use of the term "inflated prices" or "excessive prices" as used throughout this Complaint refers

to both of these measures.

21.     This action seeks restitution, surcharge, and/or other forms of relief for losses

suffered by the Plan Plaintiffs and the Plan Class who have paid and who continue to pay

inflated prices for prescription medications, and seeks disgorgement of profits. This action also

seeks restitution, surcharge, and/or other forms of relief for losses suffered by the Subscriber

Plaintiffs and the Subscriber Class, who were compelled to overpay and continue to pay inflated

prices for the co-insurance portion of the prescription medication costs they were and are

responsible for paying as Anthem plan participants, as described above and throughout this

Complaint, and seeks disgorgement of profits.

22.     Defendants Anthem and Express Scripts, both of which are fiduciaries of the

Plans, have duties to act prudently and in the best interests of the Plans represented by the Plan

Class members and the Subscriber Class members who are Anthem ERISA plan participants, and

to avoid transactions tainted by conflicts of interest and self-dealing.

23.     When, through the exercise of its discretion to set pricing for prescription

medications, Express Scripts made the decision to charge the ERISA plans and non-ERISA

plans—and therefore, Plaintiffs and the Classes—inflated prices for prescription medications

during all or part of the Class Period, it violated its fiduciary duties to Plaintiffs and the Classes.

24.     Express Scripts has also breached its fiduciary duties under ERISA by failing to

act with undivided loyalty to the plans it helps to administer for Anthem and to Anthem plan

participants. In administering ERISA plan participants' prescription medication benefits, Express

Scripts owes a duty to act solely for the benefit of Plaintiffs and the members of the Classes.

However, Express Scripts has put its own interests above Plaintiffs and the Classes' interests by,

as alleged by Anthem, subjecting Plaintiffs and members of the Classes to excessive prices for

prescription medications. Express Scripts sought to, and did, obtain a massive windfall and

increase its own profits. In doing so, it unjustly enriched itself at the expense of Plaintiffs and

members of the Classes by collecting greater amounts from Plaintiffs and members of the

Classes than permitted under its contractual, legal, and fiduciary obligations. Express Scripts has

no right to obtain—and Plaintiffs and members of the Classes have no obligation to pay—excessive prices for prescription medications under the terms of the PBM Agreement and the Anthem plans.

25.    Anthem also breached its fiduciary duties to the Plan Plaintiffs, to Plan Class members, to Subscriber Plaintiffs and to Subscriber Class members in Anthem ERISA plans. As it appears to concede at least in part, Anthem failed to monitor adequately Express Scripts' pricing under the terms of the PBM Agreement during some or all of the relevant time period. As a result, Plaintiffs and members of the Classes have been charged excessive prices for prescription medications, to the detriment of Plaintiffs and the members of the Classes.

26.    Further, if Express Scripts' allegations are correct, Anthem breached its fiduciary duties to these Class members by trading off the best interests of the plans Anthem administers as well as the best interests of Anthem insureds for its own pecuniary interest. According to Express Scripts, Anthem could have obtained Express Scripts' commitment to charge lower prices for prescription medications than purportedly allowed by the PBM Agreement. Instead, Anthem negotiated a deal by which Anthem received more money for NextRx ($4.675 billion in total), and in exchange agreed to subject Anthem plans and plan participants to higher prices for prescription medications. This allowed Express Scripts to shift the higher cost of the acquisition of NextRx to self-funded plans and Anthem's insureds through their payment of higher prices for prescription medications. If such allegation is true, this conduct would constitute, among other things, a breach of fiduciary duty and a prohibited transaction under ERISA.

27.    As a result of Defendants' conduct, the Plans on whose behalf the Plan Plaintiffs have brought suit, the Plans represented by members of the Plan Class (defined below), the Subscriber Plaintiffs, and Subscriber Class members who are members of the Subscriber ERISA

Class (defined below) have suffered losses. Defendants have similarly been unjustly enriched. Thus, relief available under ERISA § 409, 29 U.S.C. § 1109, as well as appropriate equitable relief under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), including surcharge, restitution, and disgorgement of profits is available to remedy Defendants' breaches of fiduciary duty.

28.     The Plan Plaintiffs bring claims against both Express Scripts and Anthem under ERISA §§ 502(a)(2) and 502(a)(3), 29 U.S.C. §§ 1132(a)(2) and 1132(a)(3), on behalf of the Plan Class. The Subscriber Plaintiffs (except John Doe One and Brian Corrigan) also bring claims against both Express Scripts and Anthem under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), on behalf of all members of the Subscriber Class who are participants in ERISA plans for which Anthem provides a prescription medication benefit.

29.     Express Scripts has also breached its contractual obligations, whether express or implied by law, was unjustly enriched by its unlawful conduct, engaged in unfair and deceptive trade acts and practices, and profited through a pattern of racketeering activity by sending false and misleading bills, Explanations of Benefit, invoices and electronic statements and by making false and misleading communications to the Subscriber Plaintiffs and Subscriber Class members, in violation of the Racketeer Influenced Corrupt Organizations Act ("RICO"), and in violation of state law as to those plan participants that are members of non-ERISA plans, as detailed below. In addition, by charging Anthem plan members who obtain prescription medications to treat qualified disabilities pricing that disproportionately impacted them, Express Scripts violated the Anti-Discrimination provisions of the Affordable Care Act ("ACA").

30.     Plaintiffs therefore bring this action on behalf of themselves and all others similarly situated as described in this Complaint to obtain appropriate equitable relief or

damages, as well as declaratory and injunctive relief, and any other relief as permitted and appropriate for the particular cause of action asserted herein.

## II.     JURISDICTION AND VENUE

31.     The Court has subject matter jurisdiction over this action based on diversity of citizenship under the Class Action Fairness Act and 28 U.S.C. § 1332(d). The Court also has federal question subject matter jurisdiction arising out of the claims asserted herein with regard to the ERISA claims pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e), under the provisions of RICO pursuant to 28 U.S.C. § 1331 and 18 U.S.C. § 1961, *et seq.*, and under the provisions of the ACA, pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 18116. The Court also has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

32.     All Defendants are residents of the United States and subject to service in the United States, and the Court therefore has personal jurisdiction over them. The Court also has personal jurisdiction over them pursuant to Fed. R. Civ. P. 4(k)(1)(A) because they would all be subject to the jurisdiction of a court of general jurisdiction in New York. Each Defendant systematically and continuously conducts business in this State, either directly or through their wholly-owned and controlled subsidiaries, are authorized to do business here, and otherwise possess minimum contacts with this State sufficient to establish personal jurisdiction over them.

33.     Venue is also appropriately established in this Court under 28 U.S.C. § 1391 and 29 U.S.C. § 1132(e)(2) because Defendants conduct a substantial amount of business and wrongful practices in this District, and material portions of the improper conduct and breaches that are the subject of this lawsuit took place here.

34.     This District is also a proper venue because of the related case filed in this District involving claims regarding to the pricing of prescription medications under the PBM Agreement.

*See Anthem v. Express Scripts, Inc.*, No. 1:16-cv-02048 and a choice of venue provision

contained in the contract attached as an Exhibit to that Complaint.

## III.   PARTIES

### SUBSCRIBER PLAINTIFFS

#### Plaintiff John Doe One[5]

35.     Plaintiff John Doe One is an individual residing in Dayton, Ohio. He is a member

of an Anthem Gold Pathway X HMO health care plan offered by Anthem through Community

Insurance Company, d/b/a Anthem Blue Cross and Blue Shield of Ohio (Anthem's Ohio

affiliate, referred to herein as "Anthem Community"). Included in his health care plan is a

prescription medication benefit administered by Express Scripts, under which John Doe One

pays a percentage co-insurance charge for certain specialty medications required for the

treatment of HIV. John Doe One has paid an excessive percentage co-insurance charge on

several occasions, as detailed below, and thus has suffered injury in fact as a result of Express

Scripts' illegal conduct.

36.     John Doe One purchased his Anthem Gold Pathway X HMO in January 2016

through the ACA insurance exchange. John Doe One's plan is not covered by ERISA. Since he

enrolled in his plan, Express Scripts has been the exclusive PBM for fulfilling his pharmacy

benefits under the terms of the PBM Agreement, although to the best of his knowledge, John

Doe One has not received formal notice of such a designation.

---

[5] Due to the sensitive nature of this action and in fear of retaliation, certain Plaintiffs have chosen to file under fictitious names. *See Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 190 (2d Cir. 2008) (citations omitted) (holding that two of the grounds for proceeding anonymously was that (1) "the litigation involves matters that are 'highly sensitive and [of a] personal nature'" and (2) "whether identification poses a risk of retaliatory physical or mental harm to the . . . party [seeking to proceed anonymously]"); *see also*, *Doe v. Kaweah Delta Hosp.*, 2010 U.S. Dist. LEXIS 135808 (E.D. Cal., Dec. 22, 2010) (AIDS/HIV patient permitted to proceed anonymously). All of the allegations relating to the Plaintiffs are alleged on personal knowledge.

37.     As alleged herein, Express Scripts has influenced the prices and/or directly collected amounts that were inflated, as alleged and acknowledged by Anthem in its Complaint against Express Scripts. As a result of Defendants' conduct, John Doe One has been charged excessive prices for prescription medications he purchased or acquired from Express Scripts, causing him to suffer injury in fact.

38.     John Doe One was billed directly by Express Scripts for an HIV specialty medication Atripla, which Express Scripts has (until recently) required him to obtain by mail order directly from Express Scripts or its subsidiaries, including Accredo. On February 9, 2016, he received an invoice from Express Scripts over the wires via an Internet web portal, representing that he owed $1,280.37—$1,150 of which apparently was required to meet his deductible, and $130.37 of which was a percentage of the cost of this medication for a 30-day supply. On March 2, 2016, John Doe One received a similar invoice over the wires via this web portal from Express Scripts for $736.12, all of which was required to be paid to satisfy a percentage co-insurance payment. John Doe One paid the amounts Express Scripts claimed were due from him, permitting Express Scripts to bill his credit card using the wires. According to Express Scripts' web portal, the cost of this medication upon which the co-insurance obligation was calculated is $7,361.19 for a 90-day supply, which is an inflated price based on public information obtained by counsel. Thus, John Doe One was charged for and has been paying excessive prices for this prescription medication, the amount of such overpayment to be determined during the course of discovery and established at trial. Since March 2016, John Doe One has been charged several additional times for similar amounts.

39.     The price of this HIV medication imposed upon John Doe One is inflated and excessive. Although the exact measure of damage or loss will be determined at trial after

discovery and through expert testimony, by way of example based on publicly available information, the price of Atripla is as low as $2,143.67, or $6,431.01 for a 90-day supply. These prices are less than what John Doe One was paying for this same drug to Express Scripts under his current plan with Anthem. As John Doe One is responsible for paying a percentage of these total amounts, the inflated costs are passed on to John Doe One in the form of excessive co-insurance payments.

40.     John Doe One has attempted to resolve these claims and exhaust any applicable administrative requirements prior to the initiation of this action. John Doe One sent a letter to Express Scripts' General Counsel and Anthem's Grievances and Appeals Department on April 11, 2016. This request asked for a refund of the excessive charges imposed by Express Scripts as a result of John Doe One being billed for amounts calculated by Express Scripts based on improperly inflated prices for these medications, both for himself and all others similarly situated. However, as Anthem's endeavors to rectify the situation with Express Scripts demonstrate, his request has been denied in a letter dated May 10, 2016 from Anthem, and Express Scripts ignored his letter.

41.     John Doe One is a "Covered Individual" receiving "Covered Services" or "Covered Prescriptions" under the PBM Agreement.

**Plaintiff John Doe Two**

42.     Plaintiff John Doe Two is an individual residing in Los Angeles, California. He is a member of a PPO health care plan offered by Anthem through his employer, issued by Anthem Community under an ASO agreement. John Doe Two was offered this health care plan in January 2015 by his employer MUFG Union Bank, N.A. (which is based in New York City), and this health care plan is an ERISA plan. Included in this health care plan is a prescription medication benefit administered by Express Scripts, under which he pays a percentage

co-insurance charge for, *inter alia*, certain specialty medications required for the treatment of HIV. John Doe Two has paid an excessive percentage co-insurance charge on multiple occasions for three separate medications required for the treatment of HIV, as detailed below, and thus has suffered injury in fact as a result of Express Scripts' illegal conduct.

43. John Doe Two's health care plan is an employee welfare benefit plan, as defined in ERISA § 3(1), 29 U.S.C. § 1002(1). Since he enrolled in his plan, Express Scripts has been the designated PBM for his pharmacy benefits pursuant to the terms of the PBM Agreement, although to the best of his knowledge, John Doe Two has not received formal notice of such a designation.

44. John Doe Two has been subject to a percentage co-insurance charge for the medications he purchased at both a retail pharmacy and through Express Script's mail order subsidiary Accredo, and has thus been billed excessive prices for his medications.

45. As alleged herein, Express Scripts has influenced the prices and/or directly collected amounts that were inflated, as alleged and acknowledged by Anthem in its Complaint against Express Scripts. As a result of Defendants' conduct, John Doe Two has been charged excessive prices for prescription medications he purchased or acquired through his health plan, causing him to suffer injury in fact for all percentage based co-insurance he was obligated to pay to Express Scripts.

46. For example, John Doe Two receives three brand name specialty medications to treat HIV: Truvada, Intelence, and Isentress. Starting in January 2015, John Doe Two's three HIV specialty medications were considered "Tier 2" medications, and each required a 20% co-insurance payment from John Doe Two. When John Doe Two purchased his medications at a retail pharmacy using his credit card, Express Scripts posted an electronic claims statement to

John Doe Two's web portal account page, as well as provided an electronic statement to the retail pharmacist, showing the total cost of these medications and the percentage based co-insurance charge amount John Doe Two would be billed for these medications. In February 2015, John Doe Two purchased three specialty HIV medications at a retail pharmacy. He paid a total of $715.58 in percentage co-insurance payments for the three medications. According to the electronic claims statements he received over the wires, the total of 30-day supplies of these medications in February 2015 as represented by Express Scripts through the web portal was $1,325.45 for Truvada, $1,008.32 for Intelence, and $1,244.14 for Isentress, which appear to be inflated prices based on public information obtained by counsel. Thus, John Doe Two was charged and paid excessive prices for these prescription medications, the amount of such overpayment to be determined during the course of discovery and established at trial.

47.     For March 2015, John Doe Two purchased three specialty HIV medications at a retail pharmacy. He paid a total of $731.57 in March 2015 in percentage co-insurance payments for these three medications. According to the electronic claims statements he reviewed over the wires, the total of 30-day supplies of these medications in March 2015 as represented by Express Scripts through the web portal was $1,341.71 for Truvada, $1,056.69 for Intelence, and $1,259.45 for Isentress, which appear to be inflated prices based on public information obtained by counsel. Thus, John Doe Two was charged and paid excessive prices for these prescription medications, the amount of such overpayment to be determined during the course of discovery and established at trial.

48.     Beginning in July 2015, John Doe Two was required to obtain his HIV medications through the mail from Express Scripts' subsidiary, Accredo. In July 2015, John Doe Two obtained his medications through Accredo. He was required to give his credit card number

17

over the phone to an Express Scripts representative. Express Scripts, beginning in July 2015, periodically posted an electronic claims statement over the wires to John Doe Two's web portal account page showing the total cost of his medications upon which his co-insurance payment was calculated and the amount John Doe Two's credit card was charged for these medications. According to the electronic claims statement, on or around June 30, 2015, John Doe Two's credit card was charged by Express Scripts in the amount of $1,780.98 in percentage co-insurance amounts for these three medications. The total cost of a 90-day supply for these medications as represented by Express Scripts through the web portal was $4,222.37 for Truvada (amounting to $1,407.46 for a 30-day supply), $3,109.52 for Intelence (amounting to $1,036.51 for a 30-day supply), and $3,707.30 for Isentress (amounting to $1,235.77 for a 30-day supply), which appear to be inflated prices based on public information obtained by counsel. Thus, John Doe Two was charged and paid excessive prices for these prescription medications, the amount of such overpayment to be determined during the course of discovery and established at trial. Between July 2015 and June 2016, approximately every 90 days, John Doe Two continued to have similar charges imposed on his credit card by Express Scripts, and the web portal reflects similar costs for these medications.

49.     The price of this HIV medication imposed upon John Doe Two is inflated and excessive. Although the exact measure of damage or loss will be determined at trial after discovery and through expert testimony, by way of example, based on publicly available information, the total cost of 30-day supplies of John Doe Two's medications should be $1,284.28 for Truvada, $816.18 for Intelence, and $1,205.41 for Isentress. Such amount is significantly less than the costs represented by Express Scripts through the web portal, as set

forth above. As John Doe Two is responsible for paying a percentage of these total amounts, the inflated costs are passed on to John Doe Two in the form of excessive co-insurance payments.

50.     Prior to the initiation of this action, and even though not required by law, John Doe Two sought to exhaust any applicable administrative processes to try to resolve these claims. John Doe Two sent a letter to the relevant contacts at his employer and Anthem's Grievances and Appeals Department on April 11, 2016. This request asked for a refund of the excessive charges imposed by Express Scripts as a result of increased percentage co-insurance charges billed to his credit card, both for himself and all others similarly situated. John Doe Two received a letter from Anthem dated May 2, 2016 wherein he was informed that there was nothing Anthem could do to assist him and others similarly situated. As Anthem's own efforts to rectify the situation with Express Scripts demonstrate, any administrative appeal is futile.

51.     John Doe Two is a "Covered Individual" receiving "Covered Services" or "Covered Prescriptions" under the PBM Agreement.

**Plaintiff Karen Burnett**

52.     Plaintiff Karen Burnett is a resident of Shepherdsville, Kentucky. She is enrolled in the LG&E and KU Medical Dental and Vision Care Plan ("LG&E Plan"), which is an employee welfare benefit plan, as defined in ERISA § 3(1), 29 U.S.C. §. 1002(1), sponsored by her spouse's employer, LG&E and KU Energy LLC ("LG&E"). LG&E is based in Louisville, Kentucky. Ms. Burnett has been a participant in the LG&E Plan since at least 2010.

53.     During the Class Period, the LG&E Plan had more than 3,000 participants at any given time. At all relevant times, the LG&E Plan has provided health benefits, including prescription medication benefits, through Anthem d/b/a Anthem Health Plans of Kentucky under an ASO agreement. ASO arrangements are commonly used by self-insured plans such as the LG&E plan, where the charges for medical services (other than participants' co-payment or

co-insurance obligations) are paid by the employer or a trust, but an entity such as Anthem is

retained to provide specific services, such as access to a network of medical care providers and

pharmacies, either directly or administered through the use of pharmacy benefit managers such

as Express Scripts.

54.     At all relevant times, all participants in the LG&E Plan have received their

pharmacy benefits through Defendants Anthem and Express Scripts. As the LG&E Plan

explained: "If you enroll in one of the Anthem medical options, you are automatically enrolled in

prescription drug coverage administered by Express Scripts." If a participant in the LG&E Plan

needed or needs certain specialty medications, they have been and in most circumstances may be

required to obtain their prescription medications through Express Scripts' dedicated specialty

mail order pharmacy, Accredo.

55.     Under the LG&E Plan, at all relevant times, plan participants paid 100% of the

price charged by Express Scripts for prescription medications that fell below specified ceilings

such as annual deductibles. In addition, if either Ms. Burnett or her family, or any other

participant or beneficiary of the LG&E Plan has used and/or uses an "out of network provider" to

obtain prescription medications, they have been or would be responsible for 100% of the cost of

the prescription medication, and thus wholly responsible for the cost of any inflated prices for

prescription medications to the extent such prices were directly or indirectly set by Express

Scripts.[6] In either case, Ms. Burnett, her family, and other participants and beneficiaries of the

LG&E Plan have suffered and/or would suffer individual injury in fact to the extent Express

---

[6] Losses arising out of overcharges for prescription medications provided by out of network
pharmacy providers are included within the definition of "percentage based co-insurance" for
purposes of this Complaint to the extent the prices for such medications were set by Express
Scripts under the terms of the PBM Agreement, since in that situation the "co-insurance"
percentage is 100% of the inflated price.

Scripts set and/or charged inflated prices for prescription medications. Thus, Plaintiff Burnett was charged and paid excessive prices for these prescription medications, the amount of such overpayment to be determined during the course of discovery and established at trial.

56.     All other LG&E Plan participants who were subjected to similar percentage based co-insurance payments and/or percentage based copays (including, but not limited to, when plan participants are required to pay up to 100% of the prescriptions that fall below specified ceilings) have similarly paid inflated amounts for their prescription medication charges, either directly to Express Scripts or indirectly because Express Scripts set the price for such medications to be charged by the pharmacy, under the terms of the PBM Agreement.

57.     From May 2014 to the present, Ms. Burnett has regularly obtained over ten (10) different prescription medications. For the majority of these medications, she was required to obtain these medications from Express Scripts directly through its mail order pharmacy subsidiary Accredo. During this time period, she was forced to pay Express Scripts $1,196 for such medications. Express Scripts billed her electronically for such charges, and used the wires to send her statements of these billed charges, and also used the wires to charge these amounts to her credit card. As to her remaining prescription medications, Express Scripts, acting under the terms of the PBM Agreement, set the prices for these medications that were collected by her pharmacy, using the wires to represent the amounts that would need to be billed to and collected from Ms. Burnett. She estimates that she has paid approximately $500 to $700 per year in percentage based co-insurance payments, $1,196 to Express Scripts directly and $283 to her pharmacy since May 2014. From May 2014 to the present, Ms. Burnett estimates she has paid percentage based co-insurance charges on at least 23 separate occasions.

58.     The price of this medication imposed upon Ms. Burnett is inflated and excessive. Although the exact measure of damage or loss will be determined at trial after discovery and through expert testimony, by way of example, Ms. Burnett paid $128.23 for 180 Bupropion 200 mg tablets. But, according to publicly available information, the average cost of this drug in the same amount and quantity is as low as $66.72.

59.     As alleged herein, Express Scripts has influenced the prices and/or directly collected amounts that were inflated, as alleged and acknowledged by Anthem in its Complaint against Express Scripts. As a result of Defendants' conduct, Ms. Burnett has been charged excessive prices for prescription medications she purchased or acquired through her health plan, causing her to suffer injury in fact for all percentage based co-insurance and/or percentage based copays she was obligated to pay to Express Scripts.

60.     Ms. Burnett is a "Covered Individual" receiving "Covered Services" or "Covered Prescriptions" under the PBM Agreement.

### Plaintiff Brendan Farrell

61.     Plaintiff Brendan Farrell is a resident of Long Beach, New York. Mr. Farrell is a current participant in the Verizon Medical Expense Plan for New York and New England Associates ("Verizon Plan"), which is an employee welfare benefit plan, as defined in ERISA § 3(1), 29 U.S.C. § 1002(1), sponsored by his employer, Verizon Communications Inc. based in New York City. Mr. Farrell has been a participant in the Verizon Plan (and its predecessors) since at least 1999.

62.     During the Class Period, the Verizon Plan had more than 20,000 participants at any given time. At all relevant times, the Verizon Plan has provided health benefits, including prescription medication benefits, through Defendant Anthem d/b/a Empire Health Choice, Inc. under an ASO agreement.

22

63.     At all relevant times, all participants in the Verizon Plan have received their pharmacy prescription medication benefits through Defendants Anthem and Express Scripts. As set forth in the Summary Plan Description of Mr. Farrell's Verizon Plan, all retail and mail order prescription benefits are administered by Express Scripts. Thus, if a participant in the Verizon Plan has needed or needs certain specialty medications, under most circumstances they have been required to obtain their prescriptions directly from Express Scripts through its mail order pharmacy Accredo or other Express Scripts subsidiaries.

64.     Under the Verizon Plan, at all relevant times, plan participants have paid and/or are required to pay between 30% and 100% of the price charged by Express Scripts for prescription medications that fell and/or fall below specified ceilings such as annual deductibles, or a flat co-pay plus 100% of the cost difference between comparable brand-name and generic medications. If a plan participant has used and/or uses a "non-participating pharmacy" to obtain their prescription medications, he or she has been and/or would be responsible for paying between 30% to 40% of the discounted network price for the prescription medication set by Express Scripts, plus 100% of the cost difference between the discounted network price set by Express Scripts and the retail cost.

65.     All other Verizon Plan participants who have been subjected to similar percentage based co-insurance payments and/or percentage based copays (including, but not limited to, when plan participants are required to pay up to 100% of the prescriptions that fall below specified ceilings) have similarly paid and/or must pay inflated amounts for their prescription medication charges, either obtained directly from Express Scripts or indirectly because Express Scripts set the price for such medications to be charged by the pharmacy, under the terms of the PBM Agreement.

66.     From June 2014 to the present, Mr. Farrell has regularly been prescribed and purchased over ten (10) separate prescription medications for himself or his beneficiaries under his plan. For one of these medications, he was required to obtain these medications from Express Scripts directly through its mail order pharmacy subsidiary Accredo. During this time period, he was forced to pay Express Scripts $424 for such medications. Express Scripts billed him electronically for such charges, and used the wires to send him statements of these billed charges, and also used the wires to charge these amounts to his credit card. As to the remaining prescription medications, Express Scripts, acting under the terms of the PBM Agreement, set the prices for these medications that were collected by his pharmacy, using the wires to represent the amounts that would need to be billed to and collected from Mr. Farrell. He estimates that he has paid approximately $250 per year in percentage based co-insurance payments, $424 to Express Scripts directly and $227 to his pharmacy, since June 2014, which appear to be inflated prices based on public information obtained by counsel. From June 2014 to the present, Mr. Farrell estimates he has paid percentage based co-insurance charges on at least six (6) separate occasions.

67.     The price of this medication imposed upon Mr. Farrell is inflated and excessive. Although the exact measure of damage or loss will be determined at trial after discovery and through expert testimony, by way of example, Mr. Farrell paid $12.13 for 60 ml of Bromphem Syrup, but according to publicly available information, the average cost of this drug in the same amount and quantity is as low as $10.74. Similarly, as recently as December 8, 2016, Mr. Farrell paid $924.84 for 50 gm of Retin-a Micro Pump Gel, but according to publicly available information, the average cost of this drug in the same amount and quantity is as low as $874.98.

