UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

IN RE EXPRESS SCRIPTS/ANTHEM ERISA
LITIGATION

---

**OPINION AND ORDER**

16 Civ. 3399 (ER)

Ramos, D.J.:

This litigation arises out of the relationship between Anthem, Inc. ("Anthem"), one of the

nation's largest health benefits companies, and Express Scripts, Inc. ("ESI"), a pharmacy

benefits manager ("PBM"), and the impact of their transactions on Plaintiffs, a proposed class of

certain Anthem health plans and individual subscribers to Anthem health plans who receive

prescription drug benefits through ESI. Plaintiffs assert seventeen causes of action against

Anthem and ESI ("Defendants"), including causes of action under the Employee Retirement

Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.*, the Racketeering Influenced

and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.*, and the Patient Protection

and Affordable Care Act ("ACA") anti-discrimination provision, 42 U.S.C. § 18116.

On April 24, 2017, both Anthem and ESI moved to dismiss the Plaintiffs' Second

Amended Complaint ("SAC") (Doc. 78). Docs. 93, 96. For the reasons stated below, both

motions are GRANTED.

## I.    BACKGROUND[1]

### A.    Anthem and ESI's 2009 PBM Agreement

Anthem is health benefits company that provides health care insurance and insurance

---

[1] The following facts are based on the allegations in the SAC, which the Court accepts as true for purposes of the instant motion. *See Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012).

administration programs. SAC ¶ 3. Anthem offers health care plans sponsored through an employer (Employee Welfare Benefit Plans regulated under ERISA) or offered directly from Anthem through, for example, the ACA insurance exchanges. *Id.* Anthem also provides "Administrative Services Only" ("ASO") plans to self-funded employers. *Id.* In an ASO plan, the health plan reimburses the health care costs of the plan beneficiaries, but pays Anthem a premium to administer the plan (and to negotiate on its behalf for lower rates with health care providers). *Id.* ¶ 9. ASO plans account for sixty percent of Anthem's business. *Id.* ¶ 10.

To keep costs of prescription medications manageable, insurers like Anthem frequently use in-house or third-party PBMs to administer prescription medication programs for health plans. *Id.* ¶¶ 108, 121 ("A critical key to success for health insurers is to provide effective and affordable pharmacy/drug related services and administration for its members . . . .") (quoting Complaint (Doc. 1), at ¶ 11, *Anthem v. Express Scripts, Inc.*, No. 16 Civ. 2048 (S.D.N.Y. 2016)). PBMs generally contract with pharmacies, negotiate discounts and rebates with drug manufacturers, review drug utilization, manage drug formularies, and process and pay prescription drug claims. *Id.*

ESI is the largest PBM operating in the United States. *Id.* ¶ 109. Over 97% of the pharmacies in the country are in an ESI network. *Id.* ESI processes nearly 1.4 billion prescriptions each year. *Id.* ESI provides traditional PBM services and also operates mail-order delivery services for prescription drugs. *Id.* ¶ 108.

On December 1, 2009, Anthem and ESI entered into a ten year agreement (the "PBM Agreement"). *Id.* ¶ 103. Under the PBM Agreement, ESI either processes claims of Anthem participants who fill prescriptions at retail pharmacies or fills the prescriptions of Anthem participants directly through its mail-order pharmacies. *Id.* ¶ 112. ESI also provides

administrative services relating to prescription drugs for Anthem, Anthem's health plans, and Anthem participants. *Id.* ¶ 122.

On the same day, Anthem and ESI entered into an agreement by which Anthem sold three PBM companies, NextRx, LLC, NextRx, Inc., and NextRx Services (collectively, the "NextRx companies") to ESI (the "NextRx Agreement"). *Id.* ¶ 125.[2] The execution of the PBM Agreement was a condition precedent to the signing of the NextRx Agreement. *Id.* ¶ 126. According to ESI, the purchase price for the NextRx entities was directly tied to the price Anthem would pay for prescription drugs over the course of the PBM Agreement. *Id.* ¶ 127. Specifically, ESI offered to pay $500 million to Anthem for the NextRx companies in exchange for providing prescription medications to Anthem subscribers at a lower price throughout the ten year PBM Agreement. *Id.* Conversely, ESI offered to pay a much greater amount for the NextRx companies—$4.675 billion—but allegedly made clear that prescription medication pricing would be higher over the life of the Agreement. *Id.* ¶ 128.[3] Ultimately, Anthem opted for the greater upfront payment of $4.675 billion. *Id.*

### B. Key Terms of the 2009 PBM Agreement

Plaintiffs allege that the PBM Agreement allows ESI to exclusively set prescription drug pricing, subject to certain terms and limitations. *Id.* ¶ 133. According to Plaintiffs, the PBM Agreement gives ESI discretion over pricing through several different mechanisms:

First, ESI negotiates for rebates and discounts from drug manufacturers. *Id.* ¶ 116. According to the PBM Agreement, ESI may "contract[] for its own account with manufacturers

---

[2] *See also* Declaration of Glenn M. Kurtz (Doc. 41) (Ex. 2), *Anthem, Inc. v. Express Scripts, Inc.*, 16 Civ. 2048 (S.D.N.Y. 2016).

[3] Anthem strongly disputes this version of events. *See* Memorandum of Law in Support of Anthem's Motion to Dismiss ("Anthem Mem.") (Doc. 94), at 8–9 (describing the NextRx transaction).

to obtain formulary rebates attributable to the utilization of certain brand medications and supplies by PBM client members."[4] *Id.*; Declaration of Joe R. Whatley, Jr. in Opposition to Motions to Dismiss (Doc. 110), Ex. C ("PBM Agreement") at Ex. N.

Second, ESI controls the classification of prescription drugs as "brand" or "generic." *Id.* ¶ 117. Under the PBM Agreement, the name of a drug (e.g., whether it is marketed under a "brand" name or simply the chemical or "generic" name) "does not necessarily mean that the product is recognized as a generic for adjudication, pricing, or copay purposes." PBM Agreement Ex. N. Instead, "ESI distinguishes brands and generics through a proprietary algorithm ("BGA") that . . . uses [a variety of] data elements in a hierarchical process to categorize the products as brand or generic." *Id.* Plaintiffs allege that this impacts pricing because brand medications are generally more expensive than generic ones. SAC ¶ 117.

Third, ESI determines the maximum allowable cost (the "MAC") for each of the prescription medications it provides to Anthem participants. *Id.* ¶ 118. ESI "maintains a MAC List of drug products identified as requiring pricing management. . . . ESI also maintains correlative MAC price lists based on current price reference data provided by FDB [First DataBank] or any other nationally recognized pricing source, market pricing and availability information from generic manufacturers and online research of national wholesale drug company files." *Id.*; PBM Agreement Ex. N.

Fourth, Plaintiffs claim that ESI establishes the exclusionary formulary list, which excludes certain drugs from ESI's formulary. *Id.* ¶ 119.[5]

---

[4] According to Plaintiffs, this gives ESI the discretion to determine "whether to pass rebates through to [Plaintiffs] or keep them for its own pecuniary benefit." *Id.* In other words, the PBM Agreement creates no obligation for ESI to share in whatever rebates it receives.

[5] A formulary is a list of approved prescription drugs. Some PBMs develop their own formularies and make them available to plan sponsors; PBMs might also adopt an insurer's formulary. *See Moeckel v. Caremark, Inc.*, 622 F. Supp.2d 663, 686 (M.D. Tenn. 2007) ("Caremark develops its formularies and preferred drug lists for its own

Fifth, and crucially, Plaintiffs claim that ESI's interpretation of Section 5.6 of the PBM Agreement, if correct, would give ESI additional control over pricing. *Id.* Section 5.6, titled "Periodic Pricing Review," provides that:

> [Anthem] or a third party consultant retained by [Anthem] will conduct a market analysis every ▉▉▉▉ during the Term of this Agreement to ensure that [Anthem] is receiving competitive benchmark pricing. In the event [Anthem] or its third party consultant determines that such pricing terms are not competitive, [Anthem] shall have the ability to propose renegotiated pricing terms to PBM and [Anthem] and PBM agrees to negotiate in good faith over the proposed new pricing terms. Notwithstanding the foregoing, to be effective any new pricing terms must be agreed to by PBM in writing.

PBM Agreement ¶ 5.6. Plaintiffs allege that the term "competitive benchmark pricing" is "atypical" and "not a standard term within the PBM industry." SAC ¶¶ 18, 142. Plaintiffs point to ESI's 2015 Annual Report, in which it states that it typically calculates prescription medication pricing based on the "average wholesale price" ("AWP"), *id.* ¶ 139, and ESI's PBM arrangement with the United States Department of Defense, which incorporates AWP as a pricing benchmark, *id.* ¶ 140. Section 5.6, in contrast, does not reference AWP or alternate pricing benchmarks, like MAC or Wholesale Acquisition Cost ("WAC"). *Id.* ¶ 142.

Plaintiffs have alleged that ESI used the power it had under these provisions of the PBM Agreement, especially the lack of reference to a well-known pricing benchmark in Section 5.6, to charge Plaintiffs excessive prices for prescription medications. *Id.* ¶ 133.

---

account and makes them available to prospective plan sponsor clients for adoption if they so choose. . . . Caremark's clients such as Morrell & Co. are not required to adopt Caremark's standard formulary."). Plaintiffs do not explain why they believe that ESI "has discretion to exclude certain drugs offered to Plaintiffs and the Class" or that ESI "recently excluded 66 drugs from its national formulary." SAC ¶ 119. According to the PBM Agreement, Anthem was "the sole owner of the Formularies which are administered on its behalf" by ESI, and were considered Anthem's work product. PBM Agreement ¶ 2.5(b). ESI did, however, provide consulting to support formulary administration. *Id.* ¶ 3.10.

## C. Negotiations After 2009

In 2012, Anthem and ESI engaged in negotiations over pricing and signed an amended PBM Agreement. *Id.* ¶¶ 12 n.3, 144.[6]

In preparation for the next pricing review, in late 2014 Anthem engaged third-party Health Strategy, LLC to conduct a market analysis to ensure that the pricing under the PBM Agreement remained competitive. SAC ¶ 145. In March 2015, Health Strategy reported to Anthem its conclusion that prescription drug pricing exceeded "competitive benchmark pricing" by more than $3 billion annually.[7] *Id.* ¶ 146. Anthem estimated that pricing under the PBM Agreement would therefore cost $13 billion more than "competitive benchmark pricing" over the remaining life of the Agreement, and would cost $1.8 billion more during the post-termination wind down period provided for in the Agreement. *Id.* ¶ 147.

Thereafter, on March 18, 2015, Anthem informed ESI that it had determined that current prescription drug pricing was not consistent with "competitive benchmark pricing." *Id.* ¶ 165. Anthem provided ESI with different pricing terms that it believed would be consistent with competitive prices. *Id.* ESI neither timely disputed Anthem's proposed pricing terms, nor did it make a counter-proposal. *Id.* ¶ 166. On April 1, 2015, Anthem provided ESI with a formal notice of breach as required under the PBM Agreement. *Id.* ¶ 167. In June 2015, ESI contacted Anthem about the dispute, but refused to negotiate over Anthem's proposed pricing terms. *Id.* ¶ 170.

---

[6] Plaintiffs do not allege that any of the PBM provisions at issue here changed substantively when the PBM Agreement was amended. *See* Anthem's Reply Memorandum in Support of Its Motion to Dismiss ("Anthem Reply Mem.") (Doc. 125) at 5 ("Plaintiffs' allegations do not challenge any amended or new terms of the 2012 PBM Agreement.").

[7] It is unclear how "competitive benchmark pricing" is defined. The phrase is not defined in the PBM Agreement and none of the parties attached Health Strategy's report or explained Health Strategy's understanding of the phrase. Plaintiffs sought, but were unable to obtain, the report in early discovery. *See* SAC ¶ 138 n.8.