68.     As alleged herein, Express Scripts has influenced the prices and/or directly collected amounts that were inflated, as alleged and acknowledged by Anthem in its Complaint against Express Scripts. As a result of Defendants' conduct, Mr. Farrell has been charged excessive prices for prescription medications he purchased or acquired through his health plan, causing him to suffer injury in fact for all percentage based co-insurance and/or percentage based copays he was obligated to pay to Express Scripts.

69.     Mr. Farrell is a "Covered Individual" receiving "Covered Services" or "Covered Prescriptions" under the PBM Agreement.

**<u>Plaintiff Robert Shullich</u>**

70.     Plaintiff Robert Shullich is a resident of Holmdel, New Jersey. He is a current participant in the AmTrust Health and Welfare Plan ("AmTrust Plan"), an employee welfare benefit plan, as defined in ERISA § 3(1), 29 U.S.C. § 1002(1), sponsored by his employer, AmTrust Financial Services, Inc. based in New York City. Mr. Shullich has been a participant in the AmTrust Plan since at least September 2014.

71.     During the Class Period, the AmTrust Plan had more than 3,000 participants at any given time. The AmTrust Plan provides healthcare benefits through Defendant Anthem d/b/a Community Insurance Company under an ASO agreement.

72.     At all relevant times, all participants in the AmTrust Plan have received their prescription medication benefits through Defendants Anthem and Express Scripts, with Express Scripts acting as the exclusive PBM for plan participants under the terms of the PBM Agreement. As the AmTrust Plan explains: "The pharmacy benefits available to you under the Plan are managed by the Administrator's Pharmacy Benefits Manager (PBM). The PBM is a pharmacy benefits management company with which the Administrator [Anthem] contracts to manage your pharmacy benefits. The PBM has a nationwide network of retail pharmacies, a Mail

Service pharmacy, a Specialty pharmacy, and provides clinical management services. The management and other services the PBM provides include, among others, making recommendations to, and updating, the covered Prescription Drug list (also known as a Formulary) and managing a network of retail pharmacies and, operating a Mail Service pharmacy, and a Specialty Drug Pharmacy Network."

73.     Under the AmTrust Plan, at all relevant times, the co-insurance paid by plan participants has been and is a percentage of the prescription medication price set by Express Scripts for non-generic prescriptions, up to a maximum of $250 per prescription. There also has been and is a percentage based co-insurance of 25% of the price for the medications set by Express Scripts for "preferred" brand name medications and 50% of the price for the medications set by Express Scripts for "non-preferred" brand name medications and specialty injectable medications. Plan participants also may have paid percentage based co-insurance to the extent they have paid 100% of the price charged by Express Scripts for prescriptions that fell below specified ceilings such as annual deductibles.

74.     From October 2014 to the present, Mr. Shullich has regularly obtained over ten (10) different prescription medications provided to him by Express Scripts. For nearly all of these medications, he was required to obtain these medications from Express Scripts directly through its mail order pharmacy subsidiary Accredo. During this time period, he was forced to pay Express Scripts $1,317 for such medications. Express Scripts billed him electronically for such charges, and used the wires to send him statements of these billed charges, and also used the wires to charge these amounts to his credit card. As to the remaining prescription medications, Express Scripts, acting under the terms of the PBM Agreement, set the prices for these medications that were collected by his pharmacy, using the wires to represent the amounts

that would need to be billed to and collected from Mr. Shullich. He estimates that he has paid approximately $1,500 in percentage based co-insurance payments, $1,317 to Express Scripts directly and $203 to his pharmacy, since October 2014. From October 2014 to the present, Mr. Shullich estimates he has paid percentage based co-insurance charges on at least twelve (12) separate occasions.

75. The price of this medication imposed upon Mr. Shullich is inflated and excessive. Although the exact measure of damage or loss will be determined at trial after discovery and through expert testimony, by way of example, Mr. Shullich paid $10 for 90 Furosemide 40mg tablets, but according to publicly available information, the average cost of this drug in the same amount and quantity is as low as $1.11. Similarly, Mr. Shullich paid $57.83 for 190 Potassium Chloride Extended Release tablets. But according to publicly available information, the average costs of this drug in the same amount and quantity is as low as $41.15.

76. As alleged herein, Express Scripts has influenced the prices and/or directly collected amounts that were inflated, as alleged and acknowledged by Anthem in its Complaint against Express Scripts. As a result of Defendants' conduct, Mr. Shullich has been charged excessive prices for prescription medications he purchased or acquired through his health plan, causing him to suffer injury in fact for all percentage based co-insurance and/or percentage based copays he was obligated to pay to Express Scripts.

77. Mr. Shullich is a "Covered Individual" receiving "Covered Services" or "Covered Prescriptions" under the PBM Agreement.

**Plaintiff Brian Corrigan**

78. Plaintiff Brian Corrigan is an individual residing in Jefferson County, Kentucky. Until January 2017, he was enrolled in an individual "Anthem Silver Pathway X PPO 10% for HAS S04" health care plan offered by Anthem through a public ACA exchange by Anthem

Health Plans of Kentucky, Inc. Included in his health care plan is a prescription medication benefit administered by Express Scripts, under which he paid a 10% co-insurance charge for all prescription medications. Mr. Corrigan has paid an excessive percentage co-insurance charge on several occasions, as detailed below, and thus has suffered injury in fact as a result of Express Scripts' illegal conduct.

79.     Mr. Corrigan purchased his Anthem Silver Pathway X PPO in January 2016. Mr. Corrigan's plan is not covered by ERISA. Since he enrolled in his plan, Express Scripts has been the exclusive PBM for fulfilling his pharmacy benefits under the terms of the PBM Agreement.

80.     On June 29, 2016, Mr. Corrigan filled two prescriptions at his local Kroger Pharmacy for Pravastatin Sodium 40mg, 30 tabs, and Omeprazole Delayed Release 10 mg, 30 tabs, and was charged $20.83 for one and $22.33 for the other, both of which were required to be paid to satisfy a percentage co-insurance payment, and which appear to be inflated prices based on publicly available information obtained by counsel for such medications. Mr. Corrigan paid the amounts Express Scripts electronically informed Kroger Pharmacy were due from him, via credit card. Thus, Mr. Corrigan was charged and paid excessive prices for these prescription medications, the amount of such overpayment to be determined during the course of discovery and established at trial.

81.     In August of 2016, when Mr. Corrigan attempted to fill another prescription, Kroger's Pharmacy informed Mr. Corrigan that Express Scripts would no longer cover his prescription medication unless he participated in Express Script's mail order system. Mr. Corrigan was forced to do so. In January 2017 he switched to the Anthem Silver Pathway X

HMO 5300 S05 Plan, which still requires him to use mail order and is still administered by Express Scripts.

82.     As alleged herein, Express Scripts has influenced the prices and/or directly collected amounts that were inflated, as alleged and acknowledged by Anthem in its Complaint against Express Scripts. As a result of Defendants' conduct, Mr. Corrigan has been charged excessive prices for prescription medications he purchased or acquired through his health plan, causing him to suffer injury in fact for all percentage based co-insurance he was obligated to pay to Express Scripts.

83.     Mr. Corrigan is a "Covered Individual" receiving "Covered Services" or "Covered Prescriptions" under the PBM Agreement.

**PLAN PLAINTIFFS**

### Plaintiff Stamford Health

84.     Stamford Health, Inc., fka Stamford Health System, Inc., is a Connecticut corporation with its principal place of business and operations located in Stamford, Connecticut. Both entities will be referred to in this Complaint interchangeably.

85.     Plaintiff Stamford is a fiduciary of and brings this action on behalf of an Employee Welfare Benefit Plan, the "Stamford Plan," as that term is defined in 29 U.S.C. § 1002(1)(A).

86.     The Stamford Plan is funded by contributions from Stamford. Accordingly, the Stamford Plan is a self-funded plan.

87.      Until the end of 2014, Anthem administered certain healthcare benefits of the Stamford Plan, including a prescription drug benefit, pursuant to an ASO agreement. Therefore, the Stamford Plan was a "customer" of Anthem. Plaintiff Stamford retained discretion to

override decisions of Anthem in administering benefits of the Stamford Plan.

88.     The Stamford Plan pays for prescription medication benefits for the Stamford Plan's members. The relevant plan documents provide, "The Maximum Allowed Amount for Prescription Drugs is the amount determined by Anthem BCBS using prescription drug cost information provided by the Pharmacy Benefits Manager (PBM)."

89.     The amounts that Stamford paid to Anthem and/or Express Scripts for prescription medication benefits are Stamford Plan assets.

90.     The Stamford Plan paid millions of dollars to Anthem and/or Express Scripts for prescription drugs. In 2012, Stamford paid claims for prescription drugs totaling approximately $4.64 million. The comparable figures in 2013 and 2014 were approximately $4.97 million and $6.28 million, respectively. These payments reflect the excessive pricing that Anthem admits "is harming Anthem and its customers." *See Anthem v. Express Scripts, Inc.*, No. 1:16-cv-02048, Complaint at ¶ 42.

91.     Because the Stamford Plan has paid excessive prices for prescription medication benefits as described above, the Stamford Plan has suffered injury in fact as a result of Defendants' conduct.

**Plaintiff Brothers Trading Co., Inc.**

92.     Plaintiff Brothers Trading Co., Inc. is an Ohio corporation that is a national, privately held, grocery, health and beauty care, and general merchandise distributor.

93.     Plaintiff Brothers Trading is a fiduciary of and brings this action on behalf of an Employee Welfare Benefit Plan, the "Brothers Trading Plan", as that term is defined in 29 U.S.C. § 1002(1)(A).

94.     The Brothers Trading Plan is funded by contributions from Brothers Trading. Accordingly, the Brothers Trading Plan is a self-funded plan.

30

95.     Effective on or around March 1, 2012, Anthem has administered the healthcare benefits of the Brothers Trading Plan, including a prescription medication benefit, pursuant to an ASO agreement. Therefore, the Brothers Trading Plan is a "customer" of Anthem.

96.     The Brothers Trading Plan pays for prescription medication benefits for its members.

97.     The amounts that Brothers Trading paid to Anthem and/or Express Scripts for prescription medication benefits are assets of the Brothers Trading Plan.

98.     Participants and beneficiaries of the Brothers Trading Plan use the Anthem website to access information about their prescription medication benefits provided by Express Scripts.

99.     The Brothers Trading Plan has paid millions of dollars to Anthem and/or Express Scripts for prescription medications. For example, Brothers Trading spent approximately $900,000 in 2015 and approximately $850,000 in 2014. These payments reflect the inflated prices charged pursuant to the PBM Agreement, including but not limited to the excessive pricing that Anthem admits is harming Anthem and its customers.

100.    The Brothers Trading Plan has also received communications from Anthem directly indicating that all rebates received by Express Scripts were not being passed through to Brothers Trading or the Brothers Trading Plan. Brothers Trading has also repeatedly requested an explanation and an accounting for the direct and indirect fees and charges that the Brothers Trading Plan is being charged by Express Scripts, including rebates or incentive or other payments that Express Scripts makes to Anthem. But Anthem has refused to provide this information. For example, the prices Express Scripts has charged for prescription medications has resulted in the Brothers Trading Plan paying thousands of dollars per month more to Express

Scripts than it should be paying based on standard market prices for the drugs. In addition, based on estimates derived from public information, the Plan pays prices to Express Scripts that are anywhere from 584% to 1317% higher than prices charged by other providers and retail stores and/or available online.

**DEFENDANTS**

**Defendant Express Scripts**

101.     Defendant Express Scripts is a Delaware corporation with its principal place of business at One Express Way, St. Louis, Missouri 63121.

102.     As used herein, Express Scripts includes all of Express Scripts' subsidiaries and "doing business as" (dba) monikers, including, but not limited to: Express Scripts Mail Order Processing, Inc., Express Scripts Mail Pharmacy Service, Inc., Express Scripts Pharmacy, Inc., Express Scripts Holding Company, and Accredo Health Group.

103.     Since December 1, 2009, pursuant to a 10-year agreement with Anthem, Express Scripts has been responsible for setting the prices for prescription medications paid by Anthem plans and their participants, including Plaintiffs and the Classes. Express Scripts has negotiated and negotiates with drug companies for the price of prescription medications that it manages and administers for participants in health care plans insured or administered by Anthem, including obtaining rebates and other discounts from the drug companies directly, and establishing the classification of prescription medications offered to Anthem insureds as "brand" or "generic." Anthem is one of Express Scripts largest customers – so large, that Express Scripts actually has established an "Anthem Division" (referenced *infra*).

104.     Express Scripts aggressively grew its direct mail order business beginning in 2009, the same year as the PBM Agreement as discussed below. Between 2009 and 2013, Express Scripts' mail order revenue increased by over 400%, growing from $8 billion to $37.6

billion. During that same period, the number of prescriptions Express Scripts filled directly via mail order increased from 41.8 million prescriptions in 2009 to 141.2 million prescriptions in 2013. Through this segment of its business and its ability to control acquisition costs through its mail order business, Express Scripts is able to directly control the amount individuals are required to pay for prescription medications.

**Defendant Anthem**

105.    Defendant Anthem is an Indiana corporation with its principal place of business at 120 Monument Circle, Indianapolis, Indiana 46204. Anthem is one of the nation's largest health benefits companies, with more than 38 million members enrolled in its family of health plans. As used herein, "Anthem" includes all of Anthem's subsidiaries and "doing business as" (dba) monikers. Anthem is licensed to conduct insurance operations in all 50 states through its subsidiaries as described in detail below.

106.    Anthem serves its members as the Anthem Blue Cross licensee for California and as the Blue Cross and Blue Shield, or BCBS, licensee for Colorado, Connecticut, Georgia, Indiana, Kentucky, Maine, Missouri (excluding 30 counties in the Kansas City area), Nevada, New Hampshire, New York, Ohio, Virginia (excluding the Northern Virginia suburbs of Washington, D.C.), and Wisconsin. In a majority of these service areas Anthem does business as Anthem Blue Cross, Anthem Blue Cross and Blue Shield, Blue Cross and Blue Shield of Georgia, and Empire Blue Cross Blue Shield, or Empire Blue Cross (in New York service areas). Anthem conducts business through an arrangement with another BCBS licensee in South Carolina. Anthem conducts business through its AMERIGROUP Corporation, or Amerigroup, subsidiary, in Florida, Georgia, Kansas, Louisiana, Maryland, Nevada, New Jersey, New Mexico, New York, Tennessee, Texas, Washington, and, effective January 1, 2016, Iowa. In addition, Anthem conducts business through its recently acquired Simply Healthcare Holdings,

Inc., or Simply Healthcare, subsidiary in Florida. Anthem also serves customers throughout the country through the ACA exchange and as HealthLink, UniCare (including a non-risk arrangement with Massachusetts), and in certain Arizona, California, Nevada, and Virginia markets through its CareMore Health Group, Inc., or CareMore, subsidiary. Prior to December 23, 2014, Anthem's corporate name was WellPoint, Inc. ("WellPoint"). WellPoint was originally a party to the PBM Agreement. Anthem is the successor to WellPoint, and is the successor in interest to WellPoint's rights and obligations under the PBM Agreement.

**Defendants DOES 1 through 10**

107.    The true names, roles and/or capacities in the wrongdoing alleged herein of Defendants named as DOES 1 through 10, inclusive, are currently unknown to Plaintiffs and, therefore, are named as Defendants under fictitious names as permitted by the rules of this Court. Plaintiffs will identify their true identities and their involvement in the wrongdoing at issue, as well as the specific causes of action asserted against them, if and when they become known.

## IV.    FACTUAL BACKGROUND

### A.    Express Script's Role as Pharmacy Benefit Manager

108.    PBMs are administrators of prescription medication programs for *inter alia*, commercial health plans, self-insured employer health plans, Medicare Part D health plans, individual and group health plans, fully-insured employer health plans, and various federal, state, and government employee health plans. Generally, PBMs are primarily responsible for contracting with pharmacies, negotiating discounts and rebates with drug manufacturers, engaging in drug utilization review and formulary management, and processing and paying prescription drug claims. As set forth above, Express Scripts also conducts significant business through its direct mail order delivery operations. It both provides services and competes with insurance companies, including Anthem, for the provision of such services. PBMs effectively act

as middlemen between insurers, employers, and government agencies who provide prescription drug benefits and retail pharmacies who provide prescription medications to individuals.

109.    Express Scripts is the largest PBM organization in the United States, generating revenues of approximately $101.8 billion in 2015 alone. As of December 31, 2015, more than 70,000 retail pharmacies—representing over 97% of all pharmacies in the country—participate in an Express Scripts network. Express Scripts is responsible for processing the prescription drug benefits of more than 25% of all insured patients in the United States, and processes nearly 1.4 billion prescriptions each year.

110.    Nearly all of Express Scripts' revenue is derived from its PBM operations. In 2015, 97.3% of its revenues came from its PBM business. The percentages were similar in prior years: 97.5% of Express Scripts' revenues were generated from its PBM business in 2014, and 97.8% of its revenues were generated from its PBM business in 2013.

111.    Express Scripts' largest client is Anthem. In 2015, 16.3% of Express Scripts' revenues derived from its services to Anthem plans, which rose from 14% in 2014 and 12.2% in 2013. As the exclusive PBM for Anthem plans, Express Scripts provides all the services PBMs generally provide, as set forth above. Anthem has a legal duty to monitor and ensure Express Scripts did not charge inflated prices for prescription medications to both Anthem and Plaintiffs and Class members.

112.    Under the PBM Agreement with Anthem, Express Scripts either (1) processes the claims of plan participants who fill prescription medications through retail pharmacies to the extent covered by their Anthem plans, or (2) as a direct mail order provider of prescription medications, fills and bills individual claims either directly or through its subsidiaries, such as the specialty pharmacy Accredo. In the former situation, Express Scripts controls what Anthem

and retail pharmacies charge and collect as payments from self-funded plans and as percentage

co-insurance payments from Subscriber Class members by exclusively setting the prices for such

prescription medications (subject to the terms and limitations of the PBM Agreement). In the

latter situation, Express Scripts controls what it bills Class members and collects in payments for

prescription medications Express Scripts mails directly to members.

113.     Express Scripts processed more than 175 million prescription medication claims

for Anthem in 2015, including for approximately 130,000 fully-insured and self-insured ASO

groups such as Stamford and Brothers Trading. Express Scripts supports Anthem's operations in

over 24 states and services more than 15 million members. As a result, a significant portion of

Express Scripts' revenues, including from its mail order operations, come from enrollees in

Anthem plans. Thus, the formation, impact and interpretation of the PBM Agreement was and is

material for Express Scripts, Anthem, Plaintiffs and Class members, since it directly impacts the

prices Plaintiffs and Class members are charged for prescription medications.

114.     Express Scripts operates in a fiduciary capacity with regard to the administration

and management of the Plans through the exercise of its wide and far reaching discretionary

authority and control over prices for prescription medications charged to Class members.  The

exercise of this discretion has both the purpose and effect of determining the amount of money

Express Scripts makes from Class members and establishes its status as a fiduciary to ERISA

Plans and ERISA Plan members.

115.     Express Scripts controls prescription medication pricing to Plaintiffs and Class

members through several mechanisms, examples of which are detailed below.

116.     Express Scripts exercises discretionary authority and control with regard to plan

management and administration through its control over rebates that it obtains and frequently

retains for prescription medications from drug manufacturers. Express Scripts decides for itself whether to pass rebates through to Class members or keep them for its own pecuniary benefit. This discretion is reflected in, among other places, Exhibit N to the PBM Agreement, which indicates that "ESI contracts for its own account with manufacturers to obtain formulary rebates attributable to the utilization of certain brand medications and supplies by PBM client members (and possibly certain authorized generics marketed under a brand manufacturer's new drug application)."

117.    Express Scripts also exercises discretionary authority and control with regard to plan management and administration through its control of the classification of medications as brand or generic. This distinction directly impacts both how much Class members must pay for prescription medications, and how much profit Express Scripts extracts from a transaction. Generally, brand medications are substantially more expensive than generic medications for self-funded plans and Anthem insureds. Express Scripts has the economic incentive to classify many medications as brand over generic to maximize its revenue. Again, the PBM Agreement demonstrates Express Scripts' discretion over this important aspect of pricing. As set forth in Ex. N to the PBM Agreement:

> Prescription drugs may be classified as either a "brand" or "generic;" however, the reference to a drug by its chemical name does not necessarily mean that the product is recognized as a generic for adjudication, pricing, or copay purposes. ESI distinguishes brands and generics through a proprietary algorithm ("BGA") that uses certain published elements provided by First DataBank (FDB) including price indicators, Generic Indicator, Generic Manufacturer Indicator, Generic Name Drug Indicator, Innovator, Drug Class and ANDA. The BGA uses these data elements in a hierarchical process to categorize the products as brand or generic. The BGA also has processes to resolve discrepancies and prevent "flipping" between brand and generic status due to price fluctuations and marketplace availability changes. The elements listed above and sources are subject to change based on the availability of the specific fields.

118.    Express Scripts also exercises discretionary authority and control with regard to plan management and administration through its power to determine the maximum allowable cost for each prescription medication it offers to Anthem insureds. As further set forth in Exhibit N to the PBM Agreement:

> As part of the administration of the PBM services, ESI maintains a MAC List of drug products identified as requiring pricing management due to the number of manufacturers, utilization and/or pricing volatility. The criteria for inclusion on the MAC List are based on whether the drug has readily available generic product(s), is generally equivalent to a brand drug, is cleared of any negative clinical implications, and has a cost basis that will allow for pricing below brand rates. ESI also maintains correlative MAC price lists based on current price reference data provided by FDB or other nationally recognized pricing source, market pricing and availability information from generic manufacturers and on-line research of national wholesale drug company files. Similar to the BGA, the elements listed above and sources are subject to change based on the availability of the specific fields. Updated summaries of the MAC methodology are available upon request.

119.    Express Scripts also exercises discretionary authority and control with regard to plan management and administration through the authority it claims it has to determine "competitive benchmark pricing" under the PBM Agreement. The term has resulted in inflated, excessive prices being charged to Plaintiffs and Class members, as evident from the lawsuit Anthem filed against Express Scripts, and Express Scripts' counterclaims against Anthem. Express Scripts has relied on the use of this term as a source of discretionary authority and control directly pertaining to the harm inflicted on Class members. Express Scripts also exercises discretionary authority and control with regard to plan management and administration through its authority to establish the exclusionary formulary list. In other words, Express Scripts has discretion to exclude certain drugs offered to Plaintiffs and the Class, and does so in a manner to maximize its profits. For example, Express Scripts recently excluded 66 drugs from its national formulary and maintains the sole discretion to choose which drugs are placed on this list.

**B.      Plaintiffs and Class Members Have Been and Are Subjected to Excessive Prices as a Result of Express Scripts' and Anthem's Conduct**

120.      Pursuant to the PBM Agreement, Express Scripts serves as the exclusive provider of PBM services for health insurance plans administered and/or insured by Anthem's affiliated health plans for a 10-year period from 2009 through 2019.

121.      The prescription medication benefits for the Plan Plaintiffs and for the members of the Plan Class are processed by Express Scripts and thus are subject to the PBM Agreement. The Subscriber Plaintiffs and Class members' prescription medication benefits under Anthem plans are likewise processed by Express Scripts and are therefore subject to the PBM Agreement. The PBM Agreement was meant to benefit Anthem's self-funded plan customers as well as Subscriber Plaintiffs and Class members as subscribers and enrollees in Anthem plans with a prescription medication benefit, particularly where their payment obligations were calculated as a percentage of the charged cost of the prescription medication set by Express Scripts. Indeed, Anthem alleges that "[a] critical key to success for health insurers is to provide effective and affordable pharmacy/drug related services and administration for its members. Health insurers depend on PBMs for such pricing and administration, and Anthem contracted with ESI to provide these critical services." *See Anthem v. Express Scripts, Inc.*, No. 1:16-cv-02048, Complaint at ¶ 11.

122.      The PBM Agreement further establishes that Express Scripts' primary duty is to "provide the administrative services . . . to [Anthem], Plans **and Covered Individuals** set forth in this Agreement." *See* § 3.1 of the PBM Agreement (emphasis added). The PBM Agreement also makes clear that Anthem "will offer to Plans the prescription drug benefits administered by [ESI] pursuant to this Agreement." *See* § 2.1 of the PBM Agreement.

123.    Thus, the parties to the PBM Agreement either knew or reasonably should have known that they had an obligation to act in the best interests of Class members at the time they entered into the PBM Agreement, and Anthem recognized that breaches of the PBM Agreement would adversely impact both Anthem and Class members. Plaintiffs and Class members are therefore intended beneficiaries of the PBM Agreement and, accordingly, have standing to sue for breach of the PBM Agreement to the extent of its impact on them, at least as to claims brought on behalf of members of non-ERISA plans.

124.    Express Scripts is obligated under the PBM Agreement and applicable law to ensure, among other things, (1) the performance of its services in compliance with all applicable laws and regulations, including the requirements of the Center for Medicare and Medicaid Services ("CMS") and state regulators, (2) accurate and timely PBM administration and proper medication distribution, and (3) that Class members such as Plaintiffs receive the benefit of, and are only charged, competitive benchmark pricing and not inflated prices for prescription medications.

125.    Express Scripts paid Anthem billions of dollars for the exclusive right to provide PBM services to certain Anthem plans and plan participants by purchasing NextRx in December 2009. According to Express Scripts' 2015 Annual Report:

> In December 2009, Express Scripts completed the purchase of 100% of the shares and equity interests of certain subsidiaries of Anthem that provide pharmacy benefit management services ("NextRx"). Simultaneous with this purchase, Express Scripts entered into a 10-year contract under which we provide pharmacy benefits management services to members of the affiliated health plans of Anthem. Subsequent to this acquisition, we integrated NextRx's PBM clients into our existing systems and operations.[7]

---

[7] *See* Express Scripts, Annual Report 2015 (Form 10-K) ("Express Scripts Annual Report"), http://phx.corporate-ir.net/phoenix.zhtml?c=69641&p=irol-reportsannual (last visited on September 30, 2016).

126.   The sale of NextRx was memorialized in a Stock and Interest Purchase Agreement (the "NextRx Agreement"). The NextRx Agreement required each party to deliver an executed copy of the PBM Agreement at closing.