Anthem and ESI representatives met on September 15, 2015, but ESI continued to refuse to negotiate over Anthem's proposed pricing terms. *Id.* ¶ 171. Over the next few months, Anthem and ESI continued to communicate, but did not meaningfully negotiate over their pricing disputes. *Id.* ¶¶ 171–78. On December 2, 2015, Anthem sent a revised pricing proposal to ESI, and, hearing no response, emailed again on December 14, 2015. *Id.* ¶¶ 179–80. The next day, ESI responded and reiterated its position that it was not obligated to negotiate over Anthem's proposed price terms. *Id.* ¶ 181. ESI informed Anthem it would respond substantively to the December 2, 2015 proposal in two weeks. *Id.* On January 7, 2016, ESI sent Anthem a counter-proposal that reduced pricing by $1 billion over the remaining life of the PBM Agreement. *Id.* ¶ 184. A week later, on January 13, Anthem responded, telling ESI that "Express Scripts' excessive pricing is harming Anthem and its customers. . . . Anthem is prepared to accept something less than competitive benchmark pricing . . . but obviously will not accept Express Scripts' grossly inflated pricing proposal." *Id.* ¶ 185. On January 22, 2016, Anthem sent ESI its third pricing proposal. *Id.* ¶ 186. On February 3, 2016, representatives from Anthem and ESI met a second time, and following the meeting, on February 5, Anthem submitted a proposal discussed in person. *Id.* ¶¶ 188–91. On February 12, 2016, ESI sent Anthem a counter-proposal that was not substantially different from its January 7, 2016 proposal. *Id.* ¶ 192.

After two additional in-person meetings, and much back and forth over the following month, ESI's position on pricing remained the same. *Id.* ¶ 198. On March 21, 2016, Anthem sued ESI over its pricing dispute, making Anthem's allegations of price inflation public. *See Anthem v. Express Scripts, Inc.*, 16 Civ. 2048 (S.D.N.Y. 2016).

**D.    Alleged Harm to Plaintiffs**

Plaintiffs in this case are six individuals ("Subscriber Plaintiffs") and two fiduciaries of

ERISA health plans ("Plan Plaintiffs"). Both sets of Plaintiffs seek to represent a class.

Plaintiffs define the Subscriber Class as:

> All persons who are participants in or beneficiaries of any health
> care plan from December 1, 2009 to the present in which Anthem
> provided prescription drug benefits through an agreement with
> Express Scripts and who paid a percentage based co-insurance
> payment (in any percentage amount, including 100%) in the course
> of using that prescription drug benefit.

SAC ¶ 303.[8]  Plaintiffs define the Plan Class as:

> Fiduciaries of all self-funded employee welfare benefit plans
> administered by Anthem from December 1, 2009 to the present in
> which Anthem provided prescription drug benefits through an
> agreement with Express Scripts.

*Id.* ¶ 302.

Plaintiffs all argue that, because Health Strategy's report suggested that the PBM

Agreement pricing was $3 billion more expensive than "competitive benchmark" pricing

annually, ESI has been setting prescription drug pricing at inflated rates. *See id.* ¶ 133. The

Subscriber Plaintiffs allege that under their health plans, they are responsible for payment of co-

insurance charges. *Id.* ¶ 4.  Co-insurance payments are a percentage share of the costs of a

prescription, and are specified in individual health plans. *Id.* n.2.  Because co-insurance

payments are set as a percentage, inflated prescription drug prices set by ESI would inflate the

co-insurance amount Subscriber Plaintiffs are required to pay. *Id.* ¶ 149.

---

[8] Plaintiffs propose three sub-classes of the Subscriber Class.  First, a Subscriber ERISA Sub-Class, comprised of
individuals within the Subscriber Class who received their health benefits through an ERISA-governed employee
welfare benefit plan. *Id.* ¶ 304(a).  Second, a Subscriber Non-ERISA Sub-Class, comprised of individuals within the
class who received health benefits from a non-ERISA-governed health plan. *Id.* ¶ 304(b).  Finally, Plaintiffs seek to
define a Subscriber ACA Sub-Class, comprised of "[a]ll Class Members who paid a percentage based co-insurance
charge for prescription medications to treat HIV/AIDS, Diabetes, Cancer, Epilepsy, Cerebral Palsy, Multiple
Sclerosis, and Muscular Dystrophy." *Id.* ¶ 304(c).

The Plan Plaintiffs are health plans that are self-funded by employers but operated under ASO agreements with Anthem. *Id.* ¶¶ 3, 5. They allege that with respect to their plans, Anthem absorbed none of the costs of inflated prescription pricing, and they were required to cover the difference between the PBM Agreement pricing and "competitive benchmark pricing" using plan assets. *Id.* ¶ 148. Each of the Plaintiffs also makes specific allegations detailing their overpayment for prescription drugs.

### 1.    John Doe One

Plaintiff John Doe One, a resident of Ohio, purchased Anthem health insurance in January 2016 through the insurance exchange set up under the ACA. SAC ¶¶ 35–36. His plan, Anthem Gold Pathway X HMO, included prescription medication benefits administered by ESI. *Id.*[9] Under the plan, Doe One is responsible for a co-insurance payment to ESI. *Id.* On February 9, 2016, he received an invoice from ESI for $1,280.37 for a thirty day supply of his HIV medication Atripla.[10] *Id.* ¶ 38. On March 2, 2016, Doe One received an invoice for $736.12.[11] *Id.* At that time, the ESI website listed the total price of a ninety day supply of Atripla at $7,361.19. *Id.* According to Plaintiffs, the price of Atripla for that same time period may actually have been as low as $6,431.01. *Id.* ¶ 39.

Because Doe One believed that he had been overcharged for Atripla relative to market pricing, he submitted a letter to ESI's general counsel and Anthem's grievances and appeals department on April 11, 2016. *Id.* ¶ 40. In his letter, he sought a refund of the portion of his co-

---

[9] Doe One did not recall seeing a notice explaining that ESI would be the Pharmacy Benefits Manager (PBM) for his plan. *Id.*

[10] Of that, $1,150 was attributable to Doe One's deductible, and $130.37 was his additional co-insurance payment.

[11] All of this cost was attributable to Doe One's co-insurance payment.

insurance payment attributable to ESI's allegedly inflated prices. *Id.* He also asked for a refund for "all others similarly situated." *Id.* On May 10, 2016, Doe One's request was denied.

### 2.    John Doe Two

Plaintiff John Doe Two, a resident of California, joined a preferred provider organization ("PPO") plan offered by Anthem to his employer, MUFG Union Bank, N.A.,[12] in January 2015. *Id.* ¶ 42. The PPO plan includes prescription medication benefits administered by ESI, under which Doe Two is responsible for a co-insurance payment. *Id.*[13] Doe Two was prescribed three specialty HIV medications—Truvada, Intelence, and Isentress—for which he was required to make 20% co-insurance payments. *Id.* ¶ 46. In February 2015, Doe Two paid a total of $715.58 in co-insurance payments for a thirty day supply of the three drugs. *Id.*[14] In March 2015, Doe Two paid a total of $731.57 for another thirty day supply of his medications. *Id.* ¶ 47.[15] In July 2015, Doe Two was required to obtain HIV medications through ESI's mail-order pharmacy Accredo rather than the retail pharmacy he had previously used. *Id.* ¶ 48. He also began receiving ninety day supplies. *Id.* That month, Doe Two paid $1,780.98 in co-insurance payments for his ninety day supply of his medications. *Id.* Doe Two made similar co-insurance payments from July 2015 through June 2016. *Id.*

In June 2015, ESI's web portal listed the total price for a ninety day supply of Truvada at $4,222.37 (which amounts to $1,407.46 for a thirty day supply). *Id.* However, Doe Two alleges

---

[12] MUFG Union Bank is based in New York City, New York. *Id.*

[13] Doe Two did not recall seeing a notice explaining that ESI would be the Pharmacy Benefits Manager (PBM) for his plan. *Id.* ¶ 43.

[14] That month, ESI listed the price of a thirty day supply of Truvada at $1,325.45, of Intelence at $1,008.32, and of Isentress at $1,244.14. *Id.* Doe Two has alleged that those prices were inflated.

[15] That month, ESI listed the price of a thirty day supple of Truvada at $1,341.71, of Intelence at $1,056.69, and of Isentress at $1,259.45. *Id.* Doe Two has alleged that those prices were inflated.

that in this same time period, the market price for a thirty day supply of Truvada was $1,284.28. *Id.* ¶ 49. ESI's listed price for a ninety day supply of Intelence was $3,109.52 (which amounts to $1,036.51 for a thirty day supply). *Id.* ¶ 48. Doe Two alleges that in this same time period, the market price for a thirty day supply of Intelence was $816.18. *Id.* ¶ 49. ESI's listed price for a ninety day supply of Isentress was $3,707.30 (which amounts to $1,235.77 for a thirty day supply). *Id.* ¶ 48. Doe Two alleges that the market price for a thirty day supply of Isentress was $1,205.41. *Id.* ¶ 49. [16]

On April 11, 2016, Doe Two sent a letter to his employer and Anthem's grievances and appeals department explaining that he believed he was overcharged for prescription drugs, and seeking a refund of the amount of his co-insurance payments attributable to ESI's inflated prices. *Id.* ¶ 50. He also asked for a refund to any other similarly situated subscribers. *Id.* On May 2, 2016, Anthem informed Doe Two that there was nothing Anthem could do to assist him. *Id.*

John Doe Two alleges that his PPO plan is an employee welfare benefit plan governed by ERISA. *Id.* ¶ 42.

### 3. Karen Burnett

Plaintiff Karen Burnett, a Kentucky resident, has been enrolled in a plan sponsored by her spouse's employer, LG&E and KU Energy LLC,[17] since at least 2010. *Id.* ¶ 52. Her plan, the LG&E and KU Medical Dental and Vision Care Plan, provided health benefits through an Anthem ASO Plan. *Id.* ¶ 53. Burnett's prescription drug benefits were provided through ESI.

---

[16] The SAC actually alleges that "based on publicly available information, the total cost" of the medications "should be" $1,284.28 for Truvada, $816.18 for Intelence, and $1,205.41 for Isentress. *Id.* Plaintiffs do not explain why they determined that those figures "should be" the prices for each of the drugs John Doe Two is prescribed. Drawing all reasonable inferences in favor of Plaintiffs, the Court will assume that Plaintiffs have alleged that the market price of those drugs should have been $1,284.28, $816.18, and $1,205.41, respectively.

[17] The company is based in Louisville, Kentucky. *Id.* ¶ 52.

*Id.* ¶ 54.[18]  Under Burnett's plan, she was responsible for all prescription medication pricing that

fell below her annual deductible. *Id.* ¶ 55.  She was also responsible for the full cost of any

medication obtained from an out of network provider. *Id.*  Since May 2014, Burnett has

regularly been prescribed ten different prescription medications. *Id.* ¶ 57.  She has paid Express

Scripts a total of $1,196 for the medications she received from ESI's mail-order pharmacy. *Id.*

She also estimates that she paid $283 to her retail pharmacy for prescription medications (at

prices set by ESI) in the same time period. *Id.*  At one point during this period, Burnett paid

$128.23 for 180 tablets of Buproprion. *Id.* ¶ 58.  However, Burnett alleges that the average price

of that quantity and strength of Buproprion at the time was "as low as" $66.72. *Id.*

    Burnett alleges that her health plan is an employee welfare benefit plan governed by

ERISA. *Id.* ¶ 52.

### 4. Brendan Farrell

    Plaintiff Brendan Farrell, a New York resident, has received health care through his

employer, Verizon Communications,[19] since at least 1999. *Id.* ¶ 61.  His plan, the Verizon

Medical Expense Plan for New York and New England Associates, provided benefits through an

Anthem ASO plan. *Id.* ¶¶ 61–62.  His prescription drug benefits were administered by ESI. *Id.* ¶

63.  Under the plan, and depending on the medication, Farrell was required to pay between 30%

and 100% of the price charged by ESI for prescription medications below his annual deductible

or a flat co-pay plus the cost differential between the brand-name and generic version of the

drug. *Id.* ¶ 64.  If Farrell used a pharmacy outside of ESI's network, he was responsible for

---

[18] The LG&E Plan stated, "If you enroll in one of the Anthem medical options, you are automatically enrolled in prescription drug coverage administered by Express Scripts." *Id.*

[19] Verizon is based in New York City, New York. *Id.* ¶ 61.

between 30% to 40% of the price ESI charged for the prescription and the cost differential between ESI's price and the retail price charged at the pharmacy. *Id.*

Since June 2014, Farrell has purchased at least ten different prescriptions for himself or other beneficiaries under his plan. *Id.* ¶ 66. He paid ESI $424 for medications he received from ESI's mail-order pharmacy, Accredo. *Id.* He also estimates that he paid $227 to retail pharmacies for prescription drugs. *Id.* At one point, Farrell paid $12.13 for 60 milliliters of Bromphen Syrup. *Id.* ¶ 67. However, Farrell alleges that the average cost of that medication is "as low as" $10.74. *Id.* Similarly, in December 2016, Farrell paid $924.84 for 50 grams of Retin-a Micro Pump Gel. *Id.* Farrell alleges that the average cost of that medication is "as low as" $874.98. *Id.*

Farrell alleges that his health plan is an employee welfare benefit plan governed by ERISA. *Id.* ¶ 61.