127.   According to Express Scripts in its defense of the allegations in the *Anthem v. Express Scripts* litigation, during negotiations for the right to be Anthem's exclusive PBM provider, Express Scripts presented Anthem with a range of alternatives for structuring the NextRx purchase transaction. At one end, Express Scripts offered to pay less money up-front to Anthem ($500 million) in exchange for agreeing to provide lower prescription medication pricing to Anthem plans and their participants over the 10-year life of the PBM Agreement.

128.   At the other end of the spectrum, according to Express Scripts, it offered to pay significantly more up-front to Anthem ($4.675 billion), but in exchange would impose higher prices for prescription medications over the 10-year life of the PBM Agreement to Anthem plans and their participants. In so doing, Express Scripts could make up whatever excess amounts it paid to Anthem for NextRx from Plaintiffs and Class Members by way of higher prescription medication prices. In December 2009, Anthem accepted the latter option, to the detriment to Plaintiffs and Class members.

129.   According to Express Scripts, Anthem used this money to fund stock buybacks in 2009 and 2010 "during the low watermark" of Anthem's stock price, which ultimately enriched Anthem's stockholders and management.

130.   If Express Scripts' allegations are correct, in exchange for $4.675 billion and a 10-year exclusive deal under the PBM Agreement, Anthem gave Express Scripts license to overcharge Plaintiffs and Class members for prescription medications as compared to using a standardized metric for setting such prices, as set forth above. Such a bargain cannot be squared

with either Express Scripts' or Anthem's legal duties or obligations to Plaintiffs and Class members.

131.    Moreover, under either version of the events as alleged by Express Scripts and Anthem, both are liable to Plaintiffs and Class members because both Defendants caused and continue to cause Plaintiffs and Class members to pay excessive prices for prescription medications.

132.    The Plan Plaintiffs, and members of the Plan Class have responsibility for payment of the costs of their members' prescription medications.

133.    Express Scripts has repeatedly and over an extended period of time charged Plaintiffs and members of the Class excessive prices for prescription medications as described above. In its billing statements, web portal, invoices, communications with pharmacies and Explanations of Benefits, Express Scripts has knowingly and fraudulently misrepresented the amount of co-insurance payments Subscriber Plaintiffs and Subscriber Class members should owe for their prescription medications and has failed to disclose that Express Scripts was charging more than permitted under the PBM Agreement, or that Express Scripts was acting in violation of its legal obligations.

134.    At all relevant times, Subscriber Plaintiffs and Subscriber Class members' responsibility for the cost of certain prescription medications under their Anthem plans has been and is, in whole or in part, to pay percentage based co-insurance amounts, as defined above, which are percentages of the prices Express Scripts has charged and charges for those prescription medications.

135.    As a result of Defendants' wrongful conduct of charging excessive prices for prescription medications as detailed above, Plaintiffs and Class members suffered harm.

**C.     Express Scripts Charges Inflated and Excessive Prices for Prescription Medications Contrary to the Requirements of the PBM Agreement**

136.    Section 5.6 of the PBM Agreement contains a "Periodic Pricing Review" provision that provides a process for Anthem and Express Scripts to renegotiate in good faith the pricing of prescription medications every three years to ensure that the cost of prescription medications is set at "competitive benchmark pricing" levels.

137.    According to Section 5.6 of the PBM Agreement, Anthem or a third party consultant retained by Anthem conducts a market analysis "to ensure that [Anthem] is receiving competitive benchmark pricing." If Anthem or its third party consultant determines that the pricing being imposed by Express Scripts under the terms of the PBM Agreement is not "competitive benchmark pricing," then Anthem proposes new pricing terms to ensure that Anthem and Anthem plan subscribers or enrollees, including Plaintiffs and members of the Class, receive the benefits of competitive benchmark pricing.

138.    Express Scripts and Anthem dispute the meaning of "competitive benchmark pricing." But both appear to believe that it refers to pricing that is competitive in the pharmaceutical drug market, presumably measured by a standardized metric.[8] For example, Anthem alleges that one of Express Scripts' primary obligations under the PBM Agreement is to provide "market competitive pricing" (*see Anthem v. Express Scripts, Inc.*, No. 1:16-cv-02048, Complaint at ¶ 13), and that the purpose of this provision is "to allow contracting parties to enter

---

[8] The Health Strategy Report, referred to *infra*, may include a definition or explanation of the term "competitive benchmark pricing" that would enable determination of whether Express Scripts was charging in excess of that amount. However, to date Anthem has obstructed a lawfully issued subpoena and refused to agree to Health Strategy releasing that report to Plaintiffs, even though Health Strategy has indicated it would otherwise do so. Plaintiffs reserve the right to amend the Complaint to expand upon such allegations after they obtain that report.

into long term contractual relationships by ensuring that the pricing schedules in the contracts will be reviewed periodically and adjusted to reflect prevailing market conditions." *Id.*, ¶ 14.

139.    As acknowledged by Express Scripts in its 2015 Annual Report, Express Scripts typically contracts to calculate prescription medication pricing based on the "average wholesale price" or "AWP", which is published by a third party, as a benchmark to establish pricing for prescription medications. The AWP is a national average of list prices for prescription medications purportedly charged by wholesalers to pharmacies. Typically, as set forth above such contracts provide a significant discount off of the AWP price because it is widely believed that AWP is higher than the actual prices paid by pharmacies. AWP discounts are also generally greater for generic medications than for brand medications. Other common benchmarks used in PBM agreements are MAC ("Maximum Allowable Cost"), and WAC ("Wholesale Acquisition Cost").

140.    Express Scripts' long-term exclusive PBM arrangement with the U.S. Department of Defense (its second largest client behind Anthem) incorporates AWP as a pricing benchmark to determine what prices are paid by customers for prescription medications, and provides substantial discounts off the AWP prices. The U.S. Department of Defense contract also relies on WAC for certain medications.

141.    Express Scripts follows a similar approach in other contracts. For instance, its contract with the Oklahoma City Facilities Authority states in relevant part as follows:

> 6.2 Pricing Benchmarks. The parties agree that, upon entering into this Agreement and thereafter, their mutual intent has been and is to maintain pricing stability as intended and not to advantage either party to the detriment of the other. Accordingly, to preserve this mutual intent, if ESI undertakes any or all of the following: (a) changes the AWP source across its book of business (e.g., from First DataBank to MediSpan); or (b) maintains AWP as the pricing index with an appropriate adjustment as described below, in the event the AWP methodology and/or its calculation is changed, whether by the existing or alternative sources; or

(c) transitions the pricing index from AWP to another index or benchmark (e.g., to Wholesale Acquisition Cost), Participating Pharmacy, CuraScript and Mail Service Pharmacy rates, rebates and guarantees, as applicable, will be modified as reasonably and equitably necessary to maintain the pricing intent under this Agreement. ESI shall provide Sponsor with at least ninety (90) days' notice of the change (or if such notice is not practicable, as much notice as is reasonable under the circumstances), and written illustration of the financial impact of the pricing source or index change (e.g., specific drug examples). If Sponsor disputes the illustration or the financial impact of the pricing source, the parties agree to cooperate in good faith to resolve such disputes.

This contract also provides for substantial discounts off the AWP prices. The above language is similar to that in other PBM agreements and contracts entered into not only by Express Scripts, but also by most PBMs.

142.    Section 5.6 of the PBM Agreement does not reference AWP, MAC, or WAC, and instead, as noted above, refers to the obligation to engage in "good faith negotiations" regarding "competitive benchmark pricing." Express Scripts contends that through this language Anthem provided it with discretion to charge above competitive benchmark prices. Whether this is true or not, Section 5.6 is atypical, and has been relied on by Express Scripts to justify its decision to charge prices that are higher than what Anthem has identified as competitive benchmark prices, as detailed below. The 10-year term of the PBM Agreement also is atypical for Express Scripts. According to its 2015 Annual Report, Express Scripts' client contracts are generally three years, and its pharmaceutical manufacturer and retail contracts are typically non-exclusive and terminable on relatively short notice by either party.

143.    Express Scripts admitted that negotiations over the competitive benchmark pricing provisions needed to start well in advance of the PBM Agreement's 2015 anniversary date. Specifically, Matt Totterdale, Express Scripts Vice President and General Manager for the Anthem Division of Express Scripts, sent an email to Anthem prior to this anniversary date acknowledging, "Just for historical perspective this took nearly a year last time so I think it is

good that we start sooner rather than later." Nevertheless, Express Scripts refused to participate in good faith in any substantive negotiations on pricing for approximately a year.

144.     In fact, Anthem states in Paragraph 17 of its Complaint (*see Anthem v. Express Scripts, Inc*., No. 1:16-cv-02048, Complaint at ¶ 17) that as a result of such elongated negotiations in 2012, Anthem–and as a result, Anthem plan participants–paid co-insurance charges calculated based on above competitive benchmark pricing imposed by Express Scripts for almost an extra year. If Anthem is correct, the length of such negotiations resulted in Anthem and, therefore, Plaintiffs and Class members, paying above competitive benchmark pricing during this period.

145.     Pursuant to Section 5.6 of the PBM Agreement, in late 2014, Anthem engaged Health Strategy, LLC ("Health Strategy"), a third party consultant, to conduct a market analysis in order for Anthem, in its words, "to ensure that [Anthem] is receiving competitive benchmark pricing" under the PBM Agreement.

146.     According to Anthem, Health Strategy conducted a comprehensive market analysis, which in or about March 2015 revealed that the pricing terms that Express Scripts had been charging under the PBM Agreement were not consistent with competitive benchmark pricing.[9] Based on Health Strategy's analysis, Express Scripts' then current pricing exceeded competitive benchmark pricing by more than $3 billion annually, and an additional $13 billion over the remaining term of the PBM Agreement.

147.     In addition, given the sheer volume of accounts administered by Express Scripts under the PBM Agreement, Express Scripts is permitted to wind down accounts for Anthem under the PBM Agreement for a period of time after the 10-year agreement expires. Health

---

[9] *See* n. 8.

Strategy calculated that Express Scripts' higher pricing would result in an additional $1.8 billion in overpayments during this post-termination transition period, resulting in nearly $15 billion in overcharges overall. Thus, Anthem asserts that it has been independently established that actual competitive benchmark pricing would be approximately $13 billion lower than Express Scripts' actual pricing over the remaining term of the PBM Agreement, plus approximately $1.8 billion during the post-termination transition period.

148.    Based on this analysis and given that more than 60 percent of Anthem's business is ASO business for self-insured plans where Anthem absorbs none of the costs for prescription medications and such costs are paid solely from self-insured plan assets, the Stamford Plan, and the Brothers Trading Plan, and Plan Class members have been overcharged approximately $1.8 billion dollars annually for prescription medications during the relevant time periods and, during the remaining term of the PBM Agreement and wind down period, anticipate being additionally overcharged more than $8 billion.

149.    In addition, depending on what percentage of these overcharges is passed on to Subscriber Plaintiffs and Subscriber Class members in the form of percentage based co-insurance charges in excess of the limits of competitive benchmark pricing as that term is used in the PBM Agreement, it is likely Subscriber Plaintiffs and members of the Subscriber Class will already have been and continue to be overcharged in excess of $1 billion during the entire term and wind down of the PBM Agreement.

150.    During the Fall of 2015, Health Strategy refreshed its analysis of market data and concluded that Express Scripts deviated even further away from the competitive benchmark pricing it was required to provide Anthem, Anthem-administered plans, and Anthem plan participants under the terms of the PBM Agreement. Thus, even though it was apparently on

notice of such claims by Anthem as early as March 2015, Express Scripts' pricing for prescription medications has not improved since March 2015, and, in fact, has become more inflated.

151.    Based on at least such information, as well as the previous negotiations in 2012, Express Scripts either knew or reasonably should have known that the prices it was imposing on Anthem, the plans its administers and Anthem plan participants for such prescription medications were inflated and excessive, and that as a result, Plaintiffs and Class members were being overcharged and were paying excessive and inflated prices for prescription medications. Yet Express Scripts has continued to charge Plaintiffs and Class members well above these pricing limitations.

152.    Express Scripts failed to disclose the material fact that it was overcharging Plaintiffs and Class members, even though it had an obligation to do so, based on its fiduciary obligations to them for the reasons set forth above and throughout this Complaint.

153.    Express Scripts also had a duty to disclose based on the fact that it was sending or making available to Plaintiffs and Class members over the wires and in the mail invoices or statements for payment of co-insurance charges.

154.     As a result of being charged and forced to pay co-insurance payments that were calculated based on inflated prices for prescription medications set by Express Scripts in violation of the terms of the PBM Agreement, in breach of its fiduciary duties, and/or that constituted prohibited transactions under ERISA, Plaintiffs and Class members suffered economic harm.

155.    Anthem admits that under the current pricing structure of the PBM Agreement, "Anthem *and its members* are paying inflated prices to Express Scripts, which is unsustainable." *See Anthem v. Express Scripts, Inc.*, No. 1:16-cv-02048, Complaint at ¶ 46 (emphasis added).

156.     Anthem further admits that this "excessive pricing is harming Anthem and *its customers*." *Id.*, ¶ 42 (emphasis added).

157.     Anthem also acknowledges that a primary purpose of the PBM Agreement is to "ensure that the required competitive pricing was timely made available to Anthem and its members . . . as provided for under the Agreement." *See Anthem v. Express Scripts, Inc.*, No. 1:16-cv-02048, Complaint at ¶ 17. Thus, Anthem's own allegations make clear that the prices directly paid by Plaintiffs and Class members for prescription medications are inflated, thereby establishing economic harm incurred by Plaintiffs and Class members.

158.     Express Scripts has also unlawfully retained a significant portion of the inflated payments paid either directly or indirectly by Plaintiffs and Class members, resulting in a massive profit windfall for Express Scripts.

159.     Based on recently disclosed information from Anthem alleged in its Complaint against Express Scripts, Anthem claims that it has been offered pricing for providing prescription medications to Plans and Class members in the marketplace that is approximately $15 billion lower than Express Script's anticipated pricing over the remaining term of the PBM Agreement, including the wind down period. *See Anthem v. Express Scripts, Inc.*, No. 1:16-cv-02048, Complaint, ¶ 20. This information further demonstrates that the charges and co-insurance charges imposed on Plaintiffs and Class members for prescription medications exceed competitive benchmark pricing, as that term is used in the PBM Agreement, or are otherwise inflated as set forth above.

160.     Express Scripts also offers lower pricing for prescription medications to current and prospective customers as compared to what Express Scripts offers under the terms of the PBM Agreement. *See Anthem v. Express Scripts, Inc.*, No. 1:16-cv-02048, Complaint,

¶ 21. These recent contract pricing and pricing proposals further demonstrate that Express Scripts knows that its pricing offered to Anthem, Plaintiffs and Class members is in excess of the competitive benchmark pricing levels required under the terms of the PBM Agreement or are otherwise inflated as set forth above.

161.    In March 2016, Anthem initiated legal action against Express Scripts for breach of the PBM Agreement, including breach of Express Scripts' obligation to negotiate in good faith and provide Anthem and its customers competitive benchmark pricing as required by the PBM Agreement. *Anthem v. Express Scripts, Inc.*, Case No. 1:16-cv-02048 (S.D.N.Y. March 21, 2016). Express Scripts filed an amended answer and filed counterclaims against Anthem on June 13, 2016.

162.    Although Anthem and Express Scripts have brought claims against one another for, among other things, breach of the PBM Agreement, neither party's claims seek recovery on behalf of Class members for the overpayments they have made for their prescription medications as a result of the conduct alleged by both parties.

163.    Should Anthem recover any amount from Express Scripts for excessive payments made by the Plan Plaintiffs, or by members of the Plan Class, such amounts in equity rightfully belong to Plaintiffs and Class members who have been forced to pay inflated prices for prescription medications.

**D.    Anthem and Express Scripts' Negotiations and Resulting Dispute Demonstrate the Harm to Plaintiffs and Class Members**

164.    According to Anthem's allegations in the Complaint against Express Scripts referenced herein, Express Scripts failed to negotiate in good faith with Anthem as required under Section 5.6 of the PBM Agreement to ensure that Anthem, and as a direct result Plaintiffs and Class members, would receive the benefit of "competitive benchmark pricing."

165.     In its Complaint, Anthem alleges that on March 18, 2015, Anthem timely notified Express Scripts that it had conducted a market analysis under Section 5.6 of the PBM Agreement (the Health Strategies Report referred to above), and had determined that Express Scripts' pricing was not consistent with the terms of the PBM Agreement. Anthem further alleges that, in accordance with Section 5.6, it shared with Express Scripts specific new pricing terms that would be consistent with the competitive benchmark pricing requirements of the PBM Agreement, and requested that Express Scripts provide Anthem, no later than March 30, 2015: (1) Express Scripts' confirmation that the pricing terms proposed by Anthem constituted competitive benchmark pricing, or (2) the alternative pricing terms that Express Scripts in good faith proposed would satisfy the requirement of only imposing competitive benchmark pricing on Anthem, and as a result Plaintiffs and Class members.

166.     When faced with the market analysis prepared by Health Strategies, Express Scripts did not timely dispute that the pricing terms proposed by Anthem constituted competitive benchmark pricing as required by the PBM Agreement, but did not propose any other pricing terms. Rather, according to Anthem, Express Scripts breached the PBM Agreement by repudiating its obligation to engage in good faith negotiations to set and utilize competitive benchmark pricing for prescription medications. Anthem alleges that Express Scripts failed to engage in any negotiation to obtain competitive benchmark pricing, much less in good faith negotiations. If Anthem is correct, Express Scripts' refusal to engage in good faith negotiations, as required under Section 5.6 of the PBM Agreement, constitutes a breach of a material term of the PBM Agreement.

167.     On April 1, 2015, Anthem provided Express Scripts with formal notice of a breach under Section 6.2(a) of the PBM Agreement.

168.     According to Anthem, Express Scripts failed to cure its pricing breach within the contractually mandated cure period. Instead, according to Anthem, Express Scripts continued to repudiate its obligations under Section 5.6 of the PBM Agreement, including by claiming that it did not have to negotiate at all over Anthem's pricing proposal or for competitive benchmark pricing under the terms of the PBM Agreement, and that it had a unilateral veto right over any negotiations not otherwise provided for under the PBM Agreement. Using this claimed veto right as an excuse, Express Scripts failed for months to negotiate at all, let alone in good faith, with respect to the pricing terms proposed by Anthem, even though such negotiations were necessary to ensure Anthem, self-funded plans administered by Anthem, and Anthem plan participants were only charged rates based on competitive benchmark pricing for prescription medications.

169.     According to Anthem, despite Express Scripts' failure to negotiate in good faith, Anthem continued to try to negotiate in good faith with Express Scripts to ensure Anthem, self-funded plans administered by Anthem, and Anthem plan participants were only charged competitive benchmark pricing for prescription medications. Anthem asserts that Express Scripts continued to breach Section 5.6 of the PBM Agreement by, among other things, expressly repudiating its contractual obligation to negotiate over the pricing terms proposed by Anthem for competitive benchmark pricing, by refusing to negotiate at all, let alone in good faith, over the pricing terms proposed by Anthem for competitive benchmark pricing, by failing to agree in writing to new pricing terms, and by failing to make any proposal for competitive benchmark pricing. All of this conduct adversely impacted Plaintiffs and Class members as a result of being forced to pay prescription medication claims or percentage based co-insurance charges based on inflated prescription medication pricing, which if Anthem is correct they are still being charged.

170.     According to Anthem, on June 22, 2015, long after the cure period had expired, and nearly three months after Anthem first delivered its pricing proposal, Express Scripts contacted Anthem. Express Scripts did not dispute that Anthem's proposal constituted competitive benchmark pricing. Nonetheless, Express Scripts rejected, and refused to negotiate over, Anthem's pricing terms. Moreover, Express Scripts failed to make any counter-proposal for competitive benchmark pricing.

171.     According to Anthem, as set forth below, for the next several months, Express Scripts continued to refuse to engage in negotiations with respect to Anthem's proposal to ensure that both it and Anthem, the plans Anthem administers, and Anthem plan participants were only charged competitive benchmark pricing. Anthem and Express Scripts finally met on September 15, 2015. Again, Express Scripts did not dispute that Anthem's proposal constituted competitive benchmark pricing, but again Express Scripts refused to negotiate over Anthem's proposal.

172.     On October 2, 2015, Express Scripts contacted Anthem again, but, according to Anthem, Express Scripts again refused to negotiate over Anthem's proposal to ensure Anthem, the plans Anthem administers, and Anthem plan participants were only charged competitive benchmark pricing.

173.     On October 8, 2015, Anthem sent an e-mail to Express Scripts stating that Express Scripts has a contractual obligation to ensure that Anthem, the plans Anthem administers, and Anthem plan participants are receiving competitive benchmark pricing, and that Anthem would be happy to speak to Express Scripts to negotiate such pricing.

174.     On October 19, 2015, Timothy Wentworth, President of Express Scripts, asked Anthem for a meeting. Mr. Wentworth, however, indicated he wanted to discuss matters

unrelated to whether Express Scripts was in fact charging competitive benchmark pricing, rather than negotiate in good faith over Anthem's proposal to ensure Anthem, the plans Anthem administers, and Anthem plan participants were only charged competitive benchmark pricing.

175.    On October 27, 2015, Anthem contacted Express Scripts in response to Mr. Wentworth's proposal and, among other things, agreed to meet and asked Express Scripts for a meeting time. According to Anthem, Express Scripts ignored Anthem.

176.    On November 5, 2015, Anthem again contacted Express Scripts to inquire about the setting of a meeting as Mr. Wentworth had suggested, but Express Scripts would not meet.

177.    Anthem further alleges that on November 11, 2015, Anthem again reached out to Mr. Wentworth of Express Scripts in an effort to engage Express Scripts in good faith negotiations. Anthem again asked that Express Scripts meet to negotiate over competitive benchmark pricing. Express Scripts again failed to meet or negotiate, let alone in good faith. In fact, Express Scripts responded that it did not believe it was "appropriate" for Mr. Wentworth to be involved in these critical pricing discussions, even though Mr. Wentworth had been a key Express Scripts representative with respect to the pricing issue, and just two months earlier had suggested such a direct meeting.

178.    On November 23, 2015, Anthem sent another e-mail asking Express Scripts to meet to negotiate Anthem's pricing proposal to ensure both Anthem, the plans Anthem administers, and Anthem plan participants were only charged competitive benchmark pricing. Express Scripts again did not meet with Anthem or otherwise engage in good faith negotiations with respect to Anthem's pricing proposal for competitive benchmark pricing.

179.    According to Anthem, despite Express Scripts' continuing failure to negotiate in good faith or to make any proposal for competitive benchmark pricing, on December 2, 2015,

Anthem sent a revised pricing proposal to Express Scripts. Anthem's proposal stated in relevant part:

> Attached please find a revised proposal for competitive benchmark pricing, pursuant to Section 5.6 of the Agreement. As you know, on 3/18/2015 Anthem proposed pricing terms based on a market analysis of competitive benchmark pricing conducted by it and a third-party consultant, Health Strategies, LLC, which determined that the current pricing terms of the Agreement were not even close to competitive. Months have elapsed, but Express Scripts has refused to negotiate for competitive benchmark pricing, as required under Section 5.6 of the Agreement. Given the lapse of time, Health Strategies has now updated its analysis, and has determined that competitive benchmark pricing has decreased since 3/18/2015. Nonetheless, in the hopes of getting Express Scripts to engage in meaningful negotiations, our revised proposal provides for pricing that is higher than as originally proposed and, therefore, favors Express Scripts. We remain available to discuss pricing with Express Scripts. Please let me know when you are available to meet. We look forward to a favorable consideration of this revised proposal.
>
> Thank you.

180.   Express Scripts did not respond. On December 14, 2015, Anthem emailed Express Scripts again:

> It has been as many as 19 full days now, and we still have not heard back from Express Scripts as to either communication.
>
> We would appreciate it if you could at least write back with answers to the following questions:
>
> 1.     Is Express Scripts willing to reconsider its position that it is not required to offer Anthem competitive benchmark pricing?
>
> 2.     Is Express Scripts willing to reconsider its position that it has the right to veto competitive benchmark pricing to Anthem?
>
> 3.     Will Express Scripts accept the pricing terms set forth in Anthem's revised proposal of December 2? We are ready, willing and able to respond to any inquiries you have about our competitive benchmark pricing proposal.
>
> 4.     Has Express Scripts agreed to provide, or offered to provide, pricing terms to any other customer or potential customer on terms consistent with those that Anthem is requesting? Obviously, the pricing that Express Scripts is offering

to Anthem's competitors is important, but Express Scripts still has not provided us any such information.

Tim [Wentworth], the year is quickly slipping away. We are available to meet with Express Scripts before the holidays, and we look forward to a favorable consideration of our revised proposal for competitive benchmark pricing. As we have mentioned before, Anthem is determined to continue our efforts to engage Express Scripts in meaningful negotiations for competitive benchmark pricing, and we continue to believe that a meeting among the decision-makers can help. Please let me know whether Express Scripts is willing to meet to discuss Anthem's competitive benchmark pricing proposal. Thank you.

181.    According to Anthem, on December 15, 2015, Express Scripts again repudiated the PBM Agreement by responding that it was maintaining its position that it was not obligated to negotiate over Anthem's pricing proposal for competitive benchmark pricing, and could simply unilaterally veto the need to participate in any negotiation. Express Scripts also continued its refusal to disclose the pricing terms it was offering in the market to its other current or prospective customers, likely because such information would demonstrate Express Scripts' bad faith. Express Scripts also failed to meet with Anthem to negotiate such pricing. Express Scripts stated that it would wait another two weeks before responding to the December 2 proposal.

182.    On December 17, 2015, Anthem responded, in part, by asking Express Scripts to provide a response sooner, noting that the Express Scripts already had nine months to consider the pricing issue and certainly must know its intentions.

183.    Express Scripts waited six days and then responded, by letter dated December 23, 2015, that it was not going to provide any response until after the holidays, purportedly aware that Anthem is typically on reduced staff during this period.