### 5.    Robert Shullich

Plaintiff Robert Shullich, a resident of New Jersey, is a participant in the AmTrust Health and Welfare Plan, sponsored by his employer, AmTrust Financial Services, Inc.[20] *Id.* ¶ 70. Shullich has participated in the plan, which is administered by Anthem under an ASO agreement, since September 2014. *Id.* ¶ 70–71. Shullich's prescription drug benefits are provided by ESI. *Id.* ¶ 72. Under his plan, Shullich is responsible for a co-insurance payment of 25% of the price set by ESI for a "preferred" brand name medication and 50% of the price set by ESI for a "non-preferred" brand name medication. *Id.* ¶ 73. Since October 2014, Shullich has been prescribed over ten different prescription drugs, and paid a total of $1,317 to ESI for those medications. *Id.* ¶ 74. He estimated paying an additional $203 directly to his pharmacy. *Id.* At one point,

---

[20] AmTrust is based in New York City, NY. *Id.* ¶ 70.

Shullich paid $10 for 90 tablets of Furosemide. *Id.* ¶ 75. Shullich alleges that the average cost of Furosemide at that time was "as low as" $1.11. *Id.* Shullich also paid $57.83 for 190 tablets of Potassium Chloride Extended Release. *Id.* Shullich alleges that the average cost of this medication was "as low as" $41.15 at that time.

Shullich alleges that his health plan is an employee welfare benefit plan governed by ERISA. *Id.* ¶ 70.

### 6. Brian Corrigan

Plaintiff Brian Corrigan, a resident of Kentucky, signed up for an Anthem health care plan through an ACA exchange in January 2016. *Id.* ¶¶ 78–79. Corrigan was a participant in the Anthem Silver Pathway X PPO 10% for HAS S04 plan until January 2017. *Id.* Under that plan, his prescription medication benefits were administered by ESI. *Id.* Corrigan was required to make a 10% co-insurance payment for all prescription medications. *Id.* In June 2016, Corrigan paid $43.16 for 30 tabs of Pravastatin Sodium and Omeprazole Delayed Release. *Id.* ¶ 80.[21] When Corrigan switched plans in 2017, he joined the Anthem Silver Pathway X HMO 5300 S05 plan, which still provides prescription drug benefits administered through ESI. *Id.* ¶ 81.

### 7. Stamford Health

Plaintiff Stamford Health, Inc. is a Connecticut corporation and a fiduciary of the Stamford Plan, an employee welfare benefit plan funded by Stamford Health contributions. *Id.* ¶¶ 84–86. Anthem administered certain Stamford Plan benefits pursuant to an ASO agreement until the end of 2014. *Id.* ¶ 87.[22] Anthem also administered prescription drug benefits for the Stamford Plan. *Id.* The plan documents provided that "the Maximum Allowed Amount for

---

[21] Corrigan alleges that these prices were inflated. *Id.*

[22] Stamford Health retained the ability to override certain decisions of Anthem with respect to the administration of the Stamford Plan. The SAC does not indicate what types of decisions Stamford Health could override. *Id.*

Prescription Drugs is the amount determined by Anthem BCBS using prescription drug cost information provided by the Pharmacy Benefits Manager (PBM)." *Id.* ¶ 88. Stamford Plan assets were used to pay prescription medication benefits, which cost the Plan over six million dollars in 2014. *Id.* ¶ 89–90.

### 8. Brothers Trading Company

Plaintiff Brothers Trading Company, Inc., an Ohio corporation, is the fiduciary of its employee welfare benefit plan, the Brothers Trading Plan. *Id.* ¶¶ 92–93. The Brothers Trading Plan is funded by contributions from Brothers Trading, and has been administered by Anthem through an ASO agreement since March 1, 2012. *Id.* ¶¶ 94–95. Brothers Trading Plan assets are used to pay prescription medication costs for participants and beneficiaries. *Id.* ¶¶ 96–97. In 2015, Brothers Trading spent $900,000 on prescription medications. *Id.* ¶ 99. Brothers Trading alleges that the prices it pays for its beneficiaries' prescription drugs are 584% to 1317% higher than the prices that would be charged by other providers and retail or online pharmacies. *Id.* ¶ 100.

### E. Procedural History

On May 6, 2016, Plaintiffs filed a complaint against ESI. Doc. 1. On September 30, 2016, Plaintiffs filed an amended complaint adding Anthem and Does 1–10 as defendants. Doc. 41. On March 2, 2017, Plaintiffs filed the SAC, alleging seventeen causes of action. Doc. 78. Specifically, against Anthem, the Subscriber ERISA Sub-Class and/or the Plan Class have alleged breach of ERISA fiduciary duties (Claims 3 and 9), prohibited transactions under ERISA (Claims 4 and 6) and co-fiduciary liability under ERISA (Claim 7). The Non-ERISA Subscriber Sub-Class has alleged breach of the covenant of good faith and fair dealing (Claim 15). Against ESI, the Subscriber ERISA Sub-Class and/or the Plan Class have alleged breach of ERISA

fiduciary duties (Claims 1 and 8), prohibited transactions under ERISA (Claims 2 and 5), and co-fiduciary liability under ERISA (Claim 7). All Plaintiffs have alleged violations of RICO (Claim 10). The Non-ERISA Subscriber Sub-Class has alleged breach of contract (Claim 11), quantum meruit/restitution/unjust enrichment (Claim 12), and violations of New York's General Business Laws and similar state consumer protections laws (Claims 13 and 14). Those plaintiffs have also sought declaratory relief (Claim 16). Finally, the ACA Subscriber Sub-Class has alleged violations of the ACA's anti-discrimination provision (Claim 17).[23]

On April 24, 2017, each party moved to dismiss the claims against it. Docs. 93, 96.

## II.   LEGAL STANDARD

Under Rule 12(b)(6), a complaint may be dismissed for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). When ruling on a motion to dismiss pursuant to Rule 12(b)(6), the Court must accept all factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor. *Koch*, 699 F.3d at 145. However, the Court is not required to credit "mere conclusory statements" or "threadbare recitals of the elements of a cause of action." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). Further, the Court is not obliged to reconcile and accept as true "pleadings that are contradicted by other matters asserted or relied upon or incorporated by reference . . . ." *Xi Wei Lin v. Chinese Staff & Workers' Ass'n*, No. 11 Civ. 3944 (RJS), 2012 WL 5457493, at *4 (S.D.N.Y. Nov. 8, 2012) (quoting *Fisk v. Letterman*, 401 F. Supp. 2d 362, 368 (S.D.N.Y. 2005)).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*,

---

[23] Although not all Plaintiffs have brought each claim against Defendants, for the sake of simplicity this Court will refer to "Plaintiffs" throughout the opinion to refer to the Plaintiffs who have brought the relevant claim.

550 U.S. at 570). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). Federal Rule of Civil Procedure 8 "marks a notable and generous departure from the hypertechnical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Id.* at 678–79. If the plaintiff has not "nudged [her] claims across the line from conceivable to plausible, [the] complaint must be dismissed." *Twombly*, 550 U.S. at 570.

The question in a Rule 12 motion to dismiss "'is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims.'" *Sikhs for Justice v. Nath*, 893 F. Supp. 2d 598, 615 (S.D.N.Y. 2012) (quoting *Villager Pond, Inc. v. Town of Darien*, 56 F.3d 375, 378 (2d Cir. 1995)). "[T]he purpose of Federal Rule of Civil Procedure 12(b)(6) 'is to test, in a streamlined fashion, the formal sufficiency of the plaintiff's statement of a claim for relief without resolving a contest regarding its substantive merits.'" *Halebian v. Berv*, 644 F.3d 122, 130 (2d Cir. 2011) (quoting *Global Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 155 (2d Cir. 2006)).

## III. STANDING

In its motion to dismiss, Anthem argues that all Plaintiffs lack Article III standing. Memorandum of Law in Support of Anthem's Motion to Dismiss ("Anthem Mem.") (Doc. 94) at 13–15. The "irreducible constitutional minimum" of Article III standing requires that a plaintiff has suffered an injury-in-fact that is both fairly traceable to a defendant's conduct and redressable by a favorable decision. *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). It is the plaintiff's burden to establish that standing exists by a preponderance of the evidence. *See Katz v. Donna Karan Co., L.L.C.*, 872 F.3d 114, 120 (2d Cir. 2017). Each element of standing

must be supported "with the manner and degree of evidence required at the successive stages of the litigation." *John v. Whole Foods Mkt. Grp., Inc.*, 858 F.3d 732, 736 (2d Cir. 2017) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)). Therefore, at the pleading stage, "general factual allegations of injury resulting from the defendant's conduct may suffice." *Id.*

Anthem here challenges the first element—injury-in-fact. To establish injury-in-fact, a plaintiff must show that she suffered an invasion of a legally protected interest that is "concrete and particularized" and "actual or imminent" rather than "conjectural or hypothetical." *Spokeo*, 136 S. Ct. at 1548 (quoting *Lujan*, 504 U.S. at 560). Anthem argues that Plaintiffs' allegations of overpayment for prescription drugs are nothing more than conclusory allegations of generalized wrongdoing. Anthem Mem. at 14. In the Second Circuit, however, "overpaying for a product results in a financial loss [that] constitute[s] a particularized and concrete injury in fact." *John*, 858 F.3d at 736. As discussed above, Plaintiffs have alleged that they were forced to pay inflated co-insurance rates because the PBM Agreement allowed ESI to set "inflated prescription medication prices" during the ten year term of the Agreement. SAC ¶¶ 4, 12–15, 18. Because Plaintiffs have alleged that they overpaid for certain prescription drugs as a result of inflated pricing set through the PBM Agreement, they have adequately alleged injury-in-fact and have made a sufficient showing, at this early stage in the litigation, to establish Article III standing.

Separately, in its motion to dismiss, ESI argues that two plaintiffs in particular— Plaintiffs Burnett and Farrell—lack standing because they have not alleged an injury that is "fairly traceable" to Defendants' conduct. Memorandum of Law in Support of ESI's Motion to Dismiss ("ESI Mem.") (Doc. 98) at 16. ESI argues that Burnett and Farrell are members of health plans which receive prescription drug benefits directly from ESI and not through Anthem;

any inflated co-insurance they paid, therefore, would not be "fairly traceable" to the PBM Agreement at issue in this litigation. *Id.* In support of this argument, ESI attaches a declaration from Angela Adler, a Vice President for ESI's Anthem Division. *Id.*; Declaration of Angela Adler in Support of ESI's Motion to Dismiss ("Adler Decl.") (Doc. 99). In her declaration, Adler states that since 2011, Burnett's health plan contracted directly with ESI to receive PBM services. Adler Decl. ¶ 3. Similarly, Adler states that since 2009, Farrell's health plan has contracted directly with either ESI or Medco Health Solutions, Inc. to receive PBM services. *Id.* ¶ 4.[24]

When a defendant makes a factual challenge to a plaintiff's standing by attaching evidence beyond the pleadings, a plaintiff may either "come forward with evidence of their own to controvert that presented by the defendant" or may rely on their pleadings "if the evidence proffered by the defendant is immaterial because it does not contradict plausible allegations that are themselves sufficient to show standing." *Katz*, 872 F.3d at 119 (quoting *Carter v. HealthPort Tech., LLC*, 822 F.3d 47, 57 (2d Cir. 2016)). Here, Plaintiffs allege that Burnett and Farrell are insured by Anthem; as such, they were "Covered Individuals" entitled to receive "Covered Services" under the PBM Agreement. Therefore, they argue, it is immaterial whether their employers contracted directly with ESI, because ESI's ability to inflate prices for Burnett and Farrell, like all Plaintiffs, was tied to the provisions of the PBM Agreement. *See* Memorandum of Law in Opposition to Motions to Dismiss ("Pl. Mem.") (Doc. 109) at 14; PBM Agreement ¶¶ 1.14, 1.17 (defining covered individuals and covered services). However, Burnett and Farrell have not put forward evidence showing that their insurance plans provided for prescription drug services through Anthem, rather than through ESI directly. The PBM

---

[24] Adler does not present any documentary evidence in support of these statements.