184.    Anthem asserts that late in the day on January 7, 2016, almost 10 months after Anthem had initiated negotiations to ensure Anthem, the plans Anthem administers, and Anthem plan participants were only charged competitive benchmark pricing, Express Scripts forwarded a

proposal, in bad faith, that would reduce pricing by only $1 billion, a mere 8% of what Anthem, the plans Anthem administers, and Anthem plan are entitled to under the PBM Agreement. Thus, Express Scripts delayed over another month, only to propose pricing that was still some $12 billion in excess of competitive benchmark pricing for the remaining term of the PBM Agreement, or less than 8% of the reduction necessary to constitute competitive benchmark pricing, and that further was inflated by more than another $1 billion for the post-termination transition period. In other words, at the very time that Express Scripts was supposed to be reducing its pricing under the terms of the PBM Agreement for the benefit of Anthem, the plans Anthem administers, and Anthem plan participants, Express Scripts proposed what would ultimately be an increase in that pricing over the entire term covered by the PBM Agreement.

185.    On January 13, 2016, Anthem responded by, among other things, advising Express Scripts that, for a limited time, it would be willing to accept pricing above competitive benchmark pricing to resolve the issue:

> **Express Scripts' excessive pricing is harming Anthem and its customers.**
> Consequently, Anthem needs to resolve this matter quickly. In the interest of getting to a resolution, Anthem is prepared to accept something less than competitive benchmark pricing, as reflected in Anthem's proposal, in derogation of its contract rights, but obviously will not accept Express Scripts' grossly inflated pricing proposal. Please provide Anthem with a reasonable proposal that at least approaches the competitive benchmark pricing provided for in the Agreement. Please be advised that Anthem's willingness to accept less than competitive benchmark pricing as reflected in its proposal is limited in time, so Express Scripts needs to move quickly. (Emphasis added.)

Anthem yet again asked Express Scripts to meet.

186.    Express Scripts did not respond. According to Anthem, despite Express Scripts' refusal to negotiate, on January 22, 2016, Anthem itself communicated a third proposal that was less than competitive benchmark pricing. Anthem proposed a price reduction of $11 billion over the remaining term of the PBM Agreement, which was $2 billion less than what Anthem,

Anthem's administered plans, and Anthem members, including Plaintiffs and Class members, were entitled to under the PBM Agreement. In other words, Anthem proposed to accept pricing that was $2 billion in excess of competitive benchmark pricing, and inflated further for the post-termination transition period, to resolve the dispute short of litigation. Anthem again asked Express Scripts to meet to negotiate.

187.    On January 26, 2016, Express Scripts maintained its position that Express Scripts was not obligated to provide competitive benchmark pricing. Express Scripts also continued its refusal to disclose the pricing terms it was offering in the market to its other current and prospective customers.

188.    On February 3, 2016, Anthem representatives traveled to St. Louis in order to have an opportunity, at last, to meet with Mr. Wentworth. According to Anthem, the trip was a complete waste of time. Express Scripts refused to engage in good faith negotiations with respect to the pricing terms proposed during that meeting by Anthem to ensure Anthem, the plans Anthem administers, and Anthem plan participants were only charged competitive benchmark pricing.

189.    According to Anthem, Express Scripts again repudiated the PBM Agreement by improperly stating that Express Scripts was not obligated to negotiate at all over the pricing terms proposed by Anthem, either for competitive benchmark pricing or any alternative proposal.

190.    Nonetheless, Anthem made yet another proposal, this time proposing pricing that would increase pricing to Anthem under the PBM Agreement by another $1.4 billion. Specifically, Anthem offered to accept a pricing reduction of only $9.7 billion over the remaining term of the PBM Agreement, which was $3.4 billion less than what Anthem asserted was the amount that it, the plans Anthem administers, and Anthem plan participants were entitled

to receive as competitive benchmark pricing during the remaining term of the PBM Agreement, plus additional amounts during the post-termination transition period. In other words, Anthem proposed to pay Express Scripts $3.4 billion in excess of what it deemed competitive benchmark pricing, plus additional amounts during the post-termination transition period, to expeditiously resolve the dispute without litigation.

191.    On February 5, 2016, Anthem submitted in writing the proposal discussed at the February 3, 2016 meeting with Express Scripts:

> As you know, Anthem has now spent almost one year trying to engage Express Scripts in negotiations for competitive benchmark pricing, but Express Scripts has refused to do so. **Consequently, Anthem and its members are paying inflated prices to Express Scripts, which is unsustainable.** Obviously, Anthem should not have to bid against itself, but delay is inflicting substantial harm on Anthem **and improperly enriching Express Scripts**. So, as I told you at our meeting, in yet another effort to get Express Scripts to engage, and notwithstanding its right to lower pricing, **Anthem proposes the pricing reflected on Exhibit A hereto, which is $3.4 billion more than competitive benchmark pricing available to Anthem in the marketplace**. In other words, Anthem is prepared to overpay Express Scripts by approximately $3.4 billion in an effort to get Express Scripts to provide repricing, as it is required to do (at much lower amounts) under Section 5.6 of the Agreement. Anthem's willingness to accept pricing in excess of competitive benchmark pricing is limited in time, so we urge Express Scripts to move quickly with respect to Anthem's proposal. Otherwise, Anthem reserves all rights, including the right to the full amount of the pricing reduction necessary to achieve competitive benchmark pricing.
>
> We have tried to avoid stating the obvious problem that Express Scripts, as a competitor of Anthem's, is inflating Anthem's prices so that it can then undercut Anthem's prices. We ask Express Scripts to reconsider that approach.
>
> Providing Anthem with market pricing, as you presumably provide to other customers and potential customers, would be very beneficial to Express Scripts. Accepting Anthem's proposal to pay Express Scripts $3.4 billion more than market pricing would provide Express Scripts an extraordinary windfall. Anthem cannot continue under Express Scripts' current pricing, so please respond to Anthem's proposal by next week. Anthem is again ready, willing and able to meet with Express Scripts to negotiate in good faith. Thank you. (Emphasis added.)

192.    On February 12, 2016, Express Scripts responded with a proposal that did not reduce pricing by a single dollar from Express Scripts' January 7, 2016 proposal. Express Scripts maintained its proposal for pricing that was $12 billion in excess of what Anthem deemed competitive benchmark pricing, plus more than another $1 billion for the post-termination transition period. Express Scripts again refused to provide pricing information regarding its current and prospective customers.

193.    According to Anthem, Express Scripts also proposed nominally reduced prices for some products and services, but on formularies and networks that Anthem and its customers do not use. So, rather than offering re-pricing on the products and services actually provided by Anthem to its subscribers and enrollees, Express Scripts offered lower pricing on products and services that Anthem and its subscribers and enrollees do not utilize, which is not a good faith negotiation as it was obligated to undertake pursuant to the terms of the PBM Agreement.

194.    Additionally, according to Anthem, the pricing offered for the formularies and networks was still in excess of competitive benchmark pricing and, therefore, also breached Section 5.6 of the PBM Agreement. Anthem responded, explaining that it was not interested in the supposed concessions Express Scripts was making regarding the formularies and narrower networks that Anthem and its subscribers and enrollees do not use.

195.    According to Anthem, notwithstanding Express Scripts' refusal to negotiate in good faith over the pricing terms proposed by Anthem to ensure Anthem, the plans Anthem administers, and Anthem plan participants were only charged for prescription medications based on "competitive benchmark pricing", Anthem representatives again met with Express Scripts representatives on February 18, 2016.

196.     Anthem asserts that at that meeting, Express Scripts again repudiated the PBM Agreement by stating that it was not obligated to negotiate in good faith over the pricing terms proposed by Anthem for competitive benchmark pricing or otherwise. Anthem claims that Express Scripts refused to negotiate at all, leaving Anthem to either take or leave Express Scripts' patently inadequate proposal for pricing that was still $12 billion in excess of "competitive benchmark pricing". According to Anthem, Express Scripts' "take it or leave it" proposal constituted yet another breach of its obligation to negotiate in good faith to ensure Anthem, the plans Anthem administers, and Anthem plan participants were only charged competitive benchmark pricing.

197.     Anthem asserts that it tried to work with Express Scripts' Chief Executive Officer, George Paz, to negotiate such terms. Joseph Swedish, Anthem's Chief Executive Officer, traveled to Chicago on March 1, 2016 to meet with Mr. Paz. Express Scripts again refused to negotiate in good faith or at all over the pricing terms proposed by Anthem or for competitive benchmark pricing. Express Scripts again failed to make a new proposal for competitive benchmark pricing. And Express Scripts again refused to share any market data or pricing information for its current and prospective customers. However, Express Scripts stated that it would make a revised proposal. The week after the March 1 meeting, Express Scripts stated that it would send the proposal by March 11, 2016. No proposal was sent by that date. Instead, Express Scripts responded that its proposal would be delayed.

198.     On March 17, 2016–the one-year anniversary of when Anthem first raised the competitive benchmark pricing issue with Express Scripts and more than two weeks after the March 1, 2016 meeting of Anthem's and Express Scripts' senior executives–Express Scripts sent a letter to Anthem. Express Scripts, however, did not submit a revised proposal. According to

Anthem, Express Scripts instead merely recycled its insufficient February 12, 2016 proposal. Express Scripts maintained its proposal for pricing that was approximately $12 billion in excess of competitive benchmark pricing during the remaining term of the PBM Agreement, plus more than $1 billion for the post-termination transition period. In other words, Express Scripts made Anthem wait seventeen days for the new proposal it promised, which did not reduce proposed pricing by a single dollar from Express Scripts' previous proposal. Express Scripts also again refused to provide market data or pricing information regarding its current and prospective customers.

199.    If Anthem is correct, Express Scripts has breached the competitive benchmark pricing provisions of the PBM Agreement, resulting in harm to Plaintiffs and Class members as set forth above. In addition, by extracting greater payments than provided for in the PBM Agreement, Express Scripts has breached its fiduciary duties. Express Scripts also unreasonably and unjustly enriched itself at the expense of Plaintiffs and Class members.

200.    In violation of both Express Scripts' and Anthem's duties and obligations to Plaintiffs and Class members, while the PBM Agreement has been in place, Plaintiffs and Class members have been subjected to prescription medication prices that by Anthem's own admission exceed competitive benchmark pricing or are otherwise inflated as set forth above.

**E.      Defendants' Status as ERISA Fiduciaries**

201.    Plaintiffs and members of the Subscriber ERISA Class (as defined below) are participants in employee welfare benefit plans as that term is defined in 29 U.S.C. § 1002(1)(A) insured or administered by Anthem to provide participants with medical care and prescription medications.

202.    The plans represented by the Plan Plaintiffs and the plans represented by members of the Plan Class are employee welfare benefit plans, as that term is defined in 29 U.S.C.

§1002(1)(A), and are administered by Anthem to provide participants with medical care and prescription medications.

203.    ERISA fiduciaries include not only persons explicitly named as such in governing plan instruments, but also any other person who in fact performs fiduciary functions. ERISA defines "fiduciary" not in terms of formal trusteeship, but in functional terms of control and authority over the plan. Specifically, a person is a fiduciary "to the extent . . . . he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets. . . .," ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i), or "he has any discretionary authority or discretionary responsibility in the administration of such plan," ERISA § 3(21)(A)(iii), 29 U.S.C. § 1002(21)(A)(iii). Thus, an entity is an ERISA fiduciary if it exercises discretionary authority or control in managing or administering the plan, or if it exercises any authority or control (discretionary or not) respecting management or disposition of plan assets.

204.    Whether someone is a "named fiduciary" is irrelevant to the analysis of functional fiduciary status. Nor must there be a formal delegation of fiduciary responsibility for an individual to be found a fiduciary under the functional test.

205.    ERISA also permits an ERISA fiduciary to wear "two hats." The entity assumes fiduciary status to the extent it functions as a plan administrator or PBM, or otherwise exercises discretionary authority and responsibility over the plan and its terms.

206.    At all relevant times, Express Scripts has been and continues to act as a fiduciary of all of the ERISA plans for which it has provided pharmacy management benefits under the PBM Agreement by reason of the following, as well as the acts set forth above:

(a) Express Scripts has had and has exercised discretionary authority and control by determining the prices paid by ERISA plans administered by Anthem and by non-ERISA plans and their participants for prescription medications;

(b) Express Scripts has had and has exercised discretionary authority and control by setting its own margin/compensation for the sale of prescription medications to those plans and their participants;

(c) Express Scripts has had and has exercised discretionary authority and responsibility over the management and administration of pharmacy benefits under those plans;

(d) Express Scripts has had and has exercised discretionary authority and responsibility over the plans and Anthem insureds by choosing whether to fill a prescription from a participant, reject the prescription, or shift the participant to a different prescription medication or require the use of Express Scripts' exclusive mail order pharmacy;

(e) Express Scripts has had and has exercised discretionary authority and control over the plans and Anthem insureds by trading off the interests of plans and their participants against its own interest in charging inflated prices in order to obtain excessive profits at the expense of the plans and their participants;

(f) Express Scripts has had and has exercised discretionary authority and control over the plans and Anthem insureds by designating prescription medications as either "brand" or "generic," and using its own proprietary algorithm to make this distinction, thereby resulting in Express Scripts' ability to maximize its revenue and directly control the prices it charged to Plaintiffs and Class members for prescription medications;

(g) Express Scripts has had and has exercised discretionary authority and control over the plans and Anthem insureds by controlling rebates and fees, including but not limited to manufacturer formulary rebates, and failing to pass rebates it obtains under the PBM Agreement to ASO plans for the benefit of the Plans and the participants and beneficiaries of the Plans, thereby resulting in Express Scripts' ability to maximize its revenue and directly control the prices it charged to Plaintiffs and Class members for prescription medications;

(h) Express Scripts has had and has exercised discretionary authority and control under the PBM Agreement by deciding which medications are permitted on its MAC List, thereby resulting in Express Scripts' ability to maximize its revenue and directly control the prices it charged to Plaintiffs and Class members for prescription medications; and

(i) Express Scripts has had and has exercised discretionary authority and control over the plans through its interpretation of "competitive benchmark pricing," which has resulted in high stakes litigation between Express Scripts and Anthem.

207.    At all relevant times, Anthem has been and continues to act as a fiduciary to the

Plaintiffs, the Subscriber ERISA Class members, and the Plans by reason of the following, as

well as the acts set forth above:

(a)  Anthem exercised discretionary authority and discretionary control over the plans and Anthem insureds by negotiating the terms of the PBM Agreement, purportedly for the benefit of the Plans, Plaintiffs and Class members as required by ERISA;

(b) Anthem has had and has exercised the discretionary authority or discretionary control to negotiate on behalf of the plans and their plan participants the terms of the PBM Agreement with Express Scripts – terms that directly impacted the prices for prescription medications paid by the Plans and by plan participants, which includes Plaintiffs and Class members;

(c) Anthem has had and has exercised the discretionary authority or discretionary control to set its own compensation under the PBM Agreement;

(d) Anthem has had and has exercised discretionary authority or discretionary control to monitor Express Scripts' performance and to take appropriate action to protect plans and plan participants from Express Scripts' failure to utilize and/or provide competitive benchmark pricing as required under the terms of the PBM Agreement;

(e) Anthem has had and has exercised discretionary authority or discretionary control over the management and administration of prescription medication benefits under the Plans; and

(f) Anthem has had and as exercised discretionary authority or discretionary control over the plans by failing to negotiate for additional rebates it knows or should have known that Express Scripts should be passing to the Plans.

208.    In addition, both Express Scripts and Anthem exercised discretionary authority or

discretionary control by subjecting the Plans Anthem administers as well as participants and

beneficiaries of Anthem plans to a 10-year exclusive PBM Agreement that—according to

Express Scripts—provided Express Scripts with discretion to charge above competitive

benchmark prices for prescription medications in order to obtain $4.675 billion for NextRx.

209.    In particular, both Express Scripts and Anthem had knowledge—unbeknownst

and undisclosed to Plaintiffs and Class members at the time the PBM Agreement was reached—

that this payment would result in *higher* pricing for prescription medications for the Plans

Anthem administers as well as the participants in Anthem plans than they would otherwise have

been subjected to if more standardized metrics had been agreed to, such as set forth above.

210.    Furthermore, according to Express Scripts, if Anthem would have accepted a

$500 million payment instead of a $4.675 billion upfront payment, this would have resulted in

lower prices for prescription medications to Plaintiffs and Class members. According to Express

Scripts, Anthem used the up-front payment to repurchase its stock and enrich its own

shareholders and management.

**F.    Fiduciary Duties Under ERISA**

211.    ERISA §§ 404(a)(1)(A) and (B), 29 U.S.C. §§ 1104(a)(1)(A) & (B), provides, in

pertinent part, that a fiduciary shall discharge his duties with respect to a plan solely in the

interest of the participants and beneficiaries in that plan, for the exclusive purpose of providing

healthcare benefits to participants and their beneficiaries, and with the care, skill, prudence, and

diligence under the circumstances then prevailing that a prudent person acting in a like capacity

and familiar with such matters would use in the conduct of an enterprise of a like character and

with like aims.

212.    Fiduciary duties under ERISA § 404 encompass three primary components. The

first is referred to as the "duty of loyalty," pursuant to which all decisions regarding an ERISA

plan must be made with an eye single to the interests of the participants and beneficiaries. The

second is known as the "prudent man" fiduciary obligation, which imposes an unwavering duty

on an ERISA trustee to make decisions with single-minded devotion to a plan's participants and

beneficiaries and, in so doing, to act as a prudent person would act in a similar situation. Finally,

an ERISA fiduciary must act "for the exclusive purpose of providing benefits to plan

beneficiaries." If a fiduciary fails to meet any of these high standards, it will be held personally liable for any losses that result from his or her breach of duty.

213.    In exercising its discretion to set the prices that Plaintiffs and Class members were and are required to pay Express Scripts for their prescription medications, Express Scripts, as a fiduciary, was and is required to act in the best interests of the participants and beneficiaries of the ERISA plans, which include the ERISA Class members. By charging Anthem, plans administered by Anthem, and Anthem plan participants inflated prices for prescription medications as that term is described above, Express Scripts has breached its fiduciary duties to the Plan Class members and the ERISA Class members.

214.    Express Scripts had and has a duty to offer competitive benchmark pricing pursuant to the PBM Agreement. Nevertheless, Express Scripts, through its pricing of prescription medications, has maximized and continues to maximize its revenues at the expense of Plan Class members and ERISA Class members by charging Anthem, Anthem plans administered by Anthem, and Anthem plan participants inflated prices for prescription medications as that term is described above. Express Scripts collected such excessive amounts from members of the ERISA class and the Plan Class despite its awareness of the effect its prescription medication pricing has had and has on percentage based co-insurance paid by the ERISA Class members and payments for prescription medications paid by Plan Class members.

215.    Express Scripts is also required to process and pay claims in the best interests of participants and beneficiaries of the ERISA plans at issue. In violation of these duties, Express Scripts has exercised discretionary authority or discretionary control over these plans by retaining and/or improperly allocating substantial amounts of the prices participants and beneficiaries have paid for prescription medications as set forth above. Express Scripts retains

the added margin between what it pays for such medications and what it charges Plan Class members and ERISA Class members.

216.    Furthermore, formulary management by a PBM entails interpretation of plan documents and exercise of discretion over the entitlement and/or nature of certain PBM services. Thus, PBMs have fiduciary duties of loyalty and prudence when exercising discretion over a plan's formulary, including when determining when or under what circumstances an individual should add, remove, or switch prescription medications and whether an individual should be switched to Express Scripts' mail order program. In choosing whether to fill a prescription or shift a participant to a different prescription medication, a PBM exercises discretion over plan assets. Express Scripts' formulary decisions that resulted in Plaintiffs and Class members paying in excess of competitive benchmark prices breached both its fiduciary duty of loyalty and its fiduciary duty of prudence to ERISA Class members and to Plan Class members.

217.    In negotiating and entering into a contract on behalf of an ERISA plan, a fiduciary must act prudently and negotiate terms that are reasonable and in the best interests of plan participants. In these negotiations and in the contract that is ultimately agreed upon, a fiduciary cannot place its interests over the interests of the plan participants and beneficiaries. In negotiating the PBM Agreement and accepting payment of the nearly $5 billion in connection with the sale of its business to Express Scripts instead of accepting a lower payment that would have provided lower prescription medication pricing to Plaintiffs and Class members, Anthem breached these duties.

218.    Fiduciaries cannot place their interests above participants and beneficiaries of ERISA governed plans, but must act with an "eye single" to such participants and beneficiaries. Moreover, as fiduciaries must not engage in self-dealing, transactions involving conflicts of

interest require even more exacting scrutiny to ensure the best interests of participants and beneficiaries are accounted for. Anthem breached these duties by accepting a payment from Express Scripts that it knew or reasonably should have known would result in higher prices for prescription medications, and in turn higher payments for Plan Class members and higher percentage based co-insurance payments by Subscriber Class members.

219.     In addition, a fiduciary that appoints another person to fulfill all or part of its duties, by formal or informal hiring, subcontracting, or delegation, assumes the duty to monitor that appointee to protect the interests of the ERISA Plans and their participants. The power to appoint, retain, and remove plan fiduciaries or service providers confers fiduciary status upon the person holding such power.

220.     Here, Anthem retained Express Scripts to provide PBM services for the benefit of the plans Anthem administered and ERISA plan beneficiaries, including ERISA Class members. As set forth herein, a primary purpose of the PBM Agreement is for Express Scripts to provide PBM services to Anthem insureds, and "[a] critical key to success for health insurers is to provide effective and affordable pharmacy/drug related services and administration for its members. Health insurers depend on PBMs for such pricing and administration, and Anthem contracted with ESI to provide these critical services." *See Anthem v. Express Scripts, Inc.*, No. 1:16-cv-02048, Complaint at ¶ 11.

221.     By entering into the PBM Agreement, Anthem authorized Express Scripts to exclusively set the prices for prescription medications (subject to the terms of the PBM Agreement, although according to Express Scripts even that was not a bar) and thereby to control what Express Scripts, Anthem and retail pharmacies charge and collect from plans and as percentage based co-insurance payments from Class members. For mail order pharmacy

services, Anthem authorized Express Scripts to control the prices paid by plans as well as the prices directly paid by Class members who were forced to use mail order under the terms of their Anthem health plans for certain prescription medications Express Scripts mails to participants directly, authorizing Express Scripts to set the prices for such medications. An appointing fiduciary must take prudent and reasonable action to determine whether the appointees are fulfilling their own separate fiduciary obligations.

222.    When Anthem endowed Express Scripts with authority and discretion to control prescription medication pricing for Plaintiffs and Class members as set forth above, including the amount of percentage based co-insurance amounts Subscriber Plaintiffs and Class members would be required to pay, Anthem assumed the duty to monitor Express Scripts' exercise of that discretionary authority. Anthem further owed and owes Plaintiffs and Class members the duty to establish policies and procedures to monitor Express Scripts' performance of its duties, to monitor Express Scripts' prescription medication pricing, to monitor the effect of Express Scripts' prescription medication pricing on the amount of percentage based co-insurance payments paid by Plaintiffs and the Class members, to protect the interests of Plaintiffs and Class members, and to provide complete and accurate information to Plan Class members and ERISA Class members concerning violations of ERISA rights by Express Scripts.

223.    In allowing Express Scripts to violate ERISA, and in failing to correct such breaches of duty in a timely fashion, Anthem breached its duty to monitor Express Scripts' illegal conduct as described above. These breaches are actionable under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3).

224.    ERISA also holds fiduciaries liable for the misconduct of co-fiduciaries. ERISA § 405(a), 29 U.S.C. § 1105(a). Co-fiduciary liability is an important part of ERISA's regulation of

fiduciary responsibility. Because ERISA permits the fractionalization of the fiduciary duty, there may be, as in this case, more than one ERISA fiduciary involved in a given issue.

225.    Anthem and Express Scripts are liable for each other's misconduct as co-fiduciaries. Each is a fiduciary with respect to the ERISA Plans at issue in this case and both entities have participated in each other's breaches under ERISA § 404. Furthermore, each entity has enabled the other's fiduciary breaches under ERISA § 404.

226.    In addition, ERISA § 406, 29 U.S.C. § 1106, prohibits certain types of transactions. The provisions of ERISA § 406, 29 U.S.C. § 1106, are designed to supplement the general fiduciary duty provisions of ERISA.

227.    Pursuant to ERISA § 406(b), "[a] fiduciary with respect to a plan shall not (1) deal with the assets of the plan in his own interest or for his own account, (2) in his individual or in any other capacity act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries, or (3) receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan." ERISA § 406(b), 29 U.S.C. § 1106(b). Pursuant to ERISA § 406(a), fiduciaries are prohibited from causing a plan to engage in a transaction "if the fiduciary knows or should know that such transaction constitutes a direct or indirect: (A) sale or exchange, or leasing, of any property between the plan and a party in interest; (B) lending of money or other extension of credit between the plan and a party in interest; (C) furnishing of goods, services, or facilities between the plan and a party in interest; [or] (D) transfer to, or use by or for the benefit of a party in interest, of any assets of the plan; . . . ." ERISA § 406(a), 29 U.S.C. § 1106(a).

228.     Parties-in-interest can also be held liable for violations of ERISA § 406, 29

U.S.C. § 1106. As defined in ERISA § 3(14)(A), 29 U.S.C. § 1002(14)(a), a party in interest

includes "any fiduciary (including, but not limited to, any administrator, officer, trustee, or

custodian), counsel, or employee of such employee benefit plan," or "a person providing services

to such plan." At all relevant times, Anthem and Express Scripts have been parties-in-interest to

the ERISA Plans Anthem administers or insures because each was a fiduciary of these Plans

and/or was "a person providing services to" the Plans. As parties in interest, Anthem and Express

Scripts are each liable for the prohibited transactions identified in this Complaint to which they

were parties.

229.     Neither fiduciary nor party-in-interest status is required for liability under ERISA

where non-fiduciaries participate in and/or profit from a fiduciary's breach of duty or a

prohibited transaction. Accordingly, as to the ERISA claims asserted in this Complaint, even if

Anthem or Express Scripts is not found to have fiduciary or party-in-interest status themselves,

they must nevertheless restore unjust profits or fees and are subject to other appropriate equitable

relief with regard to the transactions at issue in this action, pursuant to ERISA § 502(a)(3), 29

U.S.C. § 1132(a)(3), and pursuant to the Supreme Court's decision in *Harris Trust & Sav. Bank

v. Salomon Smith Barney Inc.*, 530 U.S. 238 (2000). As a result, to the extent that either Anthem

or Express Scripts is not deemed to be a fiduciary or a party-in-interest with regard to any

transaction at issue in this action, they are nevertheless also subject to equitable relief under

ERISA based on their knowledge of the wrongdoing at issue.