Agreement only governs ESI's relationship to individuals who are entitled to receive drugs, devices, supplies, or equipment "in accordance with and subject to the terms and conditions . . . of the applicable [Anthem-provided insurance] Plan." PBM Agreement ¶¶ 1.14, 1.17, 1.45. ESI's evidence that Burnett and Farrell were *not* entitled to receive drugs or devices under their employers' Anthem insurance plan is therefore not immaterial to determining standing. Because Plaintiffs did not offer evidence to controvert Ms. Adler's sworn declaration and it is Plaintiffs' burden to establish standing by a preponderance of the evidence, ESI's motion to dismiss Plaintiffs Burnett and Farrell is granted.[25]

## IV.    STATUTE OF LIMITATIONS

Anthem argues that Plaintiffs' ERISA claims (Claims 1–9) should be dismissed as time-barred. Anthem Mem. at 15–20. ESI argues that Plaintiffs' ERISA claims should be dismissed to the extent that they seek relief for conduct predating May 6, 2010, which is six years prior to the date the Complaint was filed—May 6, 2016. ESI Mem. at 32–33. Plaintiffs argue that all claims based on overcharges under the PBM Agreement, including those involving conduct that occurred before May 6, 2010, are timely. Pl. Mem. at 14–21.

ERISA provides three alternate statutes of limitations. Generally, a plaintiff has six years from the date of the last action that was part of the breach of fiduciary duty to file a complaint. 29 U.S.C. § 1113(1). However, if the plaintiff developed actual knowledge of the breach, then she has only three years after she learned of the breach to file a complaint. *Id.* § 1113(2). Finally, in the case of a defendant's fraud or concealment, the six year statute of limitations is tolled "until the plaintiff discovers, or should with reasonable diligence have discovered, the breach." *Id.* 227–28.

---

[25] Because none of Plaintiffs' seventeen causes of action were brought by either Burnett or Farrell alone, this decision does not limit Plaintiffs' ability to move forward on any of its claims.

### A.  Conduct after May 6, 2010

Anthem argues that all of Plaintiffs' ERISA claims against it are time barred because the claims arose on December 1, 2009, the date that Anthem and ESI entered into the PBM Agreement, which is more than six years before the filing of the Complaint. Anthem Mem. at 16. In opposition, Plaintiffs argue that they have alleged violations of ERISA based on conduct in 2009 *as well as* conduct of Anthem and ESI that occurred within the standard six year statute of limitations set forth in Section 1113. Namely, they point to the signing of the amended PBM Agreement in 2012 and the failure of Anthem to monitor ESI's pricing throughout the six years leading up to the filing of the Complaint. Pl. Mem. at 18–21.

"The renewal of a contract clearly implicates a [fiduciary's] duty under ERISA to review plan investments and eliminate imprudent ones." *Bona v. Barasch*, No. 01 Civ. 2289 (MBM), 2003 WL 1395932, at *18 (S.D.N.Y. Mar. 20, 2003). The renewal of a contract that violates ERISA, then, is itself a violation of ERISA. *Id.* at *19. A plaintiff may therefore sue under ERISA for the renewal of a contract where the renewal took place within six years of the filing of the complaint even if the original execution of the contract fell outside the statute of limitations. *Id.* Here, Plaintiffs allege—and it is not disputed—that Anthem and ESI amended the PBM Agreement at least as recently as January 1, 2012. SAC ¶ 12 n.3. Based on Plaintiffs' allegations, the ERISA causes of action arose, for purposes of the statute of limitations, on January 1, 2012, within six years of the filing of the Complaint. *See L.I. Head Start Child Dev. Servs., Inc. v. Econ. Opportunity Comm'n of Nassau Cty., Inc.*, 558 F. Supp. 2d 378, 400 (E.D.N.Y. 2008), *aff'd* 710 F.3d 57 (2d Cir. 2013) (explaining that "a new cause of action accrues for each violation where separate violations of the same type, or character, are repeated over time").

Second, Plaintiffs' claims against Anthem include allegations that Anthem failed to appropriately monitor ESI's pricing with respect to Anthem subscribers. *E.g.*, SAC ¶¶ 332, 360. Assuming, without deciding, that Anthem owed a duty to monitor ESI's pricing, then that duty began on December 1, 2009 and ran throughout the entire six year period preceding the filing of the Complaint. *See Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1828–29 (2015) (finding that an ERISA fiduciary "has a continuing duty of some kind to monitor" financial decisions and that if the alleged breach of the duty to monitor "occurred within six years of suit, the claim is timely").

Thus, none of Plaintiffs' ERISA claims are time-barred to the extent they are based on conduct occurring after May 6, 2010.[26]

### B.    Conduct before May 6, 2010

Plaintiffs also argue that conduct occurring before May 6, 2010 is not time-barred because the six year statute of limitations should be tolled pursuant to Section 1113's "fraud or concealment" exception. To qualify for tolling under the fraud or concealment exception, a complaint must allege that a fiduciary either "(1) breached its duty by making a knowing misrepresentation or omission of a material fact to induce an employee/beneficiary to act to his detriment; or (2) engaged in acts to hinder the discovery of a breach of fiduciary duty." *Janese v. Fay*, 692 F.3d 221, 228 (quoting *Caputo v. Pfizer, Inc.*, 267 F.3d 181, 190 (2d Cir. 2001)). A plaintiff must plead fraudulent allegations "with particularity," specifying the "time, place, speaker, and content of the alleged misrepresentations," explaining "how the misrepresentations were fraudulent," and describing the events giving rise to a "strong inference" that a defendant had an intent to defraud, knowledge of the falsity of the statements, or a reckless disregard for the truth. *Id.* (quoting *Caputo*, 267 F.3d at 191). To allege concealment, a plaintiff must plead

---

[26] For these reasons, Anthem's arguments with respect to the statute of limitations for the state law claims brought by the Subscriber Non-ERISA Plaintiffs also fail. *See* Anthem Mem. at 19–20.

facts giving rise to a duty to disclose the relevant information. *See DePasquale v. DePasquale*, No. 12. Civ. 2564 (RRM) (MDG), 2013 WL 789209, at *12 (E.D.N.Y. Mar. 1, 2013), *aff'd* 568 F. App'x 55 (2d Cir. 2014)).

Plaintiffs offer three possible omissions that they argue enable them to take advantage of the fraud or concealment exception. First, Plaintiffs allege that the Defendants breached their duty by omitting and concealing the relationship between the PBM Agreement and the NextRx Agreement, which they did not discover until they learned of ESI's allegations in the Anthem-ESI lawsuit. Pl. Mem. at 16.[27] Second, Plaintiffs allege that Defendants knowingly withheld material terms of the PBM Agreement, which Plaintiffs alleged "at least in part enabled ESI to overcharge for prescription medications." *Id.* at 17.[28] Third, Plaintiffs argue that Defendants failed to disclose the market analysis conducted by a third party consultant retained by Anthem, which Anthem alleges shows ESI's pricing was not at "competitive benchmark" levels. *Id.*

Plaintiffs maintain that Defendants had a duty to disclose each of these three pieces of information because both were acting as fiduciaries of Plaintiffs' health plans and ERISA fiduciaries have an "affirmative duty to inform when the [fiduciary] knows that silence might be harmful." *Id.* at 18; *In re Polaroid Litig.*, 362 F. Supp. 2d 461, 478 (S.D.N.Y. 2005) (quoting *Bixler v. Central Pennsylvania Teamsters Health & Welfare Fund*, 12 F.3d 1292, 1300 (3d Cir. 1993)). It is true that in the Second Circuit, ERISA fiduciaries have a duty to disclose "changes in the terms of a benefit plan and complete and accurate information about the administration of the plan." *In re Bear Stearns Co., Inc. Sec., Derivative, and ERISA Litig.*, 763 F. Supp. 2d 423,

---

[27] Plaintiffs allege that Anthem continues to omit material facts by not admitting that the two agreements were related. *Id.* at 16–17.

[28] Plaintiffs do not specify *which* terms were material and enabled ESI to set inflated drug pricing, although they admit they received an unredacted copy of the PBM Agreement in late April 2017. *Id.*

576 (S.D.N.Y. 2011) (citing *Devlin v. Empire Blue Cross and Blue Shield*, 274 F.3d 76, 88–89

(2d Cir. 2001)). At the same time, "it is inappropriate to infer an unlimited disclosure

obligation," *id.* at 576–77, and this Circuit has rejected breach of fiduciary duty claims seeking

disclosure of valuation reports and financial information regarding plan investments. *See*

*Gearren v. The McGraw-Hill Companies, Inc.*, 660 F.3d 605, 610 (2d Cir. 2011); *In re Citigroup*

*ERISA Litig.*, 662 F.3d 128, 142–43 (2d Cir. 2011), *abrogated on other grounds by Fifth Third*

*Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459 (2014); *Bd. of Trustees of the CWA/ITU Negotiated*

*Pension Plan v. Weinstein*, 107 F.3d 139, 146–47 (2d Cir. 1997).

Plaintiffs here claim that Defendants had a duty to disclose nonpublic financial

information regarding their contractual arrangements and a third-party evaluation of the PBM

Agreement and the pricing agreed to thereunder. This is far from the type of disclosure typically

required under ERISA: namely, "information about plan *benefits*." *See Gearren v. McGraw-*

*Hill Companies, Inc.*, 690 F. Supp. 2d 254, 271 (S.D.N.Y. 2010), *aff'd* 660 F.3d 605 (2d Cir.

2011) (quoting *In re Citigroup ERISA Litig.*, No. 07 Civ. 9790, 2009 WL 2762708, at *21

(S.D.N.Y. Aug. 31, 2009)). Plaintiffs do not, for example, argue that they were unable to see

their co-insurance rate and therefore could not have discerned the total prescription drug prices

ESI was charging. Thus, even assuming at this stage of the analysis that Defendants were

ERISA fiduciaries, this Court finds they did not have an affirmative duty to disclose the content

of the PBM Agreement, the connection between the PBM Agreement and the NextRx

Agreement, or the market analysis conducted by Anthem's expert. For this reason, Plaintiffs

have not shown that they are entitled to equitable tolling under ERISA's "fraud or concealment"

exception.

Plaintiffs alternatively argue that whether or not the "fraud or concealment" exception applies, their claim against Anthem for breaching the duty to monitor is timely because all of Anthem's conduct constitutes a single breach or violation, and the date on which the last breach occurred was within six years as required under Section 1113(1)(A). Pl. Mem. at 19–21. Plaintiffs argue that this case is similar to *LaScala v. Scrufari*, in which the defendant was liable for his retention of unlawful compensation for a period of time beginning more than six years before the filing of the complaint because his conduct "in breach of his fiduciary duties was in furtherance of a single scheme, constituting a single breach for the purposes of ERISA § 413(1)(A) . . . ." 330 F. Supp. 2d 236, 256 (W.D.N.Y. 2004), *aff'd* 479 F.3d 213 (2d Cir. 2007). In affirming, the Second Circuit agreed that the defendant should be liable for all of his conduct because it was done in furtherance of a single scheme and because "numerous of [the defendant's] breaches occurred within the limitations period." *LaScala*, 479 F.3d at 220 n.1. Solely with respect to Plaintiffs' allegations against Anthem for breach of the duty to monitor, then, the Court finds that conduct pre-dating May 6, 2010 is timely.