230.     ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes individual participants and

fiduciaries to bring suit "(A) to enjoin any act or practice which violates any provision of this

subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to

redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan." The remedies set forth in § 502(a)(3) include remedies for breaches of the fiduciary duties set forth in ERISA § 404, 29 U.S.C. §1104, and for violation of the prohibited transaction rules set forth in ERISA § 406, 29 U.S.C. § 1106.

231.    ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), authorizes fiduciaries to bring suit for the relief set forth in ERISA § 409, 29 U.S.C. § 1109 provides. Section 409 provides, "Any person who is a fiduciary with respect to a plan who breach any of the responsibility, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary."

232.    The Subscriber Plaintiffs who are subject to ERISA therefore bring claims under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), for appropriate equitable relief from Defendants as fiduciaries (and, in the alternative, from Defendants as parties in interest to prohibited transactions and/or knowing participants in breaches of any of ERISA's fiduciary responsibility provisions), including without limitation, injunctive relief and, as available under applicable law, imposition of a constructive trust, equitable surcharge, restitution, and disgorgement of profits.

233.    Plan Plaintiffs also bring claims under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), for appropriate equitable relief from Defendants as fiduciaries (and, in the alternative, from Defendants as parties in interest to prohibited transactions and/or knowing participants in breaches of any of ERISA's fiduciary responsibility provisions), including without limitation, injunctive relief and, as available under applicable law, imposition of a

constructive trust, equitable surcharge, restitution, and disgorgement of profits. Plan Plaintiffs also bring suit pursuant to ERISA § 502(a)(2) for relief pursuant to ERISA § 409, 29 U.S.C. § 1109.  Plan Plaintiffs seek restoration of the Plans' assets resulting from the breach, Defendants' profits that have been made through use of assets of the Plans, as well as other equitable or remedial relief as the Court may deem appropriate, both as to the Plan Plaintiffs' assets and the assets of Plan Class members.

## G.      Plaintiffs' Claims Are Timely

234.    Defendants' actions described herein have caused harm and continue to cause ongoing harm to Plaintiffs and Class members.

235.    Anthem alleges in its lawsuit against Express Scripts that because Anthem insureds are not paying "competitive benchmark pricing" levels for prescription medications, "Anthem and its members are paying inflated prices to ESI." *See Anthem v. Express Scripts, Inc.*, No. 1:16-cv-02048, Complaint at ¶ 46.

236.    In addition, as set forth herein, Anthem alleges it will be overcharged by approximately $15 billion over the *remaining* term of the PBM Agreement, thereby making clear that Defendants' conduct is causing ongoing and future harm through the duration of the PBM Agreement and even the post-termination transition period, which Anthem claims will cause another $1.8 billion in damages. *See Anthem v. Express Scripts, Inc.*, No. 1:16-cv-02048, Complaint at ¶ 97.

237.    Plaintiffs initiated their claims promptly after learning that Anthem and Express Scripts breached their fiduciary duties to them and Class members. Plaintiffs did not and could not reasonably know prior to Anthem's lawsuit against ESI of the conduct that formed the basis of the lawsuit, namely ESI's charging of inflated prices for prescription medications as described

in detail above, and Anthem's complicity in that conduct based on Express Scripts' counter allegations.

238.    The bases for how prescription medication prices are set are opaque, difficult to understand, and not available to lay people. Plaintiffs and Class members are at the mercy of the good faith and fair conduct of the Defendants.

239.    Both Defendants have engaged in acts that either were intended to or did hinder the discovery of a breach of fiduciary duty until just prior to the filing of this litigation. In particular, both Defendants have concealed and withheld, and continue to conceal and withhold, material information relating to their violations of ERISA by, among other things, failing to disclose to Plaintiffs and the Class the full terms of the PBM Agreement. Even after the commencement of Anthem's action against Express Scripts, Defendants still have withheld and failed to file in the public record the complete language of the PBM Agreement, instead redacting substantial portions of the PBM Agreement, including the following Exhibits to the PBM Agreement, most of which directly relate to pricing: (i) Exhibit A, titled "Fees and Pricing"; (ii) Exhibit A-2, titled "Miscellaneous Fees"; (iii) Exhibit D (not titled); (iv) Exhibit F, titled "List of Specialty Medications"; (v) Exhibit N, titled "Financial Disclosure to PBM Clients"; and (vi) Exhibit O, titled "Certain Consideration."

240.    In addition, several other provisions of the PBM Agreement have been and continue to be completely redacted, including provisions in the Pricing section of the PBM Agreement, and definitions related to pricing such as "Generic Drug," "MAC List," "Pricing Source," and "Single Source Generic Drugs." Furthermore, portions related to the duties of Anthem and ESI are also redacted.

241.    Plaintiffs and Class members, through their undersigned attorneys, have requested both Defendants produce unredacted versions of the PBM Agreement. As of the filing of this Complaint and nearly seven months after this action was commenced, both Defendants have refused to provide this information. Accordingly, material information has been concealed and withheld from Plaintiffs to this day.

242.    Anthem has also concealed relevant information relating to the true nature of the ERISA violations described herein by withholding and failing to disclose the market analysis conducted by Health Strategies at its direction, and interfering with Health Strategies' production of this report as required pursuant to lawful process served on it. Though Anthem contends that Health Strategies conducted a comprehensive market analysis that revealed that the current pricing terms in the PBM Agreement did not satisfy "competitive benchmark pricing" levels, Anthem has not yet disclosed the results and details of the study and has to date obstructed its production, which could reveal the full extent of these ERISA violations, and would provide further material information on the extent to which Plaintiffs and Class members have overpaid and continue to overpay for their prescription medications. *See* n. 8, *supra*.

243.    Defendants have also withheld and concealed both the details and nature of their negotiations regarding both the PBM Agreement and the NextRx Agreement, other than disclosing some of the details of these negotiations in the related *Anthem v. Express Scripts*, Inc., No. 1:16-cv-02048, Complaint and cross-claims. For instance, Express Scripts contends in its allegations in that action that its right to offer exclusive PBM services to Anthem was documented in "two interdependent contracts" – the NextRx Agreement and the PBM Agreement. *See Anthem v. Express Scripts, Inc.*, No. 1:16-cv-02048, Express Scripts Opposition to Anthem's Motion to Dismiss, ECF No. 44 at 6 of 29. Express Scripts further claims that "the

upfront price paid by ESI for NextRx was inextricably linked to the long-term pricing paid by Anthem for ESI's PBM services. Specifically, ESI offered Anthem a spectrum of payment and pricing options, ranging from $500 million upfront (with corresponding lower long-term pricing) at one end, to $4.675 billion upfront (and corresponding higher long-term pricing) at the other end." *Id.* Anthem disputes this contention, claiming that "the $4.675 billion was the price for specified classes of equity of three PBM businesses, not for PBM pricing." *See Anthem v. Express Scripts, Inc.*, No. 1:16-cv-02048, Anthem's Reply in Support of its Motion to Dismiss, ECF No. 46 at 6 of 14, n. 3. Thus, Plaintiffs and Class members could not have not known until the Anthem/Express Scripts litigation that the two agreements were related, or any of the details of those negotiations.

244.     Due to Defendants' concealment and withholding of *inter alia*, the full terms of the PBM Agreement, the Health Strategies report, and information relating to the nexus between the PBM Agreement and the NextRx Agreement, Plaintiffs' claims are timely under the fraud or concealment tolling provision of ERISA § 413, 29 U.S.C. § 1113.

## H.     Subscriber Plaintiffs Are Not Required to Exhaust Their Administrative Remedies

245.     The Subscriber Plaintiffs who are subject to ERISA claim breaches of fiduciary duties under ERISA §§ 404 and 405, 29 U.S.C. §§ 1104 & 1105, as well as a prohibited transaction under ERISA § 406, 29 U.S.C. § 1106, and may bring a civil action under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3). ERISA claims based on statutory rights—such as ERISA §§ 404-406 as those Plaintiffs bring here—are distinguished from claims based on "benefits due" or other contractual rights under ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B). Whereas the latter claims may require exhaustion depending on the circumstances, the former do not. Here, the Subscriber Plaintiffs who are subject to ERISA are not bringing claims for benefits and are therefore not required to exhaust their administrative remedies under ERISA.

246.    In particular, claims involving breaches of fiduciary duty by health care providers—as is the case here—that miscalculate and/or misuse participants' percentage based co-insurance that result in overpayments by plans and plan participants to the fiduciaries' benefit are not subject to the exhaustion requirement.

247.    In addition, as set forth above, Plaintiffs John Doe One and John Doe Two have made written demands prior to filing of this action for themselves and all affected Class members who might have been required to exhaust such administrative processes, but these demands were ignored. This conduct establishes that Subscriber Plaintiffs have effectively exhausted their administrative remedies.

248.    Nevertheless, should the Court find that Subscriber Plaintiffs are required to exhaust their administrative remedies or that Plaintiffs John Doe One and Two's written demands do not constitute exhaustion, Subscriber Plaintiffs reserve the right to seek permission of the Court to stay this action with regard to any such claims pending the resolution of their administrative demand and to amend their complaint upon doing so.

## I.    Express Scripts' RICO Violations

249.    In negotiations and throughout the term of the PBM Agreement, Express Scripts engaged in a scheme to obtain money by false pretenses, representations, or promises and a scheme to defraud in order to extract payments from Plaintiffs and Class members in excess of the amount to which Express Scripts was entitled, as set forth in detail above.

250.    As set forth above, Express Scripts is a fiduciary with regard to the ERISA plans administered by Anthem and Subscriber ERISA Class and, accordingly owes members of the Plan Class and members of the ERISA Class, *inter alia*, a duty of loyalty.

251. As set forth in detail above, Express Scripts represented that it would charge only competitive benchmark pricing for prescription medications for plans administered by Anthem and for Anthem subscribers and beneficiaries.

252. At the time Express Scripts made these representations, Express Scripts knew these representations were false and that it would not in good faith attempt to do so.

253. Anthem reasonably relied on Express Scripts' misrepresentations in granting Express Scripts the exclusive right to provide pharmacy benefits for the Anthem plans. Plaintiffs and Class members also reasonably relied on Express Scripts' representations as to the amounts they owed for prescription medications, as Express Scripts did not disclose such payments were calculated in contravention of its contractual and legal obligations.

254. In fact, based on Express Scripts' ongoing misrepresentations and concealments of the material fact that Express Scripts was not providing competitive benchmark pricing, Anthem did not challenge Express Scripts' performance under the PBM Agreement until March 2015.

255. Plaintiffs and Class members have been injured as a direct and proximate result of Express Script's misrepresentations.

256. The Plan Plaintiffs and Plan Class members are health plans administered by Anthem. Because Express Scripts has the exclusive right to provide pharmacy benefits for Anthem plans, Plan Class members must utilize Express Scripts for their plan members' pharmacy benefits.

257. In reliance on Express Scripts' misrepresentations regarding the amounts the Plan Plaintiffs and Plan Class members owe for prescription medications, Anthem has collected excessive payments from the Plan Plaintiffs and Plan Class members.

258.    Because the amount charged exceeds the amount Express Scripts represented to Anthem they would be charged, the Plan Plaintiffs and Plan Class members pay more for pharmacy benefits than they would have otherwise paid if Express Scripts had complied with its contractual and legal obligations.

259.    Subscriber Plaintiffs and Class members likewise must obtain their pharmacy benefits through Express Scripts. Plaintiffs and Class members pay coinsurance that is calculated based on the total amount charged for prescription medications as established by Express Scripts, which is to be based on competitive benchmark pricing; accordingly, when the total amount charged exceeds the amount Express Scripts represented to Anthem, Plaintiffs and Class members pay a higher amount of coinsurance or for prescription medications in general than they would have otherwise paid.

260.    In furtherance of its scheme, Express Scripts not only made misrepresentations to Anthem but has also charged Plaintiffs and Class members more than they should have been charged for prescription medications, represented that Express Scripts is entitled to the amounts they were charged, and failed to disclose that Express Scripts charges more than permitted under the PBM Agreement, that Express Scripts charges more than competitive benchmark pricing, and that Express Scripts is acting in violation of numerous laws as set forth herein.

261.    In communications with Subscriber Plaintiffs and Class members, Express Scripts has represented that the amounts charged for prescription medications was the amount Plaintiffs and Class members owed for their prescription medications under the terms of the PBM Agreement and, accordingly, that Express Scripts was entitled to collect the amounts represented.

262.    Express Scripts had a duty to disclose that the amount charged was not only in violation of the PBM Agreement, but also exceeded competitive benchmark pricing and was imposed in violation of law.

263.    Express Scripts' communications with Subscriber Plaintiffs and Subscriber Class members did not disclose any of the foregoing.

264.    Each Subscriber Plaintiff and Subscriber Class member reasonably relies upon Express Scripts' representations, both express and implied, that they owe and that Express Scripts is entitled to collect the amount of co-insurance stated by paying the amount charged. Moreover, Plaintiffs and Class members were required to obtain their prescription medications through Express Scripts. If Plaintiffs and Class members had not paid the amount charged by Express Scripts, Plaintiffs and Class members would not have received these medications.

265.    Subscriber Plaintiffs and Subscriber Class members did not know and had no reason to know that Express Scripts was collecting excessive co-insurance amounts.

266.    As a result, Subscriber Plaintiffs and Subscriber Class members have paid more than they would have otherwise paid for their prescription medications.

267.    Plaintiffs, Class members and Express Scripts are "persons" within the meaning of 18 U.S.C. § 1961(3).

## 1.    Racketeering Allegations

268.    Express Scripts acquired and maintained control of the Anthem Enterprise (defined below) as it relates to the provision of pharmacy benefits and the setting of pricing for prescription medications through a pattern of racketeering activity involving a scheme to obtain money by false pretenses and a scheme to defraud Plaintiffs and Class members, in violation of 18 U.S.C. § 1962(b).

269.     Express Scripts has participated in the conduct of the affairs of the Anthem Enterprise through a pattern of racketeering activity involving a scheme to obtain money by false pretenses and a scheme to defraud Plaintiffs and Class members, in violation of 18 U.S.C. § 1962(c).

270.     Express Scripts has violated federal laws including mail and wire fraud, 18 U.S.C. §§ 1341 and 1343, by utilizing or causing the use of the United States postal service, commercial interstate carrier, wire or other interstate electronic media in furtherance of its scheme to obtain money by false pretenses and its scheme to defraud.

271.     These predicate acts of mail and wire fraud were related, had a similar purpose, involved the same or similar participants and method of commission, had similar results and impacted similar victims, including Plaintiffs and members of the Class.

272.     The predicate acts of racketeering activity were related to each other in furtherance of the scheme, amount to and pose a threat of continuing racketeering activity and therefore constitute a pattern of racketeering activity through which Express Scripts has violated 18 U.S.C. § 1962(b) and 18 U.S.C. § 1962(c).

273.     Express Scripts carried out its scheme through the "Anthem Enterprise".

274.     The Anthem Enterprise, which consists of Anthem, Inc. and its subsidiaries, is an "enterprise" within the meaning of 18 U.S.C. § 1961(4), 18 U.S.C. § 1962(b), and 18 U.S.C. § 1962(c). The Anthem Enterprise is distinct from Express Scripts. The Anthem Enterprise is engaged in the sale and administration of health insurance benefits and products in interstate commerce, including the provision of pharmacy benefit services, as set forth above. As set forth above, based on the terms of the PBM Agreement, Express Scripts controls the pricing for prescription medications and thus maintains control of, is associated with and conducts the

affairs of the Anthem Enterprise as to the setting, charging and collecting of payments for such prescription medications. Express Scripts could not charge such amounts to Plaintiffs and Class members absent this relationship with Anthem.

275.    While Express Scripts acquired, maintained control of, is associated with, and conducted or participated in the conduct of the Anthem Enterprise's affairs, Express Scripts has an existence separate and distinct from the Anthem Enterprise.

276.    The Anthem Enterprise is separate and distinct from the pattern of racketeering activity. However, the predicate offenses are related to the activities of the Anthem Enterprise. The predicate acts taken in furtherance of Express Scripts' scheme necessarily relate to the Anthem Enterprise.

277.    The activities of the Anthem Enterprise are national in scope and the Anthem Enterprise has a substantial impact upon the economy and upon interstate commerce.

### 2.    Predicate Acts

278.    Section 1961(1) of RICO provides that "racketeering activity" includes any act indictable under 18 U.S.C. § 1341 or 18 U.S.C. § 1343. As set forth herein, Express Scripts has engaged and continues to engage in conduct violating each of these laws.

279.    In order to carry out its scheme to obtain money by false pretenses and to defraud, Express Scripts placed in post offices and/or official depositories of the United States Postal Service matters and things to be delivered by the Postal Service, including invoices, and caused matters and things to be delivered by commercial interstate carriers or knew that the mail would be used in furtherance of its scheme, in violation of 18 U.S.C. § 1341.

280.    Express Scripts, in order to carry out it scheme to obtain money by false pretenses and to defraud, transmitted and received by wire matters and things, including invoices, or knew that wire would be used in furtherance of its scheme, in violation of 18 U.S.C. § 1343.

281.    Express Scripts utilized United States mail and wire in its thousands, if not millions, of communications with Anthem during negotiations regarding the PBM Agreement, in communications with Anthem regarding the prices to be charged to the Plan Plaintiffs and Plan Class members for prescription medications and in ongoing communications regarding services provided to Subscriber Plaintiffs and Class members, such as through the mailing of invoices, electronic processing of credit card transactions, electronic notifications of amounts to be charged by pharmacies, and making available billing information through Express Scripts' web portal. Because these communications are in the custody of Anthem and are currently unavailable to Plaintiffs and Class members, Plaintiffs cannot provide specific details regarding the communications between Express Scripts and Anthem at this time.

282.    Moreover, Express Scripts knew and acted with the intent that Anthem would utilize United States mail and wire in communicating with the Plan Plaintiffs and Plan Class members regarding the amounts to be paid for prescription medications, such as contained in Explanations of Benefits, invoices for payments.

283.    In addition, for those Subscriber Class members who obtained their prescription medications by mail order directly from Express Scripts, Express Scripts sent statements, bills, Explanations of Benefits and/or invoices directly to Class members via mail and/or wire.

284.    Likewise, for those Subscriber Class members who obtained their prescription medications from a pharmacy, Express Scripts, either directly or indirectly, used various forms of wire communication, including the Internet through use of its web portal or the electronic

sending of billing instructions to pharmacies, regarding the amount of co-insurance payments to collect from Class members.

285.    In addition, Express Scripts' web portal also contained specific representations as to how much a Class member was charged for a particular prescription medication and the alleged cost of that medication based on Express Scripts use of supra-competitive benchmark pricing.

286.    Finally, Express Scripts collected monies for co-insurance payments via mail and/or wire.

287.    Express Scripts knowingly and intentionally made misrepresentations and concealed material facts in furtherance of its scheme and for the purpose of obtaining money from Plaintiffs and Class members by false pretenses, representations or promises and for the purpose of deceiving Plaintiffs and Class members.

288.    Express Scripts either knew or recklessly disregarded the fact that these misrepresentations and omissions were material.

289.    Express Scripts charged Subscriber Plaintiffs and Class members amounts greater than Express Scripts represented to Anthem it would charge and more than they owed for their prescription medications, represented that Express Scripts is entitled to the amount charged, conditioned receipt of Subscriber Plaintiffs' and Class members' prescription medications on payment of invoiced co-insurance amounts, failed to disclose that Express Scripts charges more than permitted under the PBM Agreement, and has acted and is acting in violation of numerous laws as set forth herein.

290.    Express Scripts committed a separate violation of 18 U.S.C. § 1341 or 18 U.S.C. § 1343 each time Express Scripts charged or accepted payment for an amount greater than the

amount to which Express Scripts was entitled in any of the following ways: (1) by submitting an invoice, report, statement, Explanation of Benefits or other communication indicating the payment due for prescription drug benefits via the U.S. mail or wires; (2) by posting an electronic statement online to an Anthem subscriber's or participant's web portal account page; (3) by instructing a pharmacy to collect an excessive payment via the U.S. mail or wires; (4) by collecting payment from Anthem for prescription medications provided to members of the Plan Plaintiffs or members of any Plan Class member; and/or (5) by collecting any co-insurance payment through the U.S. mail or wire including, but not limited to, charging an Anthem subscriber's or participant's credit or debit card during a telephone call or pursuant to an ongoing billing authorization.

291.    By submitting and receiving hundreds of thousands, if not millions, of such communications over the past several years, Express Scripts has engaged and continues to engage in a scheme to obtain money by false pretenses, representations, or promises and a scheme to defraud that constitutes a pattern of racketeering activity.

292.    The intended victims of this pattern of racketeering activity are plans administered by Anthem, including the Plan Plaintiffs and the Plan Class, and Anthem subscribers and participants, including Subscriber Plaintiffs and members of the Class.

293.    John Doe One is billed directly by Express Scripts for his specialty medication, which Express Scripts has (until recently) required him to obtain by mail order directly from Express Scripts or its subsidiaries, including Accredo. On February 9, 2016, he received an invoice from Express Scripts over the wires via an Internet web portal, representing that he owed $1,280.37 -- $1,150 of which apparently was required to meet his deductible, and, $130.37 of which was a percentage of the cost of this medication for a 30 day supply. On March 2, 2016,

John Doe One received a similar invoice over the wires via this web portal from Express Scripts for $736.12, all of which was required to be paid to satisfy a co-insurance payment. John Doe One paid Express Scripts the amount charged because Express Scripts has the exclusive right to provide pharmacy benefits for Anthem plans as a result of Express Scripts' misrepresentations to Anthem. If John Doe One had not paid the amount charged, he would not have received his prescription medications. John Doe One was not aware of and had no reason to be aware that Express Scripts made misrepresentations to Anthem and him. John Doe One reasonably believed Express Scripts was entitled to collect the amounts invoiced. Accordingly, John Doe One paid the amounts Express Scripts claimed were due from him, permitting Express Scripts to bill his credit card using the wires. According to Express Scripts' web portal, the cost of this medication upon which the co-insurance obligation was calculated is $7,361.19 for a 90-day supply, which appears to be inflated based on public information obtained by counsel as set forth more specifically above. Since March 2016, John Doe One has been charged two additional times for similar amounts.

294.    John Doe Two has been subject to a percentage co-insurance charge for the medications he purchased at both a retail pharmacy and through Express Script's mail order subsidiary Accredo, and has thus been billed above competitive benchmark pricing for his prescription medications. For example, John Doe Two receives several specialty medications. Starting in January 2015, John Doe Two's three HIV specialty medications were considered "Tier 2" medications, and each required a 20% co-insurance payment from John Doe Two. When John Doe Two purchased his medications at a retail pharmacy using his credit card, Express Scripts posted an electronic claims statement to John Doe Two's web portal account page as well as provided an electronic statement to his retail pharmacist showing the total cost of

these medications and the percentage based co-insurance charge amount John Doe Two would be billed for these medications. For example, for February 2015 and March 2015, John Doe Two purchased three specialty HIV medications at a retail pharmacy and paid a total of $715.58 and $731.57, respectively, in percentage co-insurance amounts. John Doe Two paid Express Scripts the copayments as charged because Express Scripts has the exclusive right to provide pharmacy benefits for Anthem plans as a result of Express Scripts' misrepresentations to Anthem. If John Doe Two had not paid the amount charged, he would not have received his prescription medications. John Doe Two was not aware and had no reason to be aware that Express Scripts made misrepresentations to Anthem and him. John Doe Two reasonably believed that Express Scripts was entitled to collect the amount invoiced. According to the electronic claims statements he received over the wires, the total cost of the three medications was $3,577.91 and $3,657.85 for February and March 2015, respectively, for 30-day supplies, which appears to be inflated based on public information obtained by counsel, as set forth more specifically above.

295.    Beginning in July 2015, John Doe Two was required to obtain his HIV medications through the mail from Express Scripts' subsidiary, Accredo. For July 2015, John Doe Two obtained his medications through Accredo. He was required to give his credit card number over the phone to an Express Scripts representative. Express Scripts, beginning in July 2015, periodically posted an electronic claims statement over the wires to John Doe Two's web portal account page showing the total cost of his medications upon which his co-insurance payment was calculated and the amount John Doe Two's credit card was charged for these medications. According to the electronic claims statement, on or around June 30, 2015, John Doe Two's credit card was charged by Express Scripts in the amount of $1,780.98 in percentage co-insurance amounts for his three medications. The total cost of this medication as represented by

Express Scripts through the web portal was $11,039.19 for a 90-day supply of these medications when ordered through Accredo, which appears to be inflated based on public information obtained by counsel, as set forth more specifically above. Since July 2015, approximately every 90 days, John Doe Two has continued to have similar charges imposed on his credit card by Express Scripts, and the web portal reflects similar costs for these medications. Each time, John Doe Two paid Express Scripts the amounts charged because Express Scripts has the exclusive right to provide pharmacy benefits for Anthem plans as a result of Express Scripts' misrepresentations to Anthem. If John Doe Two had not paid the amount charged, he would not have received his prescription medications. John Doe Two was not aware and had no reason to be aware that Express Scripts made misrepresentations to Anthem and him. John Doe Two reasonably believed that Express Scripts was entitled to collect the amount invoiced.

296.    From May 2014 to the present, Ms. Burnett has regularly obtained over ten (10) different prescription medications. For the majority of these medications, she was required to obtain these medications from Express Scripts directly through its mail order pharmacy subsidiary Accredo. During this time period, she was forced to pay Express Scripts $1,196 for such medications. Express Scripts would bill her electronically for such charges, using the wires to send her statements of these billed charges, and would also use the wires to charge these amounts to her credit card. As to her remaining prescription medications, Express Scripts, acting under the terms of the PBM Agreement, set the prices for these medications that were collected by her pharmacy, using the wires to represent the amounts that would need to be billed to and collected from Ms. Burnett. She estimates that she has paid approximately $500 to $700 per year in percentage based co-insurance payments, $1,196 to Express Scripts directly and $283 to her pharmacy since May 2014, which appears to be inflated based on public information obtained by

counsel, as set forth more specifically above. From May 2014 to the present, Ms. Burnett estimates she has paid percentage based co-insurance charges on at least 23 separate occasions. Each time, Ms. Burnett paid Express Scripts the amounts charged because Express Scripts has the exclusive right to provide pharmacy benefits for Anthem plans as a result of Express Scripts' misrepresentations to Anthem and her. If Ms. Burnett had not paid the amount charged, she would not have received her prescription medications. Ms. Burnett was not aware and had no reason to be aware that Express Scripts made misrepresentations to Anthem and her. Ms. Burnett reasonably believed that Express Scripts was entitled to collect the amount invoiced.