## V.    ERISA

Plaintiffs bring nine claims under ERISA, seeking relief under Sections 409 and 502. Under Section 409, any fiduciary who breaches the provisions of ERISA is personally liable to the plan for restoring any profits the fiduciary gained through use of plan assets or for "mak[ing] good" any losses the plan suffered as a result of the breach. 29 U.S.C. § 1109(a). Section 502 allows plan participants, beneficiaries, and fiduciaries to bring actions under ERISA for equitable relief. 29 U.S.C. § 1132(a)(3). Plaintiffs allege that Anthem and ESI have both breached three

substantive provisions of ERISA: Sections 404,[29] 405,[30] and 406.[31] To succeed under any of these claims, Plaintiffs must show that one or both Defendants was acting in a fiduciary capacity.[32]

ERISA's definition of a fiduciary is "functional" as opposed to defined by virtue of a party or entity's position with respect to a plan. *Frommert v. Conkright*, 433 F.3d 254, 271 (2d Cir. 2006) (quoting *LoPresti v. Terwilliger*, 126 F.3d 34, 40 (2d Cir. 1997)). "In every case charging breach of ERISA fiduciary duty," the threshold question is "whether that person was acting as a fiduciary (that is, was performing a fiduciary function) when taking the action subject to complaint." *Pegram v. Herdrich*, 530 U.S. 211, 226 (2000). That is because under ERISA, "a

---

[29] Section 404 of ERISA requires ERISA fiduciaries to discharge their duties "solely in the interest of the participants and beneficiaries" of the relevant ERISA Plan. 29 U.S.C. § 1104(a)(1). Relevant to the allegations in this case, Section 404(a)(1)(A) requires that an ERISA fiduciary's actions with respect to a Plan are taken for the "exclusive" purpose of providing benefits to participants and defraying the reasonable expenses of administering the plan. *Id.* § 1104(a)(1)(A). Section 404(a)(1)(B) also requires that an ERISA fiduciary discharge her duties "with the care, skill, prudence, and diligence" that a "prudent man acting in a like capacity . . . would use." *Id.* § 1104(a)(1)(B).

[30] Section 405 provides for co-fiduciary liability under ERISA. That is, where a fiduciary has breached any ERISA provisions, a second fiduciary will be liable for that breach in three circumstances. First, the second fiduciary will be liable if she knowingly participated in or attempted to conceal an act of the first fiduciary and knew the fiduciary's act was a breach of his ERISA obligations. 29 U.S.C. § 1105(a)(1). Second, the second fiduciary will be liable if she enabled another to fiduciary to commit a breach by failing to act with reasonable prudence as required under Section 404(a). *Id.* § 1105(a)(2). Finally, the second fiduciary will be liable if she knows of the first fiduciary's breach and fails to make reasonable efforts to remedy the breach. *Id.* § 1105(a)(3).

[31] Under Section 406, an ERISA fiduciary may not engage in certain prohibited transactions. Section 406(a) prohibits a fiduciary from engaging in transactions between the plan and a party in interest if the fiduciary knows, among other things, that: (1) the transaction would constitute a "sale or exchange" between the plan and party in interest; (2) the transaction would constitute a "furnishing of goods, services, or facilities" between the plan and the party in interest; or (3) the transaction would constitute a "transfer" of plan assets to the party in interest. 29 U.S.C. § 1106(a)(1). Section 406(b) prohibits certain transactions between the plan and the fiduciary herself. Specifically, a fiduciary may not "deal with the assets of the plan in his own interest or for its own account." 29 U.S.C. § 1106(b)(1). A fiduciary is also prohibited from participating in a transaction involving the plan if she is acting on behalf of a party whose interests are adverse to those of the plan. 29 U.S.C. § 1106(b)(2). Finally, a fiduciary is prohibited from receiving consideration to her "personal account" from any party in connection with a transaction involving plan assets. 23 U.S.C. § 1106(b)(3).

[32] As discussed above, because Section 404 only governs the conduct of ERISA fiduciaries, if either Anthem or ESI were not acting in a fiduciary capacity when taking the actions in question, they cannot be liable under ERISA. Because Section 405 creates co-fiduciary liability, if either Anthem or ESI were not acting as fiduciaries, neither can be liable under Section 405. Section 406 prohibits certain transactions between ERISA fiduciaries and the ERISA Plan or a party in interest; therefore, if neither Defendant is an ERISA fiduciary, there can be no liability.

fiduciary may have financial interests adverse to beneficiaries." *Id.* at 225. A party acts as an ERISA fiduciary with respect to a plan, for example, when it "exercises any discretionary authority or discretionary control respecting management of such plan . . . or disposition of its assets," or when it "has any discretionary authority or discretionary responsibility in the administration of such plan." 29 U.S.C. § 1002(21)(A); *see also Varity Corp. v. Howe*, 516 U.S. 489, 498 (1996).

### A.     ESI's Status as an ERISA Fiduciary

ESI argues that Claims 1, 2, 7, and 8 (under Sections 404(a), 405(a), 406(b), and 409) must be dismissed against it because Plaintiffs have not plausibly alleged that ESI was a fiduciary of the Plaintiffs' ERISA plans. ESI Mem. at 17–22. The first and second claims are brought by the Subscriber ERISA Sub-Class and the Plan Class and allege that ESI breached its fiduciary duty of prudence when it set prescription medication pricing at inflated rates and engaged in prohibited transactions when it caused the Subscriber ERISA Plaintiffs to pay those inflated prices. SAC ¶¶ 316–17, 324. The seventh claim is brought by both the Subscriber ERISA Sub-Class and the Plan Class and alleges that ESI is liable for Anthem's breaches of fiduciary duty as a co-fiduciary under Section 405. *Id.* ¶ 361. The eighth claim is brought by the Plan Class and seeks relief under Section 502(a)(2). *Id.* ¶ 367. Plaintiffs put forward three main arguments in support of their contention that ESI was an ERISA fiduciary with respect to prescription drug pricing.

### 1.     Discretion over Pricing Based on Section 5.6 of the PBM Agreement

First, Plaintiffs claim that ESI's discretion derives from Section 5.6 of the PBM Agreement, which allows Anthem or a consultant to conduct a periodic market analysis to test whether Anthem receives "competitive benchmark pricing" from ESI and requires Anthem and

ESI to negotiate in good faith over new pricing if the market analysis reveals that ESI's pricing is not competitive. [33] Pl. Mem. at 24; *see also* PBM Agreement ¶ 5.6. Plaintiffs argue that this imbues ESI with discretionary control over the drug prices paid by Plaintiffs. Pl. Mem. at 25–28. Specifically, Plaintiffs contend ESI's ability to set pricing through its own interpretation of "competitive benchmark pricing" gives ESI discretionary authority over the administration of the plans. *Id.* at 28 (citing *In re Express Scripts, Inc. PBM Litig.*, No. 05 M.D. 1672 (SNL), 2008 WL 2952787, at *13 (E.D. Mo. July 30, 2008).

In its motion to dismiss, ESI argues Plaintiffs' allegations regarding ESI's discretion over pricing is conclusory and therefore entitled to no weight under *Iqbal/Twombly*. ESI Mem. at 21 (citing SAC ¶ 206). It is of course true that the Court need not credit "mere conclusory statements" in a complaint. *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555). Here, however, Plaintiffs assert several factual allegations in support of its conclusory statement that ESI "has been and continues to act as a fiduciary of all of the ERISA plans." SAC ¶ 206 (alleging that ESI determines prescription drug prices paid by Anthem insureds, controls its own compensation, manages the administration of pharmacy benefits for Anthem insureds, and exercises discretion over Anthem insured drug-switching); *see also id.* ¶¶ 133, 221.

ESI further argues that it is not an ERISA fiduciary because its pricing merely implemented the PBM Agreement, and PBMs do not act as fiduciaries when implementing pricing terms set in a contract with a plan or insurance provider. ESI Mem. at 21. Specifically,

---

[33] Anthem and ESI disagree strongly on the extent to which Section 5.6 bound ESI to offer new pricing terms or agree to new terms proposed by Anthem during periodic pricing reviews. *See Anthem, Inc. v. Express Scripts, Inc.*, No. 16 Civ. 2048 (S.D.N.Y. 2016). In this case, Anthem alleges that under Section 5.6, ESI had an "obligation to negotiate in good faith for competitive benchmark pricing." Anthem Mem. at 10. Contrary to what Plaintiffs allege here, Anthem's briefing does not present the argument that Section 5.6 gave ESI discretion to set prescription drug prices so long as those prices were in the "competitive benchmark" range. *Id.* 9–10.

Section 5.4 of the PBM Agreement lays out additional pricing requirements and limitations.[34]

PBM Agreement ¶ 5.4. ███████████████████████████████████████



[34] Section 5.4 of the PBM Agreement contradicts Plaintiffs' allegations that ESI had the discretion to set drug prices paid by Plaintiffs. *See* SAC ¶¶ 206(a), (e), (i); *see also id.* ¶¶ 133, 221. However, even at the motion to dismiss stage, the Court need not credit as true "pleadings that are contradicted by other matters asserted or relied upon or incorporated by reference." *Xi Wei Lin*, 2012 WL 5457493, at *4. Plaintiffs have incorporated both the original 2009 PBM Agreement and the amended 2012 PBM Agreement into the SAC. *See* SAC ¶ 12 n.3. This Court will look to the PBM Agreement itself, rather than the Plaintiffs' characterization of the PBM Agreement, to determine the discretion afforded to ESI under its terms.



[REDACTED]

Numerous courts have explained that when a service provider or PBM acts pursuant to the terms of a contract, it does not exercise discretionary authority and does not act as an ERISA fiduciary. *See Moeckel v. Caremark, Inc.*, 622 F. Supp. 2d 663, 678 (M.D. Tenn. 2007) ("The arrangement challenged by the plaintiff is the product of the agreement into which [the employer] and [the PBM] entered voluntarily. No fiduciary duty is implicated."); *see also Seaway Food Town, Inc. v. Medical Mutual of Ohio*, 347 F.3d 610, 619 (6th Cir. 2003); *Bickley v. Caremark Rx*, 361 F.Supp.2d 1317 (N.D. Ala. 2004), *aff'd* 461 F.2d 1325, 1332 (11th Cir. 2006).

In *Moeckel*, the plaintiffs alleged that the PBM, Caremark, acted as an ERISA fiduciary in selecting the national reporting service it used as the basis for determining the average wholesale price of a prescription drug. *Moeckel*, 622 F. Supp. 2d at 681. The Middle District of

Tennessee determined that Caremark's use of the pricing source adhered to the specific terms of the contracts between the employer and Caremark. And, the court found, "it is axiomatic that adherence to existing contract terms precludes any finding of fiduciary status." *Id.*; *see also Mulder v. PCS Health Sys. Inc.*, 432 F. Supp. 450, 456 (D.N.J. 2006) ("[A] plan supervisor holds no discretionary authority where its 'obligation [is] to follow the written plan instrument and follow the instructions of the plan administrator.'") (quoting *Confer v. Custom Engineering Co.*, 952 F.2d 34, 39 (3d Cir. 1991)). Because the Court finds that the prescription drug pricing at issue here was not subject only to the requirements of Section 5.6, but was also constrained by the more specific requirements of Section 5.4 and Exhibit A of the Agreement, the Court finds that Plaintiffs have not sufficiently alleged that ESI was a fiduciary with respect to Section 5.6 of the PBM Agreement.[38]

### 2. Discretion over Compensation

Next, Plaintiffs assert that ESI is a fiduciary because ESI's control over pricing allowed it to control its own compensation. Plaintiffs again rely on their argument that Section 5.6 of the PBM Agreement gives ESI the ability to determine the amount to charge Anthem and Anthem insureds for prescription drugs. Pl. Mem. at 29. Plaintiffs argue that such discretion allows ESI to maximize its own compensation, thereby rendering it a fiduciary under ERISA. ESI argues that Plaintiffs' allegations that ESI could set its own compensation are rebutted by the fact that "Anthem pays prices [to ESI] that were specifically bargained for at arms' length and agreed to in the PBM Agreement." ESI Mem. at 22 n.29.

---

[38] Paragraph 5.6 of the PBM Agreement does imbue ESI with some discretion by requiring that ESI agree in writing to any new pricing terms and that Anthem and ESI negotiate in good faith over proposed new pricing. However, Plaintiff has not claimed that ESI's actions in 2015 relating to the pricing re-negotiations gave rise to ESI's fiduciary status. *See* Pl. Mem. at 24 n.11.