297.    From June 2014 to the present, Mr. Farrell has regularly been prescribed and purchased over ten (10) separate prescription medications. For one of these medications, he was required to obtain these medications from Express Scripts directly through its mail order pharmacy subsidiary Accredo. During this time period, he was forced to pay Express Scripts $424 for such medications. Express Scripts would bill him electronically for such charges, using the wires to send him statements of these billed charges, and would also use the wires to charge these amounts to his credit card. As to his remaining prescription medications, Express Scripts, acting under the terms of the PBM Agreement, set the prices for these medications that were collected by his pharmacy, using the wires to represent the amounts that would need to be billed to and collected from Mr. Farrell. He estimates that he has paid approximately $250 per year in percentage based co-insurance payments, $424 to Express Scripts directly and $227 to his pharmacy, since June 2014, which appears to be inflated based on public information obtained by counsel, as set forth more specifically above. From June 2014 to the present, Mr. Farrell estimates he has paid percentage based co-insurance charges on at least six (6) separate occasions. Each time, Mr. Farrell paid Express Scripts the amounts charged because Express

Scripts has the exclusive right to provide pharmacy benefits for Anthem plans as a result of

Express Scripts' misrepresentations to Anthem and him. If Mr. Farrell had not paid the amount

charged, he would not have received his prescription medications. Mr. Farrell was not aware and

had no reason to be aware that Express Scripts made misrepresentations to Anthem and him.

Mr. Farrell reasonably believed that Express Scripts was entitled to collect the amount invoiced.

298.    From October 2014 to the present, Mr. Shullich has regularly obtained over ten

(10) different prescription medications provided to him by Express Scripts. For nearly all of

these medications, he was required to obtain these medications from Express Scripts directly

through its mail order pharmacy subsidiary Accredo. During this time period, he was forced to

pay Express Scripts $1,317 for such medications. Express Scripts would bill him electronically

for such charges, using the wires to send him statements of these billed charges, and would also

use the wires to charge these amounts to his credit card. As to his remaining prescription

medications, Express Scripts, acting under the terms of the PBM Agreement, set the prices for

these medications that were collected by his pharmacy, using the wires to represent the amounts

that would need to be billed to and collected from Mr. Shullich. He estimates that he has paid

approximately $1,500 in percentage based co-insurance payments, $1,317 to Express Scripts

directly and $203 to his pharmacy, since October 2014, which appears to be inflated based on

public information obtained by counsel, as set forth more specifically above. From October 2014

to the present, Mr. Shullich estimates he has paid percentage based co-insurance charges on at

least twelve (12) separate occasions. Each time, Mr. Shullich paid Express Scripts the amounts

charged because Express Scripts has the exclusive right to provide pharmacy benefits for

Anthem plans as a result of Express Scripts' misrepresentations to Anthem and him. If

Mr. Shullich had not paid the amount charged, he would not have received his prescription

medications. Mr. Shullich was not aware and had no reason to be aware that Express Scripts made misrepresentations to Anthem and him. Mr. Shullich reasonably believed that Express Scripts was entitled to collect the amount invoiced.

299.    On June 29, 2016, Mr. Corrigan filled two prescriptions at his local Kroger Pharmacy and was charged $20.83 for one, and $22.33 for the other, both of which were required to be paid to satisfy a percentage co-insurance payment. Mr. Corrigan paid the amounts Express Scripts electronically informed Kroger Pharmacy were due from him, via credit card, which appears to be inflated based on public information obtained by counsel, as set forth more specifically above. Each time, Mr. Corrigan paid Express Scripts the amounts charged because Express Scripts has the exclusive right to provide pharmacy benefits for Anthem plans as a result of Express Scripts' misrepresentations to Anthem. If Mr. Corrigan had not paid the amount charged, he would not have received his prescription medications. Mr. Corrigan was not aware and had no reason to be aware that Express Scripts made misrepresentations to Anthem and him. Mr. Corrigan reasonably believed that Express Scripts was entitled to collect the amount invoiced.

### 3.    Injury

300.    As a result of Express Scripts' scheme to obtain money by false pretenses and scheme to defraud, Subscriber Plaintiffs paid the amounts charged as set forth above, thereby paying a higher co-insurance amount for their prescription medications than they would have otherwise paid. Subscriber Plaintiffs and Class members paid Express Scripts the amount charged because Express Scripts has the exclusive right to provide pharmacy benefits for Anthem plans as a result of Express Scripts' misrepresentations to Anthem and them. If Subscriber Plaintiffs and Class members had not paid the amount charged, they would not have

received their prescription medications. Subscriber Plaintiffs and Class members were not aware and had no reason to be aware that Express Scripts made misrepresentations to Anthem and them. Subscriber Plaintiffs and Class members reasonably believed that Express Scripts was entitled to collect the amount invoiced. Accordingly, Express Scripts has obtained money and property belonging to Subscriber Plaintiffs and Class members, and Plaintiffs and Class members have been injured in their business or property.

301.    In addition, as a result of Express Scripts scheme to obtain money by false pretenses and scheme to defraud, the Plan Plaintiffs and the Plan Class paid more for prescription medications than they would have otherwise paid. Accordingly, Express Scripts has obtained money and property belonging to the Plan Plaintiffs and Plan Class members, and the Plan Plaintiffs and Plan Class members have been injured in their business or property.

## V.    CLASS ALLEGATIONS

302.    The Plan Plaintiffs bring this action on behalf of themselves and all other similarly situated persons pursuant to Federal Rules of Civil Procedure Rule 23. The Plan Class is defined as:

> Fiduciaries of all self-funded employee welfare benefit plans administered by Anthem from December 1, 2009 to the present in which Anthem provided prescription drug benefits through an agreement with Express Scripts.

303.    The Subscriber Plaintiffs bring this action on behalf of themselves and all other similarly situated persons pursuant to Federal Rules of Civil Procedure Rule 23. The Subscriber Class is defined as:

> All persons who are participants in or beneficiaries of any health care plan from December 1, 2009 to the present in which Anthem provided prescription drug benefits through an agreement with Express Scripts and who paid a percentage based co-insurance payment (in any percentage amount, including 100%) in the course of using that prescription drug benefit.

304.    Within the Subscriber Class there are three sub-Classes:

(a)     Subscriber Plaintiffs (other than John Doe One and Corrigan) seek to represent

the following sub-class (the "Subscriber ERISA Class"):

> All persons who are participants in or beneficiaries of any ERISA-governed employee welfare benefit plan from December 1, 2009 to the present in which Anthem provided prescription drug benefits through an agreement with Express Scripts and who paid a percentage based co-insurance payment (in any percentage amount, including 100%) in the course of using that prescription drug benefit.

(b)     Subscriber Plaintiffs John Doe One and Corrigan seek to represent the following

sub-class (the "Subscriber Non-ERISA Class"):

> All persons who are participants in or beneficiaries of any individual or group health care plan not governed by the provisions of ERISA from December 1, 2009 to the present in which Anthem provided prescription drug benefits through an agreement with Express Scripts and who paid a percentage based co-insurance payment (in any percentage amount, including 100%) in the course of using that prescription drug benefit.

(c)     Subscriber Plaintiffs John Doe One and John Doe Two seek to represent the

following sub-class (the "Subscriber ACA Class"):

> All Class Members who paid a percentage based co-insurance charge for prescription medications to treat HIV/AIDS, Diabetes, Cancer, Epilepsy, Cerebral Palsy, Multiple Sclerosis, and Muscular Dystrophy.

305.    The members of each Class are so numerous that joinder of all members is

impracticable. More than 38 million members are enrolled in Anthem health care plans

nationwide, and Express Scripts states it provides services to over 15 million Anthem enrollees

and subscribers (which, based on Anthem's statements, should be substantially higher).

Approximately 23. 6 million, or 60 percent of Anthem members, are in self-funded plans.

Accordingly, the numerosity requirement is easily satisfied with regard to the Plan Class.

Although it is not publicly available at the present time how many of Anthem's health care plans

have a percentage based co-insurance payment requirement for certain prescription medications,

the majority of these plans likely include a prescription drug benefit. Plaintiffs are participants in

plans that include percentage based co-insurance obligations. Defendants maintain records showing the identities of Class members who paid co-insurance amounts based in whole or in part on a percentage of the price of the prescription medication, the amounts of those payments, and the prescription medications for which those payments were made and what the competitive benchmark prices for those medications should have been. Therefore, the numerosity requirement is also easily satisfied with regard to the Subscriber Class.

306.     Plaintiffs' claims are typical of the claims of Class members. The Stamford Plan and the Brothers Trading Plan paid inflated prices for prescription medications because Express Scripts prices that they were invoiced for were inflated and/or not consistent with competitive benchmark pricing for the reasons set forth in detail above. Subscriber Plaintiffs, as set forth above, each paid percentage based co-insurance payments that were based on prices for prescription medications imposed by Express Scripts that were inflated and not consistent with competitive benchmark pricing for the reasons set forth in detail above.

307.     Plaintiffs will fairly and adequately protect the interests of the members of the respective classes which each represents, are committed to the vigorous prosecution of this action, have retained counsel competent and experienced in class action litigation and in the prosecution of ERISA, RICO, ACA and health care-related claims, and have no interests antagonistic to or materially in conflict with those of the Class. Accordingly, Plaintiffs and their counsel are adequate representatives of the Classes.

308.     Common questions of law and fact exist and predominate over any questions affecting individual members of each of the Classes. Defendants have acted toward Plaintiffs and the Classes in a uniform manner, raising the following common questions, among others:

a) Whether the PBM Agreement was intended to benefit Plaintiffs and Class members, and whether they are intended third-party beneficiaries of the PBM Agreement;

b) Whether Express Scripts owed and owes fiduciary duties to Plaintiffs and the members of the Classes;

c) Whether Express Scripts breached fiduciary duties that it owed to the Plans;

d) Whether Express Scripts breached ERISA fiduciary duties that it owed to the Subscriber ERISA Class;

e) Whether Express Scripts committed a prohibited transaction in violation of ERISA §§ 406(a) and/or (b);

f) Whether Express Scripts was a party in interest within the meaning of ERISA § 3(14);

g) Whether Express Scripts was party to any transactions prohibited by ERISA § 406(a);

h) Whether Anthem breached fiduciary duties that it owed and owes to the Plans;

i) Whether Anthem owed ERISA fiduciary duties to the Subscriber ERISA Class;

j) Whether Anthem breached any ERISA fiduciary duties that it owed to the Subscriber ERISA Class;

k) Whether Anthem committed a prohibited transaction in violation of ERISA §§ 406(a) and/or (b);

l) Whether Anthem was a party in interest within the meaning of ERISA § 3(14);

m) Whether Anthem was party to any transactions prohibited by ERISA § 406(a);

n) Whether Express Scripts or Anthem is liable as a co-fiduciary under ERISA § 405;

o) Whether Defendants are responsible for charging inflated prices to Plaintiffs and Class members for prescription medications;

p) Whether Express Scripts breached the PBM Agreement and its duty of good faith and fair dealing by overcharging Subscriber Non-ERISA Class members in the form of inflated prices, as set forth in detail above;

q) Whether Anthem breached its duty of good faith and fair dealing by negotiating and entering into a contract with Express Scripts that was detrimental to the interests of the Class, and caused Subscriber Non-ERISA Class members to pay

more than they should have under their Anthem plans for prescription medications;

r) Whether Anthem breached its duty of good faith and fair dealing by failing to adequately monitor in a timely fashion the activities of Express Scripts, including but not limited to failing to adequately monitor the prices charged by Express Scripts for prescription medications;

s) Whether Express Scripts violated RICO;

t) Whether Plaintiffs and Class members were injured or otherwise suffered a loss of money or property as a result of Defendants' conduct;

u) Whether, as to the Subscriber ACA Class, Defendants' conduct violates Section 1557 of the Affordable Care Act;

v) Whether Express Scripts was unjustly enriched;

w) Whether Express Scripts engaged in a deceptive business act or practice in violation of applicable state laws as set forth below;

x) Whether Express Scripts overcharged the Plans for prescription medications provided to Plan members;

y) Whether Express Scripts overcharged Subscriber Plaintiffs and the Class members for percentage based co-insurance payments based on prescription medication charges that are higher than the competitive benchmark prices required under the PBM Agreement;

z) Whether Anthem breached its obligations to the Plaintiffs and Class members by entering into an agreement with Express Scripts that was imprudent and not in the best interests of the members of the Class but that instead enriched Anthem;

aa) Whether Anthem and Express Scripts engaged in transactions causing losses to Plaintiffs and Class members and allowing Anthem and Express Scripts to unjustly enrich themselves to the detriment of Plaintiffs and the Class, and whether any funds obtained by Anthem as a result of its action against Express Scripts belong, at least in part, to Plaintiffs and Class members;

bb) Whether Plaintiffs and Class members are entitled to damages and/or equitable monetary relief in the form of surcharge, disgorgement and/or restitution for the inflated charges they paid as appropriate for their claims;

cc) Whether the Plans are entitled to restoration of losses caused by Defendants' illegal conduct and to profits Defendants made through use of assets of the plans pursuant to 29 U.S.C. § 1109.

dd) Whether Plaintiffs and Class members are entitled to a declaration regarding their rights under any applicable contractual obligations; and

ee) Whether Plaintiffs and Class members are entitled to an Order enjoining Defendants from engaging in the conduct here at issue.

309.    The prosecution of separate actions by individual members of the Class would also create a risk of inconsistent or varying adjudications that could establish incompatible standards of conduct for Defendants.

310.    Defendants here acted or refused to act on grounds generally applicable to the Class, thereby making declaratory and injunctive relief appropriate to Class members as a whole.

311.    A class action is superior to other available methods for the fair and efficient group-wide adjudication of this controversy. Because the injuries suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for the Class members individually to redress the harm done to them.

312.    Given the uniform nature of the conduct at issue with regard to Class members, any difficulty in the management of this litigation as a class action is outweighed by the lack of any feasible alternatives for the group-wide adjudication of this controversy.

## VI.    CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

**Equitable Relief Pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3)
For Breach of Fiduciary Duties Under ERISA § 404(a), 29 U.S.C. § 1104(a)
(By the Subscriber ERISA Plaintiffs on Behalf of the Subscriber ERISA Class and by the
Plan Plaintiffs on Behalf of the Plan Class Against Defendant Express Scripts)**

313.    The Subscriber ERISA Plaintiffs and the Plan Plaintiffs incorporate by reference each of the preceding paragraphs as though fully set forth herein.

314.    This claim is brought by the Subscriber ERISA Plaintiffs and the Plan Plaintiffs against Defendant Express Scripts.

315.     Express Scripts is a fiduciary of each of the plans in which Subscriber ERISA Plaintiffs are participants, and of the Plans by exercising discretionary authority and/or discretionary control over the pricing imposed for prescription medications.

316.     Express Scripts breached its fiduciary duty of prudence under ERISA § 404(a)(1)(B) by setting the costs of prescription medications at rates in contravention of the terms of the PBM Agreement and/or at otherwise inflated rates as set forth above. Express Scripts' breach caused the Subscriber ERISA Plaintiffs and Subscriber ERISA Class members to pay increased amounts each time Subscriber ERISA Plaintiffs and Subscriber ERISA Class Members paid for a prescription medication based on a percentage of the inflated price of the prescription medication as set forth in detail above. Express Scripts' breach also caused the Plans to pay inflated amounts for prescription medications, as set forth in detail above.

317.     Express Scripts also breached its duty of loyalty under ERISA § 404(a)(1)(A) by extracting higher payments than it should have charged consistent with its duties to the Subscriber ERISA Class members and the Plans by obtaining more revenue at the expense of Plaintiffs and the Class through charging inflated prices for prescription medications as set forth in detail above. Furthermore, Express Scripts effectively fixed its own compensation as a result of inducing overpayments when it set the prices of prescription medications artificially high in contravention of the terms of the PBM Agreement and thereafter refused to negotiate in good faith over such pricing as the PBM Agreement required. These practices allowed Express Scripts to directly control the prices for prescription medications paid by Subscriber ERISA Plaintiffs, Subscriber ERISA Class members and the Plans.

318.     In so doing, Express Scripts did not act solely in the interest of Subscriber ERISA Plaintiffs, Subscriber ERISA Class members, the Plan Plaintiffs, or Plan Class members but

instead put its own interests before theirs.

319.    Express Scripts' breaches of fiduciary duty caused direct injury and losses to Subscriber ERISA Plaintiffs, each member of the Subscriber ERISA Class, the Plan Plaintiffs, and each member of the Plan Class.

320.    Subscriber ERISA Plaintiffs, the Subscriber ERISA Class, the Plan Plaintiffs, and the Plan Class seek appropriate equitable relief as set forth above, along with such other and additional relief enumerated in the Prayer and/or as may be otherwise available.

## SECOND CLAIM FOR RELIEF

**Equitable Relief Pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3)**
**For Prohibited Transactions Under ERISA § 406(b), 29 U.S.C. § 1106(b)**
**(By the Subscriber ERISA Plaintiffs on Behalf of the Subscriber ERISA Class and by the**
**Plan Plaintiffs on Behalf of the Plan Class Against Defendant Express Scripts)**

321.    The Subscriber ERISA Plaintiffs and the Plan Plaintiffs incorporate by reference each of the preceding paragraphs as though fully set forth herein.

322.    This claim is brought by the Subscriber ERISA Plaintiffs and by the Plan Plaintiffs against Defendant Express Scripts.

323.    Express Scripts engaged in prohibited transactions as a fiduciary. It violated ERISA §406(b) by dealing with the assets of the ERISA plans and/or ERISA plan participants, including Subscriber ERISA Plaintiffs, Subscriber ERISA Class members, the Plan Plaintiffs, and the Plans in its own interest or for its own account and/or by receiving consideration for its own personal account from any party dealing with a Plan in connection with a transaction involving the assets of that Plan.

324.    Specifically, Express Scripts effectively fixed its own compensation as a result of inducing overpayments made by Subscriber ERISA Plaintiffs, the Subscriber ERISA Class, the Plan Plaintiffs and the Plan Class when it set the prices for prescription medications at inflated

prices as set forth in detail above. Increasing this cost in turn increased payments made by

Subscriber ERISA Plaintiffs, the Subscriber ERISA Class, and the Plans to Express Scripts. In so

doing, Express Scripts did not act solely in the interest of the Plans or subscribers and

beneficiaries of the Plans, but instead put its own interests before theirs. This is not only a breach

of ERISA's duty of loyalty, as alleged above, but also a self-dealing prohibited transaction under

ERISA § 406(b)(1), which prohibits a fiduciary with respect to a plan from dealing with assets of

the plan in its own interest or for its own account.

325.    Express Scripts also violated ERISA § 406(b)(2) by acting in its own interest (*i.e.*,

in the interest of one whose interests are adverse to the participants, instead of in the interests of

the participants) by overcharging for prescription medications to recoup the nearly $5 billion it

paid to Anthem in exchange for the PBM Agreement terms, which provided Express Scripts the

exclusive right to provide prescription medications to Subscriber ERISA Class members.

326.    Express Scripts' violations of ERISA § 406(b) caused direct injury and losses to

Subscriber ERISA Plaintiffs, each member of the Subscriber ERISA Class, the Plan Plaintiffs

and the Plans.

327.    Subscriber ERISA Plaintiffs, the Subscriber ERISA Class, the Plan Plaintiffs and

the Plan Class seek appropriate equitable relief as set forth above, along with such other and

additional relief enumerated in the Prayer and/or as may be otherwise available.

## THIRD CLAIM FOR RELIEF

**Equitable Relief Pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3)**
**For Breach of Fiduciary Duties Under ERISA § 404(a), 29 U.S.C. § 1104(a)**
**(By the Subscriber ERISA Plaintiffs on Behalf of the Subscriber ERISA Class and by**
**Plaintiff Stamford on Behalf of the Plan Class Against Defendant Anthem)**

328.    The Subscriber ERISA Plaintiffs and the Plan Plaintiffs incorporate by reference

each of the preceding paragraphs as though fully set forth herein.

329.    This claim is brought by the Subscriber ERISA Plaintiffs and the Plan Plaintiffs against Defendant Anthem.

330.    Anthem is a fiduciary of each of the ERISA plans in which Subscriber ERISA Plaintiffs and the Subscriber ERISA Class members are participants, of the Stamford Plan, the Brothers Trading Plan, and of each of the Plans.

331.    Anthem breached its fiduciary duty under ERISA § 404(a)(1)(A) and (B) by entering into the PBM Agreement with Express Scripts that was not in the best interests of Subscriber ERISA Plaintiffs, the Subscriber ERISA Class, the Plan Plaintiffs and the Plan Class. According to Express Scripts, Anthem had the opportunity to require Express Scripts to charge lower prescription medication prices, but instead opted for an agreement that enabled Express Scripts to charge higher prices for prescription medications. It did so in order to obtain $4.675 billion for NextRx, instead of a lower sum. By trading the interests of the plans, participants and beneficiaries off for its own pecuniary gain, Anthem violated its duties as a fiduciary.

332.    Anthem further breached its fiduciary duty under ERISA § 404(a)(1)(B) by failing to adequately monitor in a timely fashion the activities of Express Scripts, including but not limited to failing to monitor the prices charged by Express Scripts for prescription medications provided to ERISA Plaintiffs and the Subscriber ERISA Class and permitting Express Scripts to exercise complete discretion in maximizing Express Scripts' own revenue at the expense of Anthem-administered plans and insureds.

333.    Anthem also breached its fiduciary duty under ERISA § 404(a)(1)(A) by entering into the PBM Agreement and negotiating a $4.675 billion upfront payment from Express Scripts that it accepted as compensation for itself and its self-interest, rather than opting for alternative contract terms from Express Scripts that were more favorable to Subscriber ERISA Plaintiffs,

Subscriber ERISA Class members, the Plan Plaintiffs and the Plan Class but would provide a lesser upfront payment to Anthem.

334.    Anthem's breaches of fiduciary duty caused direct injury and losses to Subscriber ERISA Plaintiffs, the Subscriber ERISA Class, the Plan Plaintiffs and the Plan Class.

335.    Subscriber ERISA Plaintiffs, the Subscriber ERISA Class, the Plan Plaintiffs, and the Plan Class seek to recover all losses suffered by the Subscriber ERISA Class and the Plans as set forth above, along with such other and additional relief enumerated in the Prayer and/or as may be otherwise available.

**FOURTH CLAIM FOR RELIEF**

**Equitable Relief Pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3)**
**For Prohibited Transactions Under ERISA § 406(a) & (b), 29 U.S.C. § 1106 (a) & (b)**
**(By the Subscriber ERISA Plaintiffs on Behalf of the Subscriber ERISA Class and by the**
**Plan Plaintiffs on Behalf of the Plan Class Against Defendant Anthem)**

336.    Subscriber ERISA Plaintiffs and the Plan Plaintiffs incorporate by reference each of the preceding paragraphs as though fully set forth herein.

337.    This claim is brought by the Subscriber ERISA Plaintiffs and the Plan Plaintiffs against Defendant Anthem.

338.    By entering into the PBM Agreement and receiving nearly $5 billion from Express Scripts, rather than entering into an available alternative that would have paid it less than $5 billion but provided better pricing for prescription medication benefits to Subscriber ERISA Class members and the Plans, Anthem violated ERISA § 406(b)(1) because it received consideration for its own personal account from Express Scripts in connection with transactions involving the assets of the Plans.

339.    Anthem's conduct described herein also constitutes a violation of ERISA § 406(b)(2), which prohibits a fiduciary with respect to a plan from acting in any transaction

involving the plan on behalf of a party whose interests are adverse to the interests of the plan and/or the interests of its participants and beneficiaries.

340.    Anthem's conduct also violated ERISA § 406(b)(3) by receiving consideration for its own personal account from Express Scripts in connection with a transaction involving assets of the plan.

341.    In addition, Anthem violated ERISA § 406(a) because it caused the ERISA plans to engage in one or more transactions with Express Scripts that Anthem knew or should have known constituted direct or indirect (1) sales or exchanges of property between the Plans and Express Scripts, as a party in interest under ERISA § 406(a)(1)(A), (2) furnishings of goods, services, or facilities to the Plans by Express Scripts, a party in interest under ERISA § 406(a)(1)(B), and/or (3) transfers to, or use by or for the benefit of Express Scripts, a party in interest, of assets of the Plans under ERISA § 406(a)(1)(C).

342.    Anthem's breaches of ERISA's prohibited transaction provisions caused direct injury and losses to Subscriber ERISA Plaintiffs, the Subscriber ERISA Class, and the Plan Plaintiffs and the Plan Class.

343.    Subscriber ERISA Plaintiffs, the Subscriber ERISA Class, the Plan Plaintiffs, and the Plan Class seek appropriate equitable relief as set forth above, along with such other and additional relief enumerated in the Prayer and/or as may be otherwise available.

## FIFTH CLAIM FOR RELIEF

**Equitable Relief Pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3)
For Liability as a Non-Fiduciary Party to § 406 Prohibited Transactions
(By the Subscriber ERISA Plaintiffs on Behalf of the Subscriber ERISA Class and by the
Plan Plaintiffs on Behalf of the Plan Class Against Defendant Express Scripts)**

344.    Subscriber ERISA Plaintiffs and the Plan Plaintiffs incorporate by reference each

of the preceding paragraphs as though fully set forth herein.

345.    This claim is brought by the ERISA Plaintiffs and the Plan Plaintiffs against

Defendant Express Scripts.

346.    To the extent that it was not a fiduciary with regard to any of the prohibited

transactions under ERISA § 406 alleged above, Express Scripts is liable to disgorge ill-gotten

gains and/or provide other equitable relief as to the transactions set forth above between Express

Scripts and the ERISA Plaintiffs, the Subscriber ERISA Class, the Plan Plaintiffs, and the Plan

Class under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), because it was a party in interest with

regard to each such transaction. These transactions include each instance Express Scripts charged

inflated prices to Plaintiffs and the Class when they purchased or paid for prescription

medications from Express Scripts as set forth in detail above.