Plaintiffs are correct that a party's ability to set one's own compensation under an agreement with an ERISA-covered plan may make the party an ERISA fiduciary. *F.H. Krear & Co. v. Nineteen Named Trustees*, 810 F.2d 1250, 1259 (2d Cir. 1987). But a party is entitled to retain payments "in excess of costs" if "the contract expressly authorizes the withholding" or "simply does not require [a party] to pass along all of the savings." *United Teamster Fund v. MagnaCare Administrative Servs., LLC*, 39 F. Supp.3d 461, 470 (S.D.N.Y. 2014) (quoting *Chi. Dist. Council of Carpenters Welfare Fund v. Caremark, Inc.*, 474 F.3d 463, 474 (7th Cir. 2007)).

Here, both parties agree that to the extent that Plaintiffs' prescription drug prices are related to ESI's compensation, it is because PBMs earn profits based on the spread between the drug prices it bills to insurance companies and insureds pursuant to PBM contracts and the amount it pays out to retail pharmacies or, in the context of a mail-order pharmacy, its own costs. *See* ESI Mem. at 22 n.29; Pl. Mem. at 29; *see also In re Express Scripts, Inc. PBM Litig.*, 2008 WL 2952787, at *5–6; *Bickley v. Caremark Rx, Inc.,* 361 F. Supp. 2d at 1333. A PBM's relationship with retail pharmacies is distinct from its relationship with insurance providers and subscribers and is not fiduciary in nature. *See Moeckel*, 622 F. Supp. 2d at 677 (M.D. Tenn. 2007) ("Caremark's contracting with retail pharmacies in its proprietary network . . . is part of Caremark's administration of its own business as a PBM. As such, it is not fiduciary in nature."); *Mulder*, 432 F. Supp. 2d at 458 ("[T]he fact that PCS operated independently in negotiating contracts with drug manufacturers does not make PCS an ERISA fiduciary."). Thus, the fact that ESI earns its compensation by charging an insurance provider more than it paid to the retail pharmacy for a given drug (or that exceeded its own pharmacy's costs) does not transform it into a fiduciary with respect to Plaintiffs.

### 3. Discretion over Pricing Based on Additional Terms of the PBM Agreement

Finally, Plaintiffs argue that ESI had "far-reaching discretion" over the prices paid by Plaintiffs, and as such were ERISA fiduciaries, because additional terms of the PBM Agreement imbued them with the ability to exercise discretion over the administration of the plans. Pl. Mem. at 30. Plaintiffs point to ESI's discretion over (1) how rebates and fees are passed to Anthem subscribers, if at all; (2) the classification of drugs as "generic" or "brand;" (3) the determination of which drugs are placed on the Maximum Allowable Cost (MAC) list; and (4) drug-switching. *Id.* at 31–33; SAC ¶¶ 116–18, 206(d), (f)–(h).[39] Plaintiffs allege that the decisions ESI makes in managing these functions have a "direct impact" on the prices Plaintiffs pay for prescription drugs, Pl. Mem. at 32, and that ESI therefore has wide-ranging discretionary authority over Plan administration, *id.* at 33–34.

Although Plaintiffs have made these allegations with respect to ESI, Plaintiffs offer no allegations of misconduct with respect to the allocation of rebates, the classification of drugs, or drug-switching. *See* SAC ¶¶ 316–18, 323–25, 361, 367 (referring only to ERISA violations related to overcharges and inflated pricing in the first, second, seventh, and eighth causes of action). Because the guiding question is whether ESI was acting as a fiduciary "when taking the action subject to complaint," whether or not ESI exercised discretion with respect to other aspects of Plan administration is immaterial. *Cf. Pegram v. Herdrich*, 530 U.S. 211, 226 (2000).

---

[39] With respect to drug switching, Plaintiffs, in their opposition, point to a general statement in the SAC that "PBMs have fiduciary duties of loyalty and prudence when exercising discretion over a plan's formulary, including when determining when or under what circumstances an individual should add, remove, or switch prescription medications . . . ." *Id.* ¶ 216. Plaintiffs also point to the PBM Agreement itself, which states that Anthem will consult with ESI "concerning [ESI]'s implementation and administration of [Anthem]-developed switching programs." PBM Agreement ¶ 3.9(f). Section 3.9 also states that ESI will "review all such [Anthem]-developed programs to ensure compliance with PBM's policies and applicable law." *Id.* The only mention of drug switching in connection with ESI is a general allegation that ESI "exercised discretionary authority . . . by choosing whether to fill a prescription from a participant, reject the prescription, or shift the participant to a different prescription medication." SAC ¶ 206(d).

Finding that Plaintiffs have not alleged sufficient facts to support a finding that ESI acted as a fiduciary in its relevant conduct, the Court grants ESI's motion to dismiss Claims 1, 2, 7,[40] and 8[41] of the SAC. Furthermore, because Plaintiffs' claim against Anthem for liability as a non-fiduciary party to a prohibited transaction requires ESI to be an ERISA fiduciary, the Court also dismisses Claim 6 of the SAC.[42]

### B. Anthem's Status as ERISA Fiduciary

Like ESI, Anthem argues that it was not a fiduciary with respect to the challenged conduct, and therefore seeks dismissal of Claims 3, 4, and 9 (brought under Sections 404(a), 406(a)–(b), and 409). Anthem Mem. at 20. The third and fourth claims are brought by both the Subscriber ERISA Sub-Class and the Plan Class and allege that Anthem breached its fiduciary duty by entering into the PBM Agreement, accepting money for the sale of the NextRx entities into Anthem's personal account while agreeing to higher prescription drug payments for its subscribers, failing to monitor ESI's performance under the PBM Agreement, and causing the plans to engage in prohibited transactions. SAC ¶¶ 331–33, 338–41. The ninth claim is brought only by the Plan Class and seeks relief under Section 502(a)(2). *Id.* ¶ 377.

---

[40] ESI also argues that Claim 7 (co-fiduciary liability) should be dismissed because Plaintiffs do not plausibly allege either a breach of fiduciary duty by Anthem or ESI's knowledge of Anthem's breach. ESI Mem. at 28–29. Because ESI was not acting in a fiduciary capacity when it took the actions in question, the Court need not reach the issue of whether Plaintiffs have sufficiently alleged that ESI knew or enabled Anthem's conduct. The Court discusses Anthem's fiduciary status in Part III.B *infra*.

[41] ESI also seeks to dismiss the first, second, fifth, and seventh causes of action as asserted by the Plan Plaintiffs because it argues that those claims should have been brought under ERISA § 502(a)(2) instead of § 502(a)(3). ESI Mem. at 22 n.30. The Court does not reach this issue as it finds these causes of action fail for the "threshold" reason that ESI was not acting in a fiduciary capacity.

[42] Anthem argues that Claim 6 should be dismissed for the additional reason that Plaintiffs have not alleged a prohibited transaction under either § 406(a) or § 406(b) because neither the plans nor their plan assets were involved in the relevant transactions. Anthem Mem. at 30–33. The Court does not decide this issue.

Plaintiffs argue that Anthem is a fiduciary because Anthem exercised discretion in choosing ESI to provide prescription drug prices and in negotiating the PBM Agreement itself.[43] Pl. Mem. at 34–41. In the SAC, Plaintiffs contend that Anthem had discretion over the management of Plaintiffs' prescription medication benefits. SAC ¶ 207. Therefore, they argue, Anthem had the discretion to use any number of means—purchasing drugs directly, using an in-house PBM, or contracting with a separate PBM—to provide prescription drugs and set prices for those prescriptions. Anthem's choice of ESI—and its alleged delegation of pricing and plan management to ESI—was an exercise of that discretion and gave rise to Anthem's fiduciary duty. Pl. Mem. at 36. According to Plaintiffs, by negotiating with ESI to determine prescription medicine pricing and PBM services for its clients, Anthem further exercised its discretion over the plan. *Id.* at 35.

Anthem, in contrast, argues that its negotiations with ESI over the sale of NextRx and ESI's provision of PBM services involved purely business decisions that did not give rise to fiduciary status. Anthem Mem. at 23.

Insurers can, of course, be fiduciaries with respect to ERISA health plans. *Am. Psychiatric Assoc. v. Anthem Health Plans, Inc.*, 50 F. Supp.3d 157, 169 (D. Conn. 2014), *aff'd on other grounds* 821 F.3d 352 (2d Cir. 2016). However, it is well-established that decisions about plan content, rather than plan administration, do not give rise to fiduciary duties. *See Pegram*, 530 U.S. at 225–26. While an insurer "engages in a fiduciary act when making a discretionary determination about whether a claimant is entitled to benefits under the terms of plan documents," fiduciary duties are not triggered "when the decision is, at its core, a corporate

---

[43] Plaintiffs also argue that Anthem is a fiduciary because it failed to monitor ESI, which breached its fiduciary duty. Pl. Mem. at 41–43. This begs the question. If Anthem were not a fiduciary to its subscribers, it did not have a duty to monitor ESI's performance, and therefore could not have breached that duty.

business decision." *Am. Pyschiatric Ass'n v. Anthem Health Plans, Inc.*, 821 F.3d 352, 362 n.2 (2d Cir. 2016) (internal citations and quotations omitted). Thus, an insurer's substantive decisions about setting reimbursement rates do not ordinarily trigger fiduciary duties. *Am. Psychiatric Ass'n*, 50 F. Supp. 3d at 169 (citing *Curtiss-Wright Corp. v. Schoonegon*, 514 U.S. 73, 78 (1995)). Similarly, the decision to sell corporate assets or divisions is one made in an insurer or employer's business capacity, not its fiduciary capacity, even if a plan is affected by the decision. *See Flanigan v. General Elec. Co.*, 242 F.3d 78, 88 (2d Cir. 2001) ("Because GE's decision to spin-off the division along with its pension plan was, at its core, a corporate business decision, and not one of a plan administrator, GE was acting as a settlor, not a fiduciary, when it transferred the surplus to Lockheed. Therefore, GE's general fiduciary duties under ERISA were not triggered.").

Here, Anthem's decisions to sell its PBM business and to contract the provision of PBM services out to ESI did not trigger fiduciary duties. Plaintiffs have challenged Anthem's role in setting prices they believe are unfair, not Anthem's "use of discretion in construing and applying the provisions of their group health plans and assessing a participant's entitlement to benefits." *Am. Psychiatric Ass'n*, 50 F. Supp. 3d at 169–70 (internal citations and quotations omitted). Plaintiffs do not argue that Anthem's actions misconstrued or interpreted their health plans in a way that benefitted Anthem to the detriment of Plaintiffs. Rather, Plaintiffs argue that they overpaid for prescription drugs, which they attribute, in essence, to the PBM Agreement itself, instead of Anthem's interpretation or application of their particular Anthem health plans. And while Plaintiffs point to Section 5.6 and its mention of "competitive benchmark" prices, Plaintiffs have no right under ERISA to receive "competitive benchmark pricing," or even average pricing, for prescription drugs. *See Curtiss-Wright Corp.*, 514 U.S. 73 at 78 ("ERISA

does not create any substantive entitlement to employer-provided health benefits or any other kind of welfare benefits. Employers or other plan sponsors are generally free under ERISA, for any reason at any time, to adopt, modify, or terminate welfare plans.").

The cases on which Plaintiffs rely are not to the contrary. Plaintiffs cite to *Sixty-Five Security Plan v. Blue Cross & Blue Shield of Greater New York* in support of their position that an insurer is a fiduciary when it negotiates rates for a plan. But the court noted in that case that Blue Cross's position as an insurer was "quite dissimilar" from the usual insurance arrangement, because Blue Cross "never advanced any of its own money, but simply paid out of [the Plan's] monies, and earned a fee for doing so." 583 F. Supp. 380, 385 (S.D.N.Y. 1984). Further, the court noted the importance of the insurer's "ability to determine which of the many claims submitted to it should be paid." *Id.*[44] Subsequently, courts in this District confirmed that where an insurer is acting in its normal capacity—as a "mere insurer"—no fiduciary status is triggered. *Carner v. MGS – 576 5th Ave. Inc.*, 992 F. Supp. 340, 357–58 (S.D.N.Y. 1998). Similarly, in *Donovan v. Bierwirth*, the Second Circuit found that trustees of a corporate pension plan, who were also on the Board of Directors of the corporation, were acting as fiduciaries when they used plan assets to purchase corporate stock in an attempt to thwart a hostile takeover. 680 F.2d 263, 272–74 (2d Cir. 1982). Here, however, Plaintiffs do not allege that Anthem's fiduciary status arises from control over any plan assets. *See* SAC ¶ 207 (laying out the bases under which Anthem was allegedly a fiduciary to Plaintiffs).