347.    To the extent that it was not a fiduciary or a party in interest with regard to any of

the breaches of ERISA set forth above, Express Scripts is liable to disgorge ill-gotten gains

and/or provide other appropriate equitable relief, pursuant to ERISA § 502(a)(3), 29 U.S.C. §

1132(a)(3) because it had actual or constructive knowledge of and participated in Anthem's

violations of ERISA as set forth above.

348.    As a direct and proximate result of the prohibited transactions and/or other

breaches of ERISA alleged above, Subscriber ERISA Plaintiffs, the Subscriber ERISA Class lost

and Express Scripts gained the value of inflated percentage based co-insurance payments that Subscriber ERISA Plaintiffs and the Subscriber ERISA Class were forced to pay.

349.    As a direct and proximate result of the prohibited transactions and/or other breaches of ERISA alleged above, the Plan Class lost and Express Scripts gained the inflated payments for prescription medications the Plans were forced to pay.

## SIXTH CLAIM FOR RELIEF

**Equitable Relief Pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3)**
**For Liability as a Non-Fiduciary Party to § 406 Prohibited Transactions**
**(By the Subscriber ERISA Plaintiffs on Behalf of the Subscriber ERISA Class and by the**
**Plan Plaintiffs on Behalf of the Plan Class Against Defendant Anthem)**

350.    Subscriber ERISA Plaintiffs and the Plan Plaintiffs incorporate by reference each of the preceding paragraphs as though fully set forth herein.

351.    This claim is brought by the Subscriber ERISA Plaintiffs and the Plan Plaintiffs against Defendant Anthem.

352.    To the extent that it was not a fiduciary with regard to any of the prohibited transactions under ERISA § 406 alleged above, Anthem is liable to disgorge ill-gotten gains and/or provide other equitable relief under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), for the additional compensation they received by trading off the interests of the Plans and their participants in connection with the negotiation of the PBM Agreement and the sale of the NextRx business to Express Scripts, because it was a party in interest with regard to that transaction.

353.    To the extent that it was not a fiduciary or a party in interest with regard to any of the breaches of ERISA set forth above, Anthem is liable to disgorge ill-gotten gains and/or provide other appropriate equitable relief, pursuant to ERISA § 502(a)(3), 29 U.S.C.

§ 1132(a)(3), because it had actual or constructive knowledge of and participated in Express

Scripts' violations of ERISA as set forth above.

354. As a direct and proximate result of the prohibited transactions and/or other

breaches of ERISA alleged above, the Plan Class lost and Anthem and/or Express Scripts gained

the value of inflated co-insurance payments that the Plans were forced to pay for prescription

medications.

355. As a direct and proximate result of the prohibited transactions and/or other

breaches of ERISA alleged above, the Plan Plaintiffs and the Plans lost and Anthem and/or

Express Scripts gained the value of inflated payments that the Plans were forced to pay for their

prescription medications.

### SEVENTH CLAIM FOR RELIEF

**Equitable Relief Pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3)**
**For Co-Fiduciary Liability Under ERISA § 405(a), 29 U.S.C. § 1105(a)**
**(By the Subscriber ERISA Plaintiffs on Behalf of the Subscriber ERISA**
**Class and by the Plan Plaintiffs on Behalf of the Plan Class Against Defendants Express**
**Scripts and Anthem)**

356. Subscriber ERISA Plaintiffs and the Plan Plaintiffs incorporate by reference each

of the preceding paragraphs as though fully set forth herein.

357. This claim is brought by the ERISA Plaintiffs and the Plan Plaintiffs against

Defendants Express Scripts and Anthem.

358. As Express Scripts and Anthem are both fiduciaries under ERISA, they are liable

under ERISA § 405(a) for each other's violations of ERISA.

359. Under ERISA § 405(a), 29 U.S.C. § 1105(a), a fiduciary with respect to a plan

shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the

same plan in the following circumstances:

(a) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach;

(b) if, by his failure to comply with [ERISA § 404(a)(1)] in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or

(c) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

ERISA §§ 405(a)(1)-(3), 29 U.S.C. §§ 1105(a)(1)-(3).

360.    Anthem knowingly participated in Express Scripts' breaches by allowing Express Scripts to charge the Plans and the Subscriber ERISA Class members for prescription medications at inflated prices. Anthem also enabled Express Scripts' fiduciary breaches pursuant to ERISA § 405(a)(2) by, *inter alia*, failing to negotiate and entering into an agreement with Express Scripts that was not in the best interests of Subscriber ERISA Plaintiffs, the Subscriber ERISA Class, the Plan Plaintiffs and the Plan Class and by failing to adequately and timely monitor Express Scripts' conduct during the term of the PBM Agreement. Anthem also had knowledge of Express Scripts' breaches as set forth above, including their continued conduct of charging Subscriber ERISA Plaintiffs, Subscriber ERISA Class members, Plan Plaintiffs and the Plan Class at inflated prices for prescription medications, but failed to make reasonable efforts under the circumstances to remedy the breach pursuant to ERISA § 405(a)(3).

361.    Express Scripts knowingly participated in Anthem's breaches pursuant to ERISA § 405(a)(1) by overcharging Subscriber ERISA Plaintiffs, the Subscriber ERISA Class, and the Plans for prescription medication benefits, which resulted in higher payments by Subscriber ERISA Plaintiffs, the Subscriber ERISA Class, the Plan Plaintiffs and the Plan Class for prescription medication benefits, which Anthem allowed. Express Scripts also enabled Anthem's fiduciary breaches pursuant to ERISA § 405(a)(2) by, *inter alia*, (1) requiring Subscriber ERISA

Plaintiffs and the Subscriber ERISA Class members to pay increased amounts for percentage based co-insurance payments, and requiring the Plans to pay inflated prices for prescription medications, which Anthem allowed on an ongoing basis, and (2) failing to negotiate or renegotiate lower prices for its services with Anthem pursuant to the PBM Agreement despite being aware that Subscriber ERISA Plaintiffs, the Subscriber ERISA Class, and the Plan Class were being overcharged, which Anthem failed to adequately and timely monitor. Express Scripts also had knowledge of Anthem's breaches but failed to make reasonable efforts under the circumstances to remedy the breach pursuant to ERISA § 405(a)(3).

362.     Co-fiduciary liability is joint and several under ERISA. Therefore, Express Scripts and Anthem are jointly and severally liable to the Subscriber ERISA Plaintiffs, the Subscriber ERISA Class, the Plan Plaintiffs and the Plan Class for each of the other's breaches of ERISA's fiduciary responsibility provisions.

## EIGHTH CLAIM FOR RELIEF

**For Relief Pursuant to ERISA §§ 502(a)(2) and 409, 29 U.S.C. §§ 1132(a)(2) and 1109, for Breach of Fiduciary Duty Under ERISA § 404, 29 U.S.C. § 1104 (By the Plan Plaintiffs on Behalf of the Plan Class Against Defendant Express Scripts)**

363.     The Plan Plaintiffs incorporate by reference each of the preceding paragraphs as though fully set forth herein.

364.     This claim is brought by the Plan Plaintiffs against Defendant Express Scripts.

365.     ERISA § 502(a)(2), 29 U.S.C. § 1109(a)(2), provides that a plan fiduciary (here, Stamford and Brothers Trading) may bring suit against another plan fiduciary for the relief provided in ERISA § 409, 29 U.S.C. § 1109. ERISA § 409(a), 29 U.S.C. § 1109(a) provides, in pertinent part:

> Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter

shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

366.   Express Scripts is a fiduciary of the Stamford Plan, the Brothers Trading Plan, and of each of the Plans.

367.   As set forth in Plaintiffs' Claims for Relief above, Express Scripts breached fiduciary duties owed to the Stamford Plan, the Brothers Trading Plan, and to each of the Plans. As set forth in Plaintiffs' Fifth Claim for Relief, Express Scripts was also a party in interest to prohibited transactions or participated in Anthem's ERISA violations. Also, Express Scripts has co-fiduciary liability as set forth in Plaintiffs' Seventh Claim for Relief.

368.   The monies the Plans paid to Express Scripts for prescription medications for Plan members were Plan assets.

369.   The Stamford Plan, the Brothers Trading Plan, and each of the Plans suffered losses as a result of Express Scripts' breaches of fiduciary duty in that each Plan paid more for prescription drug benefits than the Plan would have otherwise paid.

370.   Express Scripts profited through the use of the assets of the Plan Express Scripts obtained as a result of its breaches of fiduciary duty.

371.   The Plan Plaintiffs and each member of the Plan Class seek to recover losses the Plans have sustained as a result of Express Scripts' breaches, restoration of any profits Express Scripts has made through use of the Plans' assets, and such other equitable or remedial relief as the Court may deem appropriate.

## NINTH CLAIM FOR RELIEF

### Claim for Breach of Fiduciary Duty Under 29 U.S.C. § 1109
### (By the Plan Plaintiffs on Behalf of the Plan Class Against Defendant Anthem)

372.   The Plan Plaintiffs incorporate by reference each of the preceding paragraphs as though fully set forth herein.

373.   This claim is brought by the Plan Plaintiffs against Defendant Anthem.

374.   ERISA § 502(a)(2), 29 U.S.C. § 1109(a)(2), provides that a plan fiduciary (here, Stamford and Brothers Trading) may bring suit against another plan fiduciary for the relief provided in ERISA § 409, 29 U.S.C. § 1109.

375.   29 U.S.C. § 1109(a) provides, in pertinent part:

Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

376.   Anthem is a fiduciary of the Stamford Plan and of each of the Plans.

377.   As set forth in Plaintiffs' Claims for Relief above, Anthem breached fiduciary duties owed to the Stamford Plan, the Brothers Trading Plan, and to each of the Plans. As set forth in Plaintiff s' Sixth Claim for Relief, Anthem was also a party in interest to prohibited transactions or participated in Express Script's ERISA violations. Also, Anthem has co-fiduciary liability as set forth in Plaintiffs' Seventh Claim for Relief.

378.   The monies the Plans paid to Anthem for prescription medications for Plan members were Plan assets.

379.   The Plans suffered losses as a result of Anthem's breaches of fiduciary duty in that each Plan paid more for prescription drug benefits than the Plan would have otherwise paid.

380.     Anthem profited through the use of the assets of the Plans as a result of Anthem's breaches of fiduciary duty, including by obtaining greater compensation in exchange for permitting Express Scripts to obtain a greater amount of Plan assets.

381.     The Plan Plaintiffs and each member of the Plan Class seek to recover losses the Plans have sustained as a result of Anthem's breaches, restoration of any profits Anthem has made through use of the Plans' assets, and such other equitable or remedial relief as the Court may deem appropriate.

**TENTH CLAIM FOR RELIEF**

**Violation of RICO**
**18 U.S.C. §§ 1962(b), 1962(c)**
**(By Subscriber Plaintiffs on Behalf of the Subscriber Class and by the Plan Plaintiffs on Behalf of the Plan Class Against Defendant Express Scripts)**

**General RICO Allegations**

382.     Plaintiffs incorporate by reference each of the preceding paragraphs as though fully set forth herein.

383.     These claims are brought by all Plaintiffs on behalf of all Class members against Defendant Express Scripts.

384.     This claim for relief arises under 18 U.S.C. § 1964(c).

**Violation of 18 U.S.C. § 1962(b)**

385.     In violation of 18 U.S.C. § 1962(b), Express Scripts acquired and maintained control of the Anthem Enterprise as it relates to the provision of prescription medication benefits through a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(1)(B) and (5), that is, by committing predicate acts of mail and wire fraud in violation of 18 U.S.C. § 1341, 18 U.S.C. § 1343, as set forth above.

386.     Specifically, Express Scripts acquired control of the Anthem Enterprise as defined above by misrepresenting to Anthem that Express Scripts would charge only competitive benchmark pricing for prescription medications provided to plans administered by Anthem, including the Plan Plaintiffs and the Plan Class and to Anthem subscribers and beneficiaries, including Subscriber Plaintiffs and members of the Subscriber Class. Express Scripts has maintained control of the enterprise by ongoing misrepresentations and omissions regarding the payments to which Express Scripts is entitled, including ongoing communications to Anthem and including the communications to Subscriber Plaintiffs and Class members in violation of 18 U.S.C. § 1341 and 18 U.S.C. § 1343.

387.     Express Scripts acquired and maintained control of the Anthem Enterprise through a pattern of racketeering activity, that is, mail and wire fraud, as described above.

388.     Plaintiffs and Class members have been injured in their business or property as a result of Express Scripts' control of the Anthem Enterprise in that Plaintiffs and Class members have been charged and paid more than they would have paid for prescription medications absent Express Scripts' fraudulent scheme.

389.     As a result of such conduct, Plaintiffs and Class members are entitled to the payment of actual and treble damages, attorneys' fees and costs and such other relief as the Court determines appropriate for this element of this Cause of Action.

**Violation of 18 U.S.C. § 1962(c)**

390.     In violation of 18 U.S.C. § 1962(c), Express Scripts has associated with the Anthem Enterprise and has conducted or participated, directly or indirectly, in the conduct of the Anthem Enterprise's affairs, through a pattern of racketeering activity within the meaning of

18 U.S.C. § 1961(1)(B) and (5), that is, mail and wire fraud in violation of 18 U.S.C. § 1341, 18

U.S.C. § 1343, and 18 U.S.C. § 2, as set forth above.

391.     Specifically, Express Scripts is associated with the Anthem Enterprise by the

terms of the PBM Agreement, which permits it to be the exclusive provider of PBM and mail

order services to plans administered by Anthem, including the Plan Plaintiffs and the Plan Class

and to Anthem subscribers and beneficiaries, including Subscriber Plaintiffs and members of the

Class.

392.     Express Scripts conducted or participated in the conduct of the affairs of the

Anthem Enterprise with regard to the provision of PBM and mail order services to Anthem

enrollees and participants pursuant to the terms of the PBM Agreement as set forth above, and

also through the collection either directly or indirectly of payments from the Plan Plaintiffs and

the Plan Class and through the collection of percentage based co-insurance amounts from

Anthem subscribers and beneficiaries, including Plaintiffs and Class members.

393.     Express Scripts' conduct or participation in the conduct of the affairs of the

Anthem Enterprise was conducted through a pattern of racketeering activity, that is, mail and

wire fraud, as described above.

394.     Plaintiffs and Class members have been injured in their business or property as a

result of Express Scripts' conducting or participating in the conduct of the Anthem Enterprise's

affairs, in that Plaintiffs and Class members have been charged and paid more than they would

have paid for prescription medications absent Express Scripts' fraudulent scheme.

395.     As a result of such conduct, Plaintiffs and Class members are entitled to the

payment of actual and treble damages, attorneys' fees and costs and such other relief as the Court

determines appropriate for this element of this Cause of Action.

## ELEVENTH CLAIM FOR RELIEF

### Breach of Contract
### (By Plaintiffs John Doe One and Corrigan on Behalf of the Non-ERISA
### Class Against Defendant Express Scripts)

396.    Plaintiffs John Doe One and Corrigan incorporate by reference Paragraphs 1 through 200 and 234 through 312 as though fully set forth herein. This claim is asserted on behalf of members of the Subscriber Non-ERISA Class against Defendant Express Scripts.

397.    The PBM Agreement between Anthem and Express Scripts is a valid, binding, and enforceable contract.

398.    The persons on whose behalf this claim is asserted are intended beneficiaries of the PBM Agreement and, therefore, have standing to enforce the terms of the PBM Agreement.

399.    The PBM Agreement was meant primarily to benefit Plaintiffs and Class members as subscribers and enrollees in Anthem plans with a prescription medication benefit, particularly where their payment obligations were calculated as a percentage of the charged cost of the prescription medications unilaterally set by Express Scripts. Indeed, Anthem states that "[a] critical key to success for health insurers is to provide effective and affordable pharmacy/drug related services and administration for its members. Health insurers depend on PBMs for such pricing and administration, and Anthem contracted with ESI to provide these critical services." *See Anthem v. Express Scripts, Inc.*, No. 1:16-cv-02048, Complaint at ¶ 11.

400.    The PBM Agreement further establishes that Express Scripts' primary duty is to "provide the administrative services…to [Anthem], Plans and Covered Individuals set forth in this Agreement." *See* § 3.1 of the PBM Agreement. The Agreement also makes clear that Anthem "will offer to Plans the prescription drug benefits administered by [ESI] pursuant to this Agreement." *See* § 2.1 of the PBM Agreement.

401.    Anthem also acknowledges that a primary purpose of the PBM Agreement is to "ensure that the required competitive pricing was timely made available to Anthem and its members . . . as provided for under the Agreement." *See Anthem v. Express Scripts, Inc.*, No. 1:16-cv-02048, Complaint at ¶ 17.

402.    Thus, the parties to the PBM Agreement knew or reasonably should have known that they had an obligation to act in the best interests of Class members at the time they entered into the PBM Agreement, and Anthem recognized that breaches of the PBM Agreement would adversely impact both Anthem and Class Members.

403.    Section 5.6 of the PBM Agreement provides a mechanism for re-pricing "to ensure that [Anthem and, accordingly, subscribers and beneficiaries in Anthem health care plans are] receiving competitive benchmark pricing."

404.    Anthem and an expert third-party consultant conducted market analyses that demonstrated that Express Scripts' pricing terms for prescription medications are not consistent with "competitive benchmark pricing", as that term is used in the PBM Agreement.

405.    On March 18, 2015, Anthem notified Express Scripts of the marketing analysis and proposed competitive benchmark pricing. Express Scripts was required to negotiate in good faith over the proposed new pricing terms "to ensure that [Anthem and, accordingly, subscribers and beneficiaries in Anthem health care plans are] receiving competitive benchmark pricing." Express Scripts never disputed that Anthem's initial proposals were for competitive benchmark pricing, and that Anthem's subsequent proposals were for pricing in excess of competitive benchmark pricing.

406.    Express Scripts breached the PBM Agreement by expressly repudiating its obligations under Section 5.6 of the PBM Agreement, by delaying for over a year to address such

116

issues, by refusing to meet with Anthem to negotiate over Anthem's proposed pricing terms for competitive benchmark pricing in good faith, by refusing to negotiate in good faith or at all over Anthem's proposed pricing terms for competitive benchmark pricing, by failing to make any proposal that actually offered competitive benchmark pricing, by failing to agree to new pricing terms that were consistent with the terms of the PBM Agreement, and by failing to consistently provide competitive benchmark pricing to Anthem and, by extension, to all persons on whose behalf this claim is asserted. Express Scripts' breach of the PBM Agreement undermines the value of the PBM Agreement to Anthem and, as stated above, to all persons on whose behalf this claim is asserted.

407.    Express Scripts' conduct also breaches the implied covenant of good faith and fair dealing incorporated into all agreements as a matter of law because it deprived all persons on whose behalf this claim is being asserted of the full benefit of the PBM Agreement. Notice of this breach has been provided by at least John Doe One and Anthem prior to filing this action, as set forth above.

408.    As a direct and proximate result of Express Scripts' breach of the PBM Agreement, the Subscriber Non-ERISA Class members have paid excess amounts to Express Scripts in the form of inflated percentage based co-insurance payments based on supra-competitive benchmark pricing. Express Scripts has thus directly and proximately caused damages to such persons by breaching the PBM Agreement, in an amount to be determined at trial.

## TWELFTH CLAIM FOR RELIEF

### *Quantum Meruit* and Assumpsit/Common Law Restitution/Unjust Enrichment
### (By Plaintiffs John Doe One and Corrigan on Behalf of the Non-ERISA
### Class Against Defendant Express Scripts)

409.    Plaintiffs John Doe One and Corrigan incorporate by reference Paragraphs 1 through 200 and 234 through 312 as though fully set forth herein. This claim is asserted on behalf of members of the Subscriber Non-ERISA Class against Defendant Express Scripts.

410.    The persons on whose behalf this claim is asserted conferred upon Express Scripts economic benefits in the form of percentage based co-insurance payments, either directly or indirectly, for prescription medications.

411.    Express Scripts accepted or retained these economic benefits with awareness that Subscriber Non-ERISA Class members were paying more than they were required to pay pursuant to the terms of the PBM Agreement and collecting inflated prices for such prescription medications.

412.    To the extent the persons on whose behalf this claim is asserted are unable to assert claims for breach of the PBM Agreement or express breach of contract, in the alternative Express Scripts is liable to such persons under principles of assumpsit, *quantum meruit*, implied or quasi-contract, common law restitution and unjust enrichment.

413.    Permitting Express Scripts to retain the unjust benefits and enrichment conferred under these circumstances would be unjust and inequitable.

414.    As a result of Express Scripts' conduct, members of the Subscriber Non-ERISA Class have suffered economic loss and harm. They thus seek an order for disgorgement and restitution of Express Scripts' revenues, profits and other benefits resulting from the overcharges

detailed above in derogation of the obligations imposed on Express Scripts for the acts and practices at issue herein.

## THIRTEENTH CLAIM FOR RELIEF

**Violation of New York Gen. Bus. Law Sections 349 and 350**
**(By Plaintiffs John Doe One and Corrigan on Behalf of the Non-ERISA**
**Class Against Defendant Express Scripts)**

415.    Plaintiffs John Doe One and Corrigan incorporate by reference Paragraphs 1 through 200 and 234 through 312 as though fully set forth herein. This claim is asserted on behalf of members of the Subscriber Non-ERISA Class against Defendant Express Scripts.

416.    As set forth in detail above, Express Scripts' conduct in overcharging the persons on whose behalf this claim is asserted for prescription medications in contravention of the PBM Agreement, and making false and misleading statements in connection therewith, constitutes an unfair or deceptive trade practice.

417.    Under the terms of the PBM Agreement, New York provides the applicable choice of law to the extent it is deemed applicable to this controversy, and affects numerous members of the Subscriber Non-ERISA Class who reside in New York and are billed inflated prices for such prescription medications by Express Scripts.

418.    Express Scripts' conduct has violated and continues to violate New York General Business Law Sections 349 and 350.

419.    The conduct set forth above in terms of collecting monies from Subscriber Non-ERISA Class members calculated in violation of the terms of the PBM Agreement, and making claims as to monies that were supposedly due but in fact were not, would be misleading and deceptive, and results in injury in fact and a loss of money or property to all those on whose behalf such claim is alleged, no matter which law is found to apply.

420.    By the acts and conduct alleged herein, Express Scripts committed unfair or deceptive acts and practices by misrepresenting the amounts that it could properly charge and collect from Subscriber Non-ERISA Class members. Such deceptive acts and practices were directed at consumers.

421.    Such deceptive acts and practices are misleading in a material way because they materially misrepresent how much consumers should have been required to pay for their prescription medications, and were made by Express Scripts in an effort to induce consumers to pay the prices they did, in violation of Section 349 of the New York General Business Law.

422.    In addition, based on the foregoing, Express Scripts has engaged in consumer-oriented conduct directed at consumers that is deceptive or misleading in a material way, which further constitutes false advertising in violation of Section 350 of the New York General Business Law.

423.    Express Scripts' false, misleading, and deceptive statements and representations of fact either express or implied (i.e., that the amounts consumers were charged for their prescription medications were correctly calculated) were and are likely to mislead a reasonable consumer acting reasonably under the circumstances.

424.    Express Scripts' false, misleading, and deceptive statements and representations of fact have resulted in consumer injury or harm to the public interest.

425.    As a result of Express Scripts' false, misleading, and deceptive statements and representations of fact, the Subscriber Non-ERISA Class members have been injured, and suffered and continue to suffer economic injury and an ascertainable loss because they would not have paid the prices they did for their prescription medications if they knew that such charges were higher than Express Scripts was permitted to charge them.

426.     On behalf of the members of the Subscriber Non-ERISA class, Plaintiffs John

Doe One and Corrigan seek to enjoin the unlawful acts and practices described herein, to recover

actual or statutory damages, whichever is greater, equitable monetary relief and reasonable

attorneys' fees to the extent permitted by such law, and such other and further relief as the Court

finds appropriate.

## FOURTEENTH CLAIM FOR RELIEF

**Violation of State Unfair and Deceptive Trade Practice Acts Other than GBL 349 and 350
(By Plaintiffs John Doe One and Corrigan on Behalf of the Non-ERISA
Class Against Defendant Express Scripts)**

427.     Plaintiffs John Doe One and Corrigan incorporate by reference Paragraphs 1

through 200 and 234 through 312 as though fully set forth herein. This claim is asserted on

behalf of members of the Subscriber Non-ERISA Class against Defendant Express Scripts.

428.     Similar uniform and deceptive trade practice statutes, similar in material respects

to New York Gen. Bus. §§ 349 and 350 not otherwise stated herein, are in effect in virtually

every state jurisdiction within the United States.[10]

---

[10] This claim is plead in the alternative pursuant to Rule 8(a), should the Court determine that
New York law is not determinative and applicable to all Subscriber Non-ERISA Class
members, and is based on, in addition to GBL Sections 349 and 350, ALA. CODE § 8-19-1, *et
seq.* (Alabama); ALASKA STAT § 45.50.471, *et seq.* (Alaska);  ARIZ. REV. STAT. § 44-
1522*, et seq.* (Arizona); ARK. CODE ANN. § 4-88-107, *et seq.* (Arkansas); CAL. BUS. &
PROF. CODE § 17200 *et seq.* and Cal. Civ. Code Section 1750, *et seq.* (California); COLO.
REV. STAT. § 6-1-101*, et seq.*, (Colorado); CONN. GEN STAT. §42-110a, *et seq.*
(Connecticut); DEL. CODE ANN. tit. 6, § 2511, *et seq.* (Delaware); D.C. CODE ANN. § 28-
3901, *et seq.* (District of Columbia); FLA. STAT. § 501.201, *et seq.* (Florida); GA. CODE
ANN. § 10-1-370, *et seq.* (Georgia); HAW. REV. STAT. § 480, *et seq.* (Hawaii); IDAHO
CODE § 48-601, *et seq.* (Idaho); ILL. COMP. STAT. 510/1 (2010), *et seq.* (Illinois); IOWA
CODE § 714.16 (2015), *et seq.* (Iowa); IND. CODE ANN. § 24-5-0.5-1, *et seq.* (Indiana);
KAN. STAT. ANN. § 50-626, *et seq.* (Kansas); KY. REV. STAT. ANN. § 367.110, *et seq.*
(Kentucky); LA. REV. STAT. ANN. § 51:1401, *et seq.* (Louisiana); ME. REV. STAT. tit. 5, §
205-A, *et seq.* (Maine); MD. CODE ANN. COM. LAW § 13-301, *et seq.* (Maryland); MASS.
GEN. LAWS ch. 93A, §1, *et seq.* (Massachusetts); MICH. COMP. LAWS § 445.901, *et seq.*
(Michigan); MINN. STAT. § 8.31, *et seq.* (Minnesota); MO. REV. STAT. § 407.010, *et seq.*

429.    The conduct set forth above in terms of collecting inflated prices for prescription medications from Subscriber Non-ERISA Class members calculated in violation of the terms of the PBM Agreement and as set forth above, and making claims as to moneys that were supposedly due but in fact were not, would be misleading and deceptive, and results in injury in fact and a loss of money or property to all those on whose behalf such claim is alleged, no matter which law is found to apply.