Plaintiffs also point to cases in which an insurer's interpretation and implementation of insurance contracts gave rise to fiduciary duties. *See Devlin v. Empire Blue Cross & Blue*

---

[44] Further, on reargument, the court certified the case for interlocutory appeal, noting that "there can be no doubt that 'there is substantial ground for difference of opinion' on substantially every point that has been presented for determination." 588 F. Supp. 119, 121 (S.D.N.Y. 1984).

*Shield*, 274 F. 3d 76, 87–88 (2d Cir. 2001) (an insurer's reduction in life insurance benefits may have violated insurance plan documents and therefore may have involved the exercise of discretion giving rise to a breach of fiduciary duty); *Everson v. Blue Cross & Blue Shield*, 898 F. Supp. 532, 538–39 (N.D. Ohio 1994) (finding that certain plaintiffs stated a claim for breach of fiduciary duty when it alleged that insurer did not share in the discounts it received from health care providers in violation of subscriber certificates); *Reis v. Humana Health Plan, Inc.*, No. 94 Civ. 6180 (HDL), 1995 WL 669583, at *7 (N.D. Ill. Nov. 8, 1995) (finding that where insurer had admitted it was a plan fiduciary, the plaintiff stated a claim for breach of fiduciary duty by alleging that insurer did not share in the discounts it received from health care providers in violation of the plan's subscriber's service agreement).[45] In each of these cases, the allegations involved an insurer's misrepresentation of benefits provided to beneficiaries under the health insurance plans. But here, Plaintiffs do not allege that Anthem was required to provide them with certain pricing levels for prescription drugs and then violated those requirements. Nor do Plaintiffs allege that Anthem promised them "competitive benchmark pricing" and either failed to meet this requirement or failed to disclose that it could negotiate for, but could not guarantee, competitive benchmark pricing throughout the pendency of the PBM Agreement. Plaintiffs' claims therefore are distinguishable from the claims that survived in *Devlin*, *Everson*, and *Reis*.

Plaintiffs, however, argue that this difference helps their claims, because "there is *not one provision* that specifies the prices the plans or its participants will pay for prescription medications," arguably showing the extent of Anthem's discretion over pricing. Pl. Mem. at 41. But in a similar context, the Sixth Circuit found that fiduciary duties were not triggered by an

---

[45] *But see Alves v. Harvard Pilgrim Health Care Inc.*, 204 F. Supp. 2d 198, 210 (D. Mass. 2002) (rejecting the plaintiffs' argument that "although . . . the creation of the business terms of an ERISA plan is not a fiduciary act . . . the defendants' failure to implement the plan in a way that gives plan members the benefit of negotiated discounts on the cost of prescription drugs constitutes a breach of fiduciary duty").

insurer's pricing decisions. In *DeLuca v. Blue Cross Blue Shield of Michigan*, BCBS provided three forms of health care coverage: an open-access plan, a preferred provider plan (PPO), and a health maintenance organization (HMO). 628 F.3d 743, 745 (6th Cir. 2010). For each of the plans, BCBS negotiated and set separate rates for each of the coverage options. In 2004, BCBS re-negotiated rates in order to make its HMO more competitive, decreasing HMO rates while increasing PPO and open-access plan rates to make the move budget-neutral for service providers. *Id.* at 746. The Sixth Circuit held BCBS "was not acting as a fiduciary when it negotiated the challenged rate changes, principally because those business dealings were not directly associated with the benefits plan at issue . . . but were generally applicable to a broad range of health-care consumers." *Id.* at 747.

The Court is persuaded by the Sixth Circuit's reasoning, as well as the reasoning of courts in this Circuit who have determined that a health benefits company setting prices in its role as a health insurer is not acting as an ERISA fiduciary. *See Am. Psychiatric Ass'n*, 50 F. Supp.3d at 169–70. For those reasons, the Court GRANTS Anthem's motion to dismiss Claims 3, 4,[46] and 9 of the SAC. Furthermore, because Plaintiffs' claim against ESI for liability as a non-fiduciary party to a prohibited transaction requires Anthem to be an ERISA fiduciary, the Court also dismisses Claim 5 of the SAC.[47]

## VI.    RICO

ESI also moves to dismiss Claim 10 of the SAC, which alleges that ESI violated RICO through its control of the "Anthem Enterprise," as it related to the provision of prescription drug

---

[46] Anthem also seeks the dismissal of Claim 4 for the same reasons as discussed in note 42 *supra*.

[47] ESI also argues that Claim 5 of the SAC should be dismissed because Plaintiffs are actually seeking compensatory damages, rather than equitable relief as required under ERISA § 502(a)(3). ESI Mem. at 29–32. Anthem joins in that argument with respect to Claims 3, 4, 6, and 7 of the SAC. Anthem Mem. at 36–40. The Court does not decide this issue, having found that neither Anthem nor ESI were acting in their fiduciary capacities with respect to the conduct at issue.

benefits, and its pattern of committing mail and wire fraud by misrepresenting to Anthem and

Plaintiffs the price of prescription medications. SAC ¶¶ 385–87, 390–93. ESI argues that

Plaintiffs' RICO claim fails because (1) Plaintiffs failed to show that ESI had control over an

"enterprise," and (2) Plaintiffs failed to plead predicate acts of mail and wire fraud. ESI Mem. at

34–36.

### A.    ESI's Control Over Anthem

ESI argues that Plaintiffs failed to plead that ESI had control over an "enterprise" as

required under RICO, because Plaintiffs cannot allege that they had some part in directing the

"Anthem" enterprise, as they did not participate in the operation or management of the Anthem

enterprise. ESI Mem. at 35–36. The "operation or management" test does not require primary

responsibility for an enterprise's operations, only "some part in directing the enterprise's affairs."

*City of New York v. LaserShip, Inc.*, 33 F. Supp. 3d 303, 309–10 (S.D.N.Y. 2014) (quoting *Reves*

*v. Ernst & Young*, 507 U.S. 170, 179 (1993)). The test is a "relatively low hurdle for plaintiffs to

clear, especially at the pleading stage." *Id.* (quoting *First Capital Asset Mgmt. v. Satinwood,*

*Inc.*, 385 F.3d 159 175–76 (2d Cir. 2004)).

Here, Plaintiffs have alleged that ESI was responsible for the administration of

prescription medication benefits for Anthem participants. *See* SAC ¶¶ 274–77. ESI makes two

primary arguments as to why such pleading is insufficient. First, ESI argues that Plaintiffs did

not allege that ESI "actually directs, operates, or manages Anthem." ESI Mem. at 35. However,

such pleading is not required under RICO. The "operation or management" test does not require

participation in all of the enterprise's affairs; only those affairs which relate to the alleged RICO

violation. *See City of New York v. FedEx*, 175 F. Supp. 3d 351, 372 (S.D.N.Y. 2016) (finding

that Plaintiffs stated a claim under the enterprise prong of RICO by "describing the control and

discretion" the defendant had over the relevant "portion of the enterprise's affairs"). Second, ESI argues that elsewhere in the SAC, Plaintiffs allege that Anthem had authority over ESI to "protect plans and plan participants from" ESI's alleged inflated pricing. ESI Mem. at 36. According to ESI, that allegation is "contradictory" to Plaintiff's RICO claim. *Id.* But because RICO does not require that a defendant bear "primary responsibility" over an enterprise's operations, these two allegations are not necessarily inconsistent. By alleging that ESI participated in and controlled Anthem's prescription drug benefit program under the PBM Agreement, Plaintiffs have adequately plead this RICO element.

### B.    Predicate Acts of Wire and Mail Fraud

To plead wire or mail fraud, a plaintiff must allege "(1) a scheme to defraud, (2) money or property as the object of the scheme, and (3) use of the mails or wires to further the scheme." *United States v. Binday*, 804 F.3d 558, 569 (2d Cir. 2015) (internal quotations omitted). ESI argues that Plaintiffs have failed to adequately plead that ESI had "a scheme to defraud," because the SAC makes "only conclusory allegations" about ESI's knowledge and intent to conceal material facts. ESI Mem. at 34.

Plaintiffs allege that ESI's "scheme to defraud" was primarily its practice of mailing or electronically posting prescription drug medication bills in "amounts greater than Express Scripts represented to Anthem it would charge and more than [Subscriber Plaintiffs] owed for their prescription medications." SAC ¶ 289. As discussed above, Plaintiffs have no *ex ante* right to a certain level of prescription drug pricing. *See Curtiss-Wright Corp.*, 514 U.S. at 78 ("ERISA does not create any substantive entitlement to employer-provided health benefits or any other kind of welfare benefits. Employers or other plan sponsors are generally free under ERISA, for any reason at any time, to adopt, modify, or terminate welfare plans."). Although Plaintiffs have

not attached any of their health plans or the ASO agreements between their employers and Anthem, they concede that nothing in those contracts entitled them to a specific set or range of prescription drug prices. *See* Pl.'s Mem. at 40–41. Thus, to defeat a motion to dismiss, Plaintiffs must have adequately alleged that ESI fraudulently represented to Anthem that it would charge Anthem participants "competitive benchmark pricing" for prescription medications.

Under Federal Rule of Civil Procedure 9, a fraud claim must be stated "with particularity." *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1775 (2d Cir. 1993). Specifically, a complaint must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Id.* "Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). However, a complaint "must plead facts that give rise to a strong inference that the defendant possessed fraudulent intent." *Tymoshenko v. Firtash*, 57 F. Supp. 3d 311, 321 (S.D.N.Y. 2014) (quoting *Mills*, 12 F.3d at 1176); *see also Turner v. New York Rosbruch/Harnik, Inc.*, 84 F. Supp. 3d 161, 168 (E.D.N.Y. 2015).

In describing ESI's alleged scheme to defraud, Plaintiffs do not detail any misrepresentations, instead alleging generally that "Express Scripts represented that it would charge only competitive benchmark pricing for prescription medications for plans administered by Anthem and for Anthem subscribers and beneficiaries." SAC ¶ 251. Plaintiffs claim that they "set forth in detail" the nature of those representations elsewhere in the complaint, but do not point to any particular allegations. *Id.* In their opposition, Plaintiffs still do not elaborate. Pl. Mem. at 63. Similarly, Plaintiffs allege that "at the time Express Scripts made these representations, Express Scripts knew these representations were false." SAC ¶ 252. But the SAC does not say *when* these alleged misrepresentations occurred, *where* they occurred, or *who*

made the statements. Later, the SAC references ESI's "ongoing misrepresentations and concealments of the material fact that Express Scripts was not providing competitive benchmark pricing," but again, Plaintiffs do not explain what the misrepresentations were, nor do they explain when, where, and by whom they were made. All of those details are required under Rule 9. Because the predicate acts alleged in the SAC are all connected to misrepresentations from ESI to Anthem, and because those misrepresentations were plead with insufficient particularity, the Court finds that Plaintiffs have failed to plead predicate acts as required under RICO and grants ESI's motion to dismiss Claim 10 of the SAC.

## VII.    ACA NONDISCRIMINATION PROVISION

Does One and Two have been diagnosed with HIV. In Claim 17 of the SAC, Does One and Two allege that ESI violated the ACA's anti-discrimination provision, which provides that an individual shall not "be excluded from participation in, be denied the benefits of, or be subjected to discrimination under [] any health program or activity." 42 U.S.C. § 18116. The ACA's nondiscrimination provision specifically references Section 504 of the Rehabilitation Act of 1973 ("Section 504"), which prohibits discrimination against an "otherwise qualified individual with a disability." 29 U.S.C. § 794(a). Does One and Two allege that because of ESI's inflated prices, they overpaid for their HIV-related prescription drug pricing. SAC ¶ 455. This resulted in "disparate economic harm," according to Plaintiffs, because prescription drugs related to chronic conditions like HIV are often defined as "specialty medications" subject to a higher percentage based co-insurance charge. *Id.* ¶¶ 455–56.

Comments from the Health and Human Services Department's 2016 Nondiscrimination in Health Programs and Activities rules emphasize that the nondiscrimination provision "is not intended to apply lesser standards for the protection of individuals from discrimination than the

standards under Title VI, Title IX, Section 504, the Age [Discrimination] Act, or the regulations issued pursuant to those laws." 81 Fed. Reg. 31381 (2016). Thus, this Court looks to Section 504 to determine the pleading requirements for a disability discrimination claim under the ACA.