430.    By the acts and conduct alleged herein, Express Scripts committed unfair or deceptive acts and practices by misrepresenting the amounts that it could properly charge and collect from Subscriber Non-ERISA Class members, which it could not for the reasons set forth above. Such deceptive acts and practices were directed at consumers.

431.    Such deceptive acts and practices are misleading in a material way because they materially misrepresent how much consumers should have been charged for their prescription medications, and were made by Express Scripts in an effort to induce consumers to pay the prices they did.

---

(Missouri); MONT. CODE ANN. § 30-14-101 (1973), *et seq.* (Montana); NEB. REV. STAT. § 59-1601, *et seq.* (Nebraska); NEV. REV. STAT. 598.0903, *et seq.* (Nevada); N.H. REV. STAT. ANN. § 358-A:1, *et seq.* (New Hampshire); N.J. STAT. ANN. §56:8-1 *et seq.* (New Jersey); N.M. STAT. ANN. § 57-12-1, *et seq.* (New Mexico); N.C. GEN. STAT. § 75-1.1 (North Carolina); N.D. CENT. CODE § 51-15-01, *et seq.* (North Dakota); OHIO REV. CODE ANN. § 1345.01, *et seq.* (Ohio); OKLA STAT. ANN. tit. 15, § 751, *et seq.* (Oklahoma); OR. REV. STAT. § 646.605, *et seq.* (Oregon); 73 PA. CONS. STAT. § 201-1, *et seq.* (Pennsylvania); R.I. GEN. LAWS § 6-13.1-1, *et seq.* (Rhode Island); S.C. CODE ANN. § 39-5-10 (1976), *et seq.* (South Carolina); S.D. CODIFIED LAWS § 37-24-1, *et seq.* (South Dakota); TENN. CODE ANN. § 47-18-101, *et seq.* (Tennessee); TEX. BUS. & COM. CODE ANN. § 17.41, *et seq.* (Texas); UTAH CODE. ANN. § 13-11-1, *et seq.* (Utah); VT. STAT. ANN. tit. 9, § 2451, *et seq.* (Vermont); VA. CODE ANN. § 59.1-196, *et seq.* (Virginia); WASH. REV. CODE § 19.86.010, *et seq.* (Washington) and/or W. VA. CODE § 46A-6-101, *et seq.* (West Virginia); WIS. STAT. § 100.18, *et seq.* (Wisconsin); WYO. STAT. ANN. § 40-12-101, *et seq.* (Wyoming).

432.     In addition, based on the foregoing, Express Scripts has engaged in consumer-oriented conduct directed at consumers that is deceptive or misleading in a material way, which further constitutes false and misleading advertising.

433.     Express Scripts' false, misleading, and deceptive statements and representations of fact either express or implied (i.e., that the amounts consumers were charged for their prescription medications were correctly calculated) were and are likely to mislead a reasonable consumer acting reasonably under the circumstances.

434.     Express Scripts' false, misleading, and deceptive statements and representations of fact have resulted in consumer injury or harm to the public interest.

435.     As a result of Express Scripts' false, misleading, and deceptive statements and representations of fact, the Subscriber Non-ERISA Class members have been injured, and suffered and continue to suffer economic injury and an ascertainable loss because they would not have paid the inflated prices they did for their prescription medications if they knew that such charges were higher than Express Scripts was permitted to charge them.

436.     On behalf of the members of the Subscriber Non-ERISA class, Plaintiffs John Doe One and Corrigan seek to enjoin the unlawful acts and practices described herein, to recover actual or statutory damages, whichever is greater, equitable monetary relief and reasonable attorneys' fees to the extent permitted by such law, and such other and further relief as the Court finds appropriate.

## FIFTEENTH CLAIM FOR RELIEF

### Breach of the Covenant of Good Faith and Fair Dealing
### (By Plaintiffs John Doe One and Corrigan on Behalf of the Non-ERISA
### Class Against Defendant Anthem)

437.  Plaintiffs John Doe One and Corrigan incorporate by reference Paragraphs 1 through 200 and 234 through 312 as though fully set forth herein. This claim is asserted on behalf of members of the Subscriber Non-ERISA Class against Defendant Anthem.

438.  Defendant Anthem breached the implied covenant of good faith and fair dealing that is implied in every contract as a matter of law and is thus implied into the health plans under which the Subscriber Non-ERISA Class members are covered by engaging in the course of conduct described in greater detail above.

439.  Specifically, Anthem acted in bad faith and breached the covenant of good faith and fair dealing implied into the Subscriber Non-ERISA Class's health plans by negotiating and entering into a contract with Express Scripts that was detrimental to the interests of the Class, and caused Subscriber Non-ERISA Class members to pay more than they should have under their Anthem health plans for prescription medications. This breach included, but was not limited to, entering into the PBM Agreement, which at least according to Express Scripts, gave to Express Scripts the discretion (subject to the "competitive benchmark pricing" limitation set forth herein) to set the prices of prescription medications provided to members of the non-ERISA Class.

440.  Anthem further acted in bad faith and breached the duty of good faith and fair dealing implied into the Subscriber Non-ERISA Class's health plans by failing to adequately monitor in a timely fashion the activities of Express Scripts, including but not limited to failing to timely monitor and correct the prices charged by Express Scripts for prescription medications provided to the Subscriber Non-ERISA Class members.

441.     Anthem also breached the covenant of good faith and fair dealing implied into the Subscriber Non-ERISA Class's health plans by, according to the allegations of Express Scripts, entering into the PBM Agreement and negotiating a $4.675 billion upfront payment from Express Scripts that it accepted as compensation for itself and its self-interest, rather than opting for alternative contract terms from Express Scripts that were more favorable to non-ERISA Class members, but would provide a lesser payment to Anthem.

442.     Anthem's breaches of the covenant of good faith and fair dealing caused direct injury and losses to the Subscriber Non-ERISA Class members as set forth in detail above.

443.     Plaintiffs John Doe One and Corrigan, on behalf of the Subscriber Non-ERISA Class members, seek to recover all losses suffered by them along with such other and additional applicable relief enumerated in the Prayer and/or as may be otherwise available.

### SIXTEENTH CLAIM FOR RELIEF

**Declaratory Relief**
**(By Plaintiffs John Doe One and Corrigan on Behalf of the Non-ERISA**
**Class Against Defendant Express Scripts)**

444.     Plaintiffs John Doe One and Corrigan incorporate by reference Paragraphs 1 through 200 and 234 through 312 as though fully set forth herein. This claim is brought against Defendant Express Scripts.

445.     An actual controversy over which this Court has jurisdiction now exists between members of the Subscriber Non-ERISA Class and Express Scripts concerning their respective rights, duties and obligations under all applicable agreements, including the PBM Agreement, as set forth herein.

446.     Plaintiffs are entitled to a declaration regarding their rights and obligations under such agreements, including: (a) whether Express Scripts owes obligations to members of the

Subscriber Non-ERISA Class under the PBM Agreement; (b) whether Express Scripts may unilaterally refuse to negotiate in good faith under the terms of the PBM Agreement or refuse to limit the charges for prescription medications to competitive benchmark pricing; (c) whether Subscriber Non-ERISA Class members have a right to independently enforce the terms of the PBM Agreement as a result of being a third party intended beneficiary thereof; and (d) whether Express Scripts overcharged members of the Subscriber Non-ERISA Class under the terms of any applicable agreements. Such declarations may be had before there has been any breach of such obligation in respect to which such declaration is sought.

447.    Subscriber Non-ERISA Class members may be without adequate remedy at law, rendering declaratory relief appropriate, in that:

(a)    relief is necessary to inform the parties of their rights and obligations under the agreements referenced herein;

(b)    damages may not adequately compensate these Class members for the injuries suffered, nor may other claims permit such relief;

(c)    the relief sought herein in terms of ceasing such practices may not be fully accomplished by awarding damages; and

(d)    if the conduct complained of is not enjoined, harm will result to these Class members and the general public because Defendant Express Scripts' wrongful conduct is both threatened and on-going.

448.    A judicial declaration is therefore necessary and appropriate at this time and under these circumstances so the parties may ascertain their respective rights and duties.

449.    These Plaintiffs request a judicial determination and declaration of the rights of Subscriber Non-ERISA Class members, and the corresponding responsibilities of Defendant Express Scripts, as set forth above. They also request an order declaring Defendant Express Scripts is obligated to conform its conduct and billing to the terms of the PBM Agreement and pay over all funds it may have wrongfully acquired either directly or indirectly as a result of the

illegal conduct set forth herein by which it was unjustly enriched, in terms of reimbursements or payment of monies that would not have been paid to Express Scripts or retained by it absent such illegal conduct.

**SEVENTEENTH CLAIM FOR RELIEF**

**Violation of Anti-Discrimination Provisions of
Affordable Care Act (42 U.S.C. § 18116)
(By Plaintiffs John Doe One and John Doe Two on Behalf of the Subscriber ACA Class
Against Defendant Express Scripts)**

450.    Plaintiffs John Doe One and John Doe Two incorporate by reference Paragraphs 1 through 200 and 234 through 312 as though fully set forth herein. This claim is asserted by Plaintiffs John Does One and Two on behalf of the Subscriber ACA Class against Express Scripts.

451.    Section 1557 of the ACA applies the Rehabilitation Act of 1973, 29 U.S.C. § 701 *et seq.* (the "Rehabilitation Act") to "any health program or activity, any part of which is receiving Federal financial assistance, including credits, subsidies, or contracts of insurance." 42 U.S.C. § 18116. The Rehabilitation Act provides that "no otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be *excluded from the participation in*, be *denied the benefits of*, or be *subjected to discrimination* under any" health plan. 29 U.S.C. § 794(a) (emphasis added).

452.    Defendant Express Scripts, and the provision of prescription medication benefits that are paid for utilizing percentage based co-insurance charges are "health program[s] or activit[ies]" which "receiv[e] Federal financial assistance, including credits, subsidies, or contracts of insurance" (42 U.S.C. § 18116) and thus are subject to the provisions of the ACA. A "health program or activity" includes any entity providing the "administration of health-related services, health-related insurance coverage, or other health-related coverage, and the provision of

127

assistance to individuals in obtaining health-related services or health-related insurance coverage. For an entity principally engaged in providing or administering health services or health insurance coverage or other health coverage, all of its operations are considered part of the health program or activity.… Such entities include a … group health plan, health insurance issuer, … or other similar entity." 45 C.F.R. § 92.4. Since Express Scripts and the provision of prescription medication benefits utilizing percentage based co-insurance charges provide these services, they are "health program[s] or activit[ies]" under Section 1557 of the ACA. Also, Express Scripts receives a wide range of "federal financial assistance"[11] through Medicaid programs, state health exchanges, and tax credits/deductions for self-insured plans or any employer-sponsored plans.

453.    Under the health plans of Plaintiffs John Doe One and John Doe Two and the Subscriber ACA Class members, medications used to treat HIV/AIDS, Diabetes, Cancer, Epilepsy, Cerebral Palsy, Multiple Sclerosis, and Muscular Dystrophy (hereafter, "Disabilities") are subject to percentage based co-insurance charges, which generally range between 20% and 30%.

454.    Plaintiffs John Doe One and John Doe Two (who are HIV positive) and other Subscriber ACA Class members are individuals with Disabilities who paid a percentage based co-insurance charge to obtain medications to treat their Disabilities.

---

[11] "Federal financial assistance means any grant, loan, credit, subsidy, contract (other than a procurement contract but including a contract of insurance), or any other arrangement by which the Federal government provides or otherwise makes available assistance in the form of: (i) Funds; (ii) Services of Federal personnel; or (iii) Real and personal property or any interest in or use of such property … [as well as] all tax credits under Title I of the ACA, as well as payments, subsidies, or other funds extended by the Department [of Health and Human Services] to any entity providing health-related insurance coverage for payment to or on behalf of an individual obtaining health-related insurance coverage from that entity or extended by the Department directly to such individual for payment to any entity providing health-related insurance coverage." 45 C.F.R. § 92.4.

455.     Due to Express Scripts' charging of supra-competitive prices, Plaintiffs' and Subscriber ACA Class members' percentage based co-insurance charges resulted in higher payments than Subscriber ACA Class members would have owed had Express Scripts abided by the terms of the PBM Agreement. Express Scripts' use of inflated prices, coupled with the percentage based co-insurance charges applicable to the high-cost medications treating the "Disabilities," has resulted in disparate economic harm to Plaintiffs John Doe One and John Doe Two and other Subscriber ACA Class members, who may end up paying thousands of dollars per year to obtain their life-sustaining medications.

456.     When subject to percentage based co-insurance charges, consumers who are prescribed medications for a qualifying Disability are more likely to pay more than consumers who do not pay for medications to treat qualifying Disabilities. This is because medications used to treat such chronic conditions like the Disabilities are typically defined by health plans as "specialty medications," which in turn are synonymous with specialty drug tiers tied to the offending percentage based co-insurance charges. The disparity between the out of pocket costs that Plaintiffs John Doe One and John Doe Two and Subscriber ACA Class members have paid and must pay to obtain their medications and that Class members without Disabilities have paid and must pay to obtain their medications is substantial.

457.     For example, as set forth in Paragraph 38, John Doe One is billed directly by Express Scripts for his HIV specialty medication, which Express Scripts has (until recently) required him to obtain by mail order directly from Express Scripts or its subsidiaries, including Accredo. On February 9, 2016, he received an invoice from Express Scripts over the wires via an Internet web portal, representing that he owed $1,280.37 -- $1,150 of which apparently was required to meet his deductible, and $130.37 of which was a percentage of the cost of this

medication for a 30-day supply. On March 2, 2016, John Doe One received a similar invoice over the wires via this web portal from Express Scripts for $736.12, all of which was required to be paid to satisfy a percentage co-insurance payment. Since March 2016, John Doe One has been charged two additional times for similar amounts. According to Express Scripts' web portal, the cost of this medication upon which the co-insurance obligation was calculated is $7,361.19 for a 90-day supply, which is inflated as set forth above.

458.    In addition, as set forth in Paragraphs 46 through 48, John Doe Two receives three specialty HIV medications, which are considered "Tier 2" medications and required him to pay a 20% co-insurance payment in 2015. In February 2015 and March 2015, John Doe Two purchased his medications at a retail pharmacy and paid a total of $715.58 and $731.57, respectively, in percentage co-insurance amounts for his three HIV medications. The total cost of the three medications was $3,577.91 and $3,657.85 for February and March, respectively, for 30-day supplies, which is inflated for the reasons set forth in detail above. In 2015, John Doe Two paid over $3,500 for his HIV medications.

459.    In comparison to Plaintiffs John Doe One and John Doe Two and Subscriber ACA Class members, Class members who do not have to obtain medications to treat the Disabilities pay far less than Subscriber ACA Class members per medication, and per year on medications. For example, as set forth above in Paragraph 57, from May 2014 to the present, Plaintiff Burnett regularly obtained over ten (10) different prescription medications for which she was forced to pay Express Scripts $1,196 for such medications; as set forth above in Paragraph 66, from June 2014 to the present, Plaintiff Farrell has regularly been prescribed and purchased over ten (10) separate prescription medications for himself or his beneficiaries for which he was forced to pay Express Scripts $424 for such medications; and as set forth above in Paragraph 74,

from October 2014 to the present, Plaintiff Shullich has regularly obtained over ten (10) different prescription medications for which he was forced to pay Express Scripts $1,317 for such medications.

460.    Additionally, according to a study conducted by Express Scripts, the average insured American's prescription drug costs in 2015 were $1,060.75.[12] This is less than Plaintiffs John Doe One and John Doe Two and Subscriber ACA Class members pay to obtain medications to treat their Disabilities.

461.    Express Scripts' conduct violates the ACA since, on the basis of their Disabilities, Plaintiffs John Doe One and John Doe Two and Subscriber ACA Class members have been excluded from participation in, have been denied the benefits of, or are being subjected to discrimination under their health plans. This is because as a result of requiring such persons to pay percentage based co-insurance charges in order to obtain their specialty medications, Plaintiffs John Doe One and John Doe Two and Subscriber ACA Class members are forced to pay far more for their high-cost medications than Class members who do not take medications to treat their Disabilities.

462.    "Disability" or "Disabilities" has the same meaning under Section 1557 as it does under the Americans with Disabilities Act ("ADA"). *See* 45 CFR § 92.4. Under the ADA, the term "disability" means, with respect to an individual: "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment (as described in paragraph (3))." 42 U.S.C. § 12102(1)(A)-(C). "Major life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting,

---

[12] The Express Scripts Lab, *Express Scripts 2015 Drug Trend Report,* Mar. 2016, https://lab.express-scripts.com/lab/drug-trend-report (last visited on February 2, 2017).

bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2)(A). A "major life activity also includes the operation of a major bodily function, including but not limited to, functions of the immune system, normal cell growth, digestive, bowel, bladder, neurological, brain, respiratory, circulatory, endocrine, and reproductive functions." 42 U.S.C. § 12102(2)(B).

463.   A regulation promulgated by the U.S. Equal Employment Opportunity Commission ("EEOC") states "it should easily be concluded that the following types of impairments will, at a minimum, substantially limit the major life activities indicated: … cancer substantially limits normal cell growth; … cerebral palsy substantially limits brain function; … diabetes substantially limits endocrine function; … epilepsy substantially limits neurological function; … Human Immunodeficiency Virus (HIV) infection substantially limits immune function; … multiple sclerosis substantially limits neurological function; … muscular dystrophy substantially limits neurological function." 29 C.F.R. § 1630.2(j)(iii). [13]

464.   As set forth in the EEOC regulation, since patients' Disabilities "impose a substantial limitation on a major life activity[,]" they constitute disabilities within the meaning of Section 1557 of the ACA. Thus, because Plaintiffs John Doe One and John Doe Two and the Subscriber ACA Class members have qualified disabilities, they are members of a protected class under the ACA and the Rehabilitation Act.

465.   By failing to charge the agreed-to competitive benchmark pricing required under the PBM Agreement and charging percentage based co-insurance charges for prescription medications treating the Disabilities that are placed on drug tiers subject to higher co-insurance charges, causing disparate financial impact on Plaintiffs John Doe One and John Doe Two and

---

[13] The U.S. Supreme Court also has recognized HIV/AIDS as a "disability" subject to the ADA. *Bragdon v. Abbott*, 524 U.S. 624, 655 (1998).

Subscriber ACA Class members, Express Scripts: (i) excludes Subscriber ACA Class members from participation in their health plans, (ii) denies Subscriber ACA Class members the benefits of their health plans, and (iii) subjects Subscriber ACA Class members to unjust discrimination. As noted in the comments to the regulation implementing Section 1557, manipulating drug tiering so as to increase the cost of medications is a violation of law: "[CMS] has identified benefit design features that might be discriminatory. For example, placing most or all prescription medications that are used to treat a specific condition on the highest cost formulary tiers."

466.     As set forth in Paragraphs 35 and 42, Plaintiffs John Doe One and John Doe Two have been diagnosed with HIV, which is considered a "Disability" under the ACA. Thus, they fall within the zone of protected persons under the ACA and thus have standing to seek all appropriate relief available under this statute.

467.     Plaintiffs John Doe One and John Doe Two, on behalf of themselves and the Subscriber ACA Class members, request an award of damages, injunctive relief, attorneys' fees, costs, and such other and further appropriate relief against Express Scripts as may be available under this claim.

## VII.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of the Class they represent and as applicable to the three sub-classes identified above, pray for relief as follows as applicable for the particular cause of action:

1. An Order certifying this action to proceed on behalf of the Subscriber Class, and appointing Subscriber Plaintiffs and the counsel listed below to represent the Class, as applicable to both the Subscriber ERISA Class, the Subscriber Non-ERISA Class and the Subscriber ACA Class;

2. An Order certifying this action to proceed on behalf of the Plan Class, and appoint the Plan Plaintiffs and the counsel listed below to represent the Plan Class.

3. An Order finding that Express Scripts wrongfully deprived Plaintiffs and Class members of a benefit to which they were entitled;

4. An Order finding that Defendants violated their fiduciary duties to the Subscriber ERISA Plaintiffs, the Subscriber ERISA Class members, the Plan Plaintiffs, and the Plan Class and awarding Subscriber ERISA Class members such relief as the Court deems proper;

5. An Order finding that Defendants engaged in prohibited transactions and awarding the Subscriber ERISA Plaintiffs, Subscriber ERISA Class members, the Plan Plaintiffs, and the Plan Class such relief as the Court deems proper;

6. An Order awarding the Subscriber ERISA Plaintiffs, Subscriber ERISA Class members, the Plan Plaintiffs, and the Plan Class recovery in the form of equitable surcharge to the extent permitted by the above claims;

7. An Order awarding the Plan Plaintiffs, and the Plan Class all losses to the plans resulting from Express Scripts and/or Anthem's breach of fiduciary duty, restoration of all profits that Express Scripts and/or Anthem made through use of Plan assets and such other equitable or remedial relief as the court may deem appropriate.

8. An Order finding that Defendants are jointly and severally liable as co-fiduciaries and/or as fiduciary and party in interest and/or as a fiduciary and a non-fiduciary participant in violation of ERISA;

9. An Order enjoining Express Scripts from charging plans administered by Anthem, enrollees and subscribers in Anthem ERISA plans and non-ERISA plans an amount that is greater than they are required to pay under the terms of the PBM Agreement or any other operative agreement or applicable law;

10. An Order providing for an equitable accounting from Anthem and Express Scripts;

11. An Order providing a declaration of rights as set forth above;

12. An Order awarding Plaintiffs and Class members treble damages for Defendants' RICO violations;

13. An Order awarding Plaintiffs and the Class members who might be entitled to such relief actual, compensatory, statutory and/or treble damages to the extent permitted by the above claims;

14. An Order awarding Plaintiffs' counsel attorneys' fees, litigation expenses, expert witness fees and other costs pursuant to the federal and state causes of action set forth above that permit such an award; and

15. An Order awarding such other and further relief as may be just and proper, including pre-judgment and post-judgment interest on the above amounts.

## JURY TRIAL DEMAND

Plaintiffs demand a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil

Procedure, of all issues so triable.

Dated: March 2, 2017                   Respectfully submitted,

**WHATLEY KALLAS, LLP**

*/s/Joe R. Whatley, Jr.*
Joe R. Whatley, Jr.
Edith M. Kallas
Michael S. Lyons
1180 Avenue of the Americas, 20th Floor
New York, NY 10036
Telephone: (212) 447-7060
Fax: (800) 922-4851
Emails: jwhatley@whatleykallas.com
ekallas@whatleykallas.com
mlyons@whatleykallas.com

Henry C. Quillen (Admitted *Pro Hac Vice*)
159 Middle Street, Suite 2C
Portsmouth, NH 03801
Telephone: (603) 294-1591
Fax: (800) 922-4851
Email: hquillen@whatleykallas.com

Alan M. Mansfield (Of Counsel)
(Admitted *Pro Hac Vice*)
16870 W. Bernardo Dr., Suite 400
San Diego, CA 92127
Telephone: 858-674-6641
Fax: 855-274-1888
Email: amansfield@whatleykallas.com

Charles Nicholas Dorman
(Admitted *Pro Hac Vice*)
P. O. Box 10968
Birmingham, AL 35202-0968
Telephone: (205) 488-1200
Fax: (800) 922-4851

Email: ndorman@whatleykallas.com

**CONSUMER WATCHDOG**
*/s/Harvey Rosenfield*
Harvey Rosenfield (Admitted *Pro Hac Vice*)
Jerry Flanagan (Admitted *Pro Hac Vice*)
Laura Antonini (Admitted *Pro Hac Vice*)
2701 Ocean Park Blvd., Suite 112
Santa Monica, CA 90405
Telephone: (310) 392-0522
Fax: (310) 392-8874
Emails: harvey@consumerwatchdog.org
jerry@consumerwatchdog.org
laura@consumerwatchdog.org

**KELLER ROHRBACK L.L.P.**
*/s/ Derek W. Loeser*
Lynn Lincoln Sarko (Admitted *Pro Hac Vice*)
lsarko@kellerrohrback.com
Derek W. Loeser (Admitted *Pro Hac Vice*)
dloeser@kellerrohrback.com
T. David Copley (TC 9647)
dcopley@kellerrohrback.com
David J. Ko (Admitted *Pro Hac Vice*)
dko@kellerrohrback.com
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
Telephone: (206) 623-1900

David S. Preminger (DP 1057)
dpreminger@kellerrohrback.com
1140 Avenue of the Americas
New York, NY 1003
Telephone: (646) 380-6690

Jeffrey Lewis (Admitted *Pro Hac Vice*)
jlewis@kellerrohrback.com
300 Lakeside Drive, Suite 1000
Oakland, CA 94612
Telephone: (510) 463-3900

***Co-Lead Counsel for Plaintiffs and the Class***

**GRAY AND WHITE LAW**
Mark K. Gray (Admitted *Pro Hac Vice*)
mgray@grayandwhitelaw.com
713 E Market St #200

Louisville, KY 40202
Telephone: 502-805-1800

**NEUBERT, PEPE & MONTEITH, P.C.**
Gregory J. Pepe (To Apply *Pro Hac Vice*)
gpepe@npmlaw.com
195 Church Street, 13th Floor
New Haven, CT 06510
Telephone: (203) 821-2000

*Attorneys for Plaintiffs*

**Certificate of Service**

I hereby certify that on the __2nd__ day of March, 2017, a true and correct copy of the foregoing SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT was electronically filed using the CM/ECF system, which will send notice of such filing to all parties so registered.

*s/Joe R. Whatley, Jr.*
JOE R. WHATLEY, JR.