To state a claim under Section 504, a plaintiff must show that she: (1) is a "qualified individual with a disability;" (2) was "excluded from participation . . . or was otherwise discriminated against" by the defendant; and (3) was excluded or discriminated against "due to" her disability. *B.C. v. Mount Vernon School Dist.*, 837 F.3d 152, 158 (2d Cir. 2016). ESI argues that Plaintiffs have not stated a claim because Plaintiffs have failed to show that they paid higher drug prices "solely by reason of" their disability. ESI Mem. at 43 (quoting 29 U.S.C. § 794(a)).

Plaintiffs argue that they need not show that the prices they paid for HIV medication was "solely by reason of" their disability, because Section 504 and the ACA nondiscrimination provision, allows Plaintiffs to bring disparate impact claims. Pl. Mem. at 76–77.

Section 504 has not been universally understood to encompass all disparate impact claims. In fact, the Supreme Court has found "troubling" the proposition that Section 504 would reach "all action[s] disparately affecting the handicapped." *Alexander v. Choate*, 469 U.S. 287, 298–99 (1985). In *Alexander*, the Court found that the statute should be interpreted to combat discrimination resulting from "apathetic attitudes" as well as "affirmative animus," but also noted that "the handicapped typically are not similarly situated to the nonhandicapped" and doubted that Congress "intended Section 504 to embrace all claims of disparate-impact discrimination." *Id.* at 297–98. Instead of creating a bright-line rule, the Court emphasized that the purpose of Section 504 was to provide a disabled person "meaningful access to the benefit that the grantee offers." *Id.* at 301. *Alexander* also advised lower courts to "be responsive to two

powerful but countervailing considerations—the need to give effect to the statutory objectives and the desire to keep Section 504 within manageable bounds." *Id.* at 299.

The Second Circuit seems to take a more inclusive view of Section 504, and has stated that under either the Americans with Disabilities Act or Section 504, a plaintiff may base a discrimination claim on disparate impact theory. *See B.C.*, 837 F.3d at 158. Other courts, however, have followed more narrowly the Supreme Court's "meaningful access" guidance in *Alexander v. Choate. See Civic Ass'n of the Deaf of New York City, Inc. v. City of New York*, No. 95 Civ. 8591 (RWS), 2011 WL 5995182, at *9 (S.D.N.Y. Nov. 29, 2011) ("In formulating the meaningful access standard, the Supreme Court explicitly rejected the position that all conduct that had a disparate impact on disabled persons violated [Section 504] . . . ."). In *Ruskai v. Pistole*, the First Circuit explained its understanding of the availability of disparate impact claims under Section 504:

> When the Supreme Court assumed that a disparate impact theory could apply in an action under Section 504 in some situations, the situation it identified was a case in which persons with disabilities were denied meaningful access to a government program or benefit. That exclusionary situation may fairly be described as the primary target of Section 504. . . .
>
> [Plaintiff] points to no case law adopting the view that any government conduct that affects a group that includes a disproportionate number of persons with a disability (e.g., a group of Medicare recipients, or hospital patients, or retirement resort residents, etc.) must be free from any unpleasant effects, such as dollar impact, waiting time, or lack of quality, unless those effects are fundamental or necessary to the government's program. And it is precisely this type of effect—neither connected to any denial of access nor motivated by discriminatory intent—that *Alexander* treats as outside the scope of Section 504's target.

*Ruskai*, 775 F.3d 61, 78–79 (1st Cir. 2014) (internal citations omitted). Similarly, considering claims of inflated Hepatitis C drug pricing brought under the ACA's nondiscrimination provision

and Section 504, the Eastern District of Pennsylvania determined that "while obviously only patients with a Hepatitis C diagnosis would try to acquire these drugs in the first place, that type of obvious barrier is an example of the Supreme Court's concern in *Alexander v. Choate* about interpreting Section 504 so as to reach all claims of disparate impact discrimination." *Southeastern Pennsylvania Transp. Authority v. Gilead Sci., Inc.*, 102 F. Supp. 3d 688, 700 (E.D. Pa. 2015).

Here, the Court need not decide whether Plaintiffs may bring a disparate impact claim on the basis that their prescription medications for their disabilities are costly, because even assuming that standard applies, the Subscriber ACA Sub-Class has not plead facts sufficient to sustain a claim against ESI. To state a disparate impact claim, a plaintiff must allege "(1) the occurrence of certain outwardly neutral practices, and (2) a significantly adverse or disproportionate impact on persons of a particular type produced by the defendant's facially neutral acts or practices." *B.C.*, 837 F.3d at 158 (quoting *Tsombanidis v. W. Haven Fire Dep't*, 352 F.3d 565, 574–75 (2d Cir. 2003)). Plaintiffs argue that ESI's inflated pricing disproportionately impacts individuals with chronic conditions because drugs treating those conditions are likely to be subject to a higher co-insurance rate. SAC ¶ 456. However, with respect to John Doe One, the SAC does not state what co-insurance rate he paid for his HIV medication Atripla. Critically, the SAC also does not allege that Doe One's co-insurance rate was higher for Atripla than it was for other prescription drugs he may have needed for non-HIV related conditions. With respect to John Doe Two, the SAC clarifies that he paid a 20% co-insurance charge for his prescriptions of Truvada, Intelence, and Isentress. *Id.* ¶ 46. However, the SAC does not allege that John Doe Two's co-insurance rate for non-HIV related drugs was lower than 20%. Plaintiffs' allegations that pricing increases disproportionately affect Anthem

subscribers with HIV because of the high co-insurance rate for HIV drugs are further rebutted by the fact that subscribers who did not suffer from HIV had higher co-insurance rates than John Doe Two. *See id.* ¶ 64 (Farrell's co-insurance rate was between 30% and 100%); ¶ 73 (Shullich's co-insurance rate was between 25% and 50%).[48] Thus, Plaintiffs' allegations do not "state a claim for relief that is plausible on its face." *See Iqbal*, 556 U.S. at 678 (2009) (quoting *Twombly*, 550 U.S. at 555). Therefore, ESI's motion to dismiss Claim 17 of the SAC is granted.

## VIII.   STATE LAW CLAIMS

Plaintiffs assert that this Court has jurisdiction over its state law claims due to the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d). SAC ¶ 31. CAFA provides for original jurisdiction over civil class action suits where there is at least some diversity of citizenship between Plaintiffs and Defendants and where the matter in controversy exceeds $5 million. *Id.* A party seeking federal jurisdiction must show a "reasonable probability" that the aggregate amount-in-controversy exceeds $5 million. *Blockbuster, Inc. v. Galeno*, 472 F.3d 53, 58 (2d Cir. 2006).

Plaintiffs do not attempt to quantify their damages, nor do they assert that the damages they seek will be above $5,000,000. Furthermore, the remaining state law claims are brought only on behalf of the Non-ERISA Subscriber Sub-Class. Plaintiffs estimate that the Subscriber Class as a whole may have been "overcharged in excess of $1 billion." SAC ¶ 149. However, Plaintiffs also allege that the majority of Anthem's business is comprised of ASO plans, which are often funded by employers. *See id.* ¶ 3 (explaining ASO agreements); ¶ 10 (explaining that

---

[48] Plaintiffs do argue that the cost the Subscriber ACA Plaintiffs pay for their medications is higher than the cost paid by individuals who are not part of the Subscriber ACA Sub-Class. SAC ¶¶ 459–60 (comparing the costs Does One and Two pay for prescription drugs annually to costs paid by other Plaintiffs and the "average insured American"). But Plaintiffs' allegations of disparate impact are tied to the allegedly higher co-insurance rate for specialty medications. *See* SAC ¶¶ 455–56; Pl. Mem. at 78. Therefore, the Court does not find Plaintiffs' comparisons relevant to their theory of drug pricing discrimination under the ACA.

ASO plans account for over 60% of Anthem's business). Those plans are likely to fall within the ambit of ERISA, and therefore subscribers in ASO plans are unlikely to be members of the Non-ERISA Subscriber Sub-Class. In the Second Circuit, "the party asserting federal jurisdiction bears the burden of establishing jurisdiction." *Blockbuster*, 472 F.3d at 57. In this case, the burden is on Plaintiffs, and because they not have shown a "reasonable probability" that the aggregate claims of the Non-ERISA Subscriber Class are in excess of $5 million, the Court finds that, having dismissed the Plaintiffs' federal claims, it cannot exercise original jurisdiction over Plaintiffs' state law claims.

Plaintiffs also allege that this Court also has supplemental jurisdiction over its state law claims. Federal courts may exercise supplemental jurisdiction over state law claims "that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." SAC ¶ 31; 28 U.S.C. § 1367(a). Subsection (c) of § 1367 enumerates circumstances in which a district court "may decline to exercise supplemental jurisdiction over a claim under subsection (a)." 28 U.S.C. § 1367(c)(3). One such circumstance is where, as here, "the district court has dismissed all claims over which it has original jurisdiction." *Id.* at § 1367(c)(3).

Once a district court's discretion is triggered under § 1367(c)(3), it balances the traditional "values of judicial economy, convenience, fairness, and comity" in deciding whether to exercise jurisdiction. *Kolari v. New York-Presbyterian Hospital*, 455 F.3d 118, 122 (2d Cir. 2006) (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988)). The Supreme Court has noted that in a case where all federal claims are eliminated before trial, "the balance of factors . . . will point toward declining to exercise jurisdiction over the remaining state-law claims." *Id.* (quoting *Cohill*, 484 U.S. at 350 n.7). Accordingly, as Plaintiffs' federal claims

have all been dismissed, the Court declines to exercise jurisdiction over the remaining state law claims.

## IX. AMENDMENT

Plaintiffs request leave to amend the SAC in the event that the Court dismisses its claims against ESI and Anthem. Pl. Mem. at 79–80. ESI opposes this request on the basis that amendment would be futile, as the SAC is the fourth iteration of Plaintiffs' claims. ESI Mem. at 45. Anthem presumably also opposes this request; although it presents no argument as to why amendment should be denied, it seeks dismissal "with prejudice" of all of Plaintiffs' claims. Anthem Mem. at 44.

A court may deny leave to amend a complaint for "good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party." *Holmes v. Grubman*, 568 F.3d 329, 334 (2d Cir. 2009) (quoting *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007)). A court may deny a motion to amend on the basis of futility "only where no colorable grounds exist to support the proposed claim." *Allison v. Clos-ette Too, L.L.C.*, No. 14 Civ. 1618 (LAK) (JCF), 2015 WL 136102, at *2 (S.D.N.Y. Jan. 9, 2015). In *Loreley Financing (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, the Second Circuit reaffirmed that the "liberal spirit" of Federal Rule of Civil Procedure 15 embodies a "strong preference for resolving disputes on the merits." 797 F.3d 160, 190–91 (2d Cir. 2015) (quoting *Williams v. Citigroup Inc.*, 659 F.3d 208, 212–13 (2d Cir. 2011)). This is especially true, the Second Circuit explained, for a case involving "a complex commercial reality with a long, multi-prong complaint" that has not had "the benefit of a ruling" that highlights "the precise defects" of the complaint. *Id.*

Here, while Plaintiffs have already had opportunities to amend the original complaint, none were in the context of a motion to dismiss decision and the Court has therefore not yet

provided guidance as to how Plaintiffs' claims may be adequately made. Further, the unredacted PBM Agreement was only made available to Plaintiffs after it filed the SAC. *See* Pl. Mem. at 17. Therefore, because there is a possibility that the unredacted PBM Agreement provides Plaintiffs with newly available information that enables them to raise colorable claims based on the Court's guidance in this opinion, the SAC will be dismissed without prejudice.

## X.    CONCLUSION

Defendants' motions to dismiss are GRANTED without prejudice. The parties' requests for oral argument on the motions are DENIED AS MOOT. The Clerk of Court is respectfully directed to terminate the motions (Docs. 93, 96, 97, 100 and 112). The Plaintiffs shall file their Third Amended Complaint by January 26, 2018.

It is SO ORDERED.

Dated:    January 5, 2018
          New York, New York

Edgardo Ramos, U.S.D.J